**ORAL ARGUMENT REQUESTED**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
             :
CARLOS TORRES, RUBEN MORA, and BOBBY :
IRIZARRY, on behalf of themselves and all others :
similarly situated,       :  No. 04 Civ. 3316 (RMB)
             :
    Plaintiffs,    :  Judge Richard M. Berman
             :
   v.        :
             :
GRISTEDE'S OPERATING CORP., NAMDOR, :
INC., GRISTEDE'S FOODS, INC., CITY :
PRODUCE OPERATING CORP., GRISTEDE'S :
FOODS NY, INC.,      :
             :
    Defendants.    :
             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## MEMORANDUM OF LAW IN SUPPORT OF GRISTEDE'S
## MOTION TO DISMISS AND TO STRIKE CLASS ALLEGATIONS


GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Attorneys for Defendants


August 4, 2004

TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ....................................................................................................... 4

A.  The Parties ........................................................................................................... 4

B.  Plaintiffs' Allegations Against Gristede's ........................................................... 4

C.  Torres, Mora, And Irizarry Were "Exempt" Managerial Employees ................. 5

1.  Co-Managers And Night Managers At Gristede's Are Supervisory Employees
With Significant Managerial Responsibility ................................................ 5

2.  Carlos Torres Was A Co-Manager In Charge Of More Than 20 Employees
And Earning $550 Per Week ......................................................................... 6

3.  Ruben Mora Was A Night Manager Supervising As Many As Eight Employees
And Earning $450 Per Week ......................................................................... 9

4.  Bobby Irizarry Was A Night Manager, Supervising Five Employees And
Earning $450 Per Week During His Four-Month Stint At Gristede's .......... 10

D.  Torres Abused His Authority And Violated Company Rules ............................. 11

E.  Torres Was Fired After An Internal Investigation Confirmed That He Sexually
Harassed Four Female Subordinates .................................................................. 12

F.  The New York State Department Of Labor Determined That Torres Was Fired
For Cause For Sexually Harassing Female Subordinates And, Therefore, Was
Not Entitled To Unemployment Benefits ........................................................... 14

G.  Mora Voluntarily Abandoned His Employment At Gristede's  Following Poor
Work Performance ............................................................................................. 14

H.  The New York State Department Of Labor Has Determined That Mora Quit
His Job At Gristede's "Without Cause" And, Therefore, Was Not Entitled To
Unemployment Benefits ..................................................................................... 15

J.  Irizarry Voluntarily Abandoned His Employment At Gristede's Following
Sporadic Attendance During His Four Months Of Employment ....................... 15

PROCEDURAL BACKGROUND .......................................................................................... 16

ARGUMENT .......................................................................................................................... 17

I.  PLAINTIFFS' CLAIMS SHOULD BE DISMISSED FOR FAILURE TO
STATE A CLAIM ............................................................................................... 17

A.   Torres, Mora, And Irizarry Were "Exempt" From Federal Overtime Wage
     Requirements Because They Were Managerial Employees Paid More Than
     $250 Per Week And Their Time Was Substantially Devoted To Supervisory
     Functions ................................................................................................................... 18

B.   Torres, Mora, And Irizarry Are Also "Bona Fide Executives" Under
     New York's Identical Labor Law ...................................................................................... 19

II.   PLAINTIFFS' CLASS ALLEGATIONS SHOULD BE STRICKEN BECAUSE
      TORRES, MORA, AND IRIZARRY ARE INADEQUATE AND
      UNSUPPORTABLE CLASS REPRESENTATIVES ......................................................... 20

III.  PLAINTIFFS' CLASS ALLEGATIONS SHOULD BE STRICKEN BECAUSE
      THE DETERMINATION OF WHETHER EACH PLAINTIFF IS AN "EXEMPT"
      MANAGER REQUIRES INDIVIDUALIZED CONSIDERATION AND, THUS, IS
      INAPPROPRIATE FOR CLASS TREATMENT ............................................................. 22

IV.   THIS COURT SHOULD ALSO DISMISS PLAINTIFFS' PENDING STATE LAW
      CLAIMS OR ELSE DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION
      OVER THEM ................................................................................................................. 23

CONCLUSION ............................................................................................................................. 25

# TABLE OF AUTHORITIES

Page(s)

## Cases

Baim & Blank, Inc. v. VIM Television & Appliance Stores, Inc., 139 F. Supp. 378
(S.D.N.Y. 1955) ................................................................................................................21
Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343 (1988)........................................................24
Castellano v. Bd. of Trustees, 937 F.2d 752 (2d Cir. 1991) .............................................23, 24
Dean v. Priceline.Com, Inc., No. 3:00 Civ. 1273, 2001 U.S. Dist. LEXIS 24982
(D. Conn. June 5, 2001) .................................................................................................3, 22
Donovan v. Burger King Corp., 675 F.2d 516 (2d Cir. 1982) .........................................17, 18
Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569 (S.D.N.Y. 2004) ................19
Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
903 F.2d 176 (2d Cir. 1990)..............................................................................................21
Henkin v. Forest Laboratories, Inc., No. 01 Civ. 4255, 2003 WL 749236
(S.D.N.Y. March 5, 2003), aff'd, 88 Fed. Appx. 478, No. 03-7512, 2004
WL 436006 (2d Cir. Mar. 9, 2004) ..................................................................................3, 23
Kline v. Wolf, 702 F.2d 400 (2d Cir. 1983)............................................................................21
Madrid v. Minolta Business Solutions, Inc., No. 02 Civ. 2294, 2002 U.S. Dist.
LEXIS 18539 (S.D.N.Y. Oct. 1, 2002) ............................................................................22, 23
Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216 (D. Conn. 2003) ............................3, 22
PFT of America, Inc. v. Tradewell, Inc., No. 98 Civ. 6413, 1999 WL 179358
(S.D.N.Y. March 31, 1999).................................................................................................20
Savino v. Computer Credit, Inc., 164 F.3d 81 (2d Cir. 1998).................................................21
Shafii v. PLC British Airways, 22 F.3d 59 (2d Cir. 1994).........................................................9

## Statutes

29 U.S.C. § 213 ........................................................................................................................17
29 U.S.C. § 216(b) ...................................................................................................................22
29 U.S.C. §§ 207 .....................................................................................................................17
29 U.S.C. §§ 211 .....................................................................................................................17
Fair Labor Standards Act, 29 U.S.C. §§ 206 et seq. .................................................................4
N.Y. Lab. Law § 650 et seq.....................................................................................................17
N.Y. Lab. Law § 740................................................................................................................23
N.Y. Labor Law art. 6, §§ 190 et. seq. .....................................................................................4
N.Y. Labor Law art. 6, §§ 650 et seq. ......................................................................................4

## Rules

Fed. R. Civ. P. 11(b)................................................................................................................20
Fed. R. Civ. P. 12(b)(6).............................................................................................................3
Fed. R. Civ. P. 23(a)(4) .........................................................................................................3, 4
Fed. R. Civ. P. 56 .....................................................................................................................3

## Regulations

29 C.F.R. § 541.1 .....................................................................................................................18

Fed. R. Evid. 801 ................................................................................................................................9

N.Y.Comp Codes R. & Regs. tit. 12, § 142-2.14 (2003) ...............................................................2, 19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                              :

CARLOS TORRES, RUBEN MORA, and
BOBBY IRIZARRY, on behalf of themselves
and all others similarly situated,

                      Plaintiffs,

       v.

GRISTEDE'S OPERATING CORP.,
NAMDOR, INC., GRISTEDE'S FOODS,
INC., CITY PRODUCE OPERATING
CORP., GRISTEDE'S FOODS NY, INC.,

                   Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

No. 04 Civ. 3316 (RMB)

Judge Richard M. Berman

## MEMORANDUM OF LAW IN SUPPORT OF GRISTEDE'S
## MOTION TO DISMISS AND TO STRIKE CLASS ALLEGATIONS

### PRELIMINARY STATEMENT

Defendants (collectively, "Gristede's") submit this memorandum of law in support of Gristede's motion to dismiss this action and to strike plaintiffs' class allegations seeking to represent Gristede's managerial employees as a class in connection with alleged federal and state overtime wage claims.

Plaintiffs' counsel has enlisted perhaps the worst candidates ever assembled to act as "class representatives" to bring this unlikely action seeking supposedly unpaid overtime wages: three disgruntled ex-Gristede's managerial employees who are exempt from overtime pay requirements under federal and state labor laws, one of whom (Carlos Torres) was terminated for sexually harassing as many as four female subordinates, one of whom (Ruben Mora) is now being investigated by the State Insurance Fund for fraud after abandoning his job and then applying for workers' compensation benefits even though he never claimed to have had any work-related injury at Gristede's, and one of whom (Bobby Irizarry) worked barely two months for Gristede's, during which time he often failed to appear for work and then quit in a tirade.

This complaint should be dismissed and plaintiffs' class allegations stricken for at least four separate reasons.

First, these plaintiffs were all Gristede's managers exempt from the overtime pay requirements of the Fair Labor Standards Act ("FLSA") and New York Labor Law because they each satisfied the statutory definition of a "bona fide executive." Under the FLSA, to be exempt from overtime requirements, employees such as these three who earn more than $250 per week need only satisfy a "short test" to be considered "exempt" managerial employees: "their 'primary duty' must be management, and they must regularly direct the work of two or more other employees." Donovan v. Burger King Corp., 675 F.2d 516, 518 (2d Cir. 1982) (quoting 29 C.F.R. § 541.1(f)). Plaintiff and former Gristede's Co-Manager Carlos Torres is an "exempt" employee who made a salary of $550 a week and supervised as many as 25 other employees. Similarly, plaintiff Ruben Mora, who is Torres's cousin, is likewise an exempt managerial employee, having earned a salary of $450 a week while working as a Night Manager and supervising as many as eight other employees. Plaintiff Bobby Irizarry is also an exempt employee, having earned a salary of $450 a week while working as a Night Manager and supervising as many as five other employees. Because of their high salary levels and supervisory roles, Torres, Mora and Irizarry also meet New York Labor Law's essentially identical "bona fide executive" standard. See N.Y.Comp Codes R. & Regs. tit. 12, § 142-2.14 (2003). On this basis alone, plaintiffs' claims must be dismissed with prejudice.

Second, these plaintiffs cannot possibly be considered adequate or suitable to represent the interests of a class, given their Gristede's employment histories and untrustworthy conduct. Plaintiff Torres was fired for cause for sexually harassing four his female subordinates. (Maldonado Dec. ¶¶ 15-20, Ex. 8 (Summary of Investigation); McCormick Dec. ¶¶ 17-19; Roman Dec. ¶¶ 18-20). Plaintiff Mora, Torres's cousin, stopped showing up for work as a Gristede's Night Manager after "being told [he] would not be transferred to another store" and was then fired for cause or, as the State Labor Department put it in denying his application for unemployment benefits, he "quit for no good cause." (Maldonado Dec. ¶ 28, Ex. 13 (New York State Department of Labor Determination); McCormick Dec. ¶ 26; Roman Dec. ¶ 27). Furthermore, after abandoning his job as a Night Manager at Gristede's, Mora filed a workers' compensation claim that the State Insurance Fund is now investigating for fraud

because he never claimed to have had any work-related injury before he left his employ at Gristede's. (See Maldonado Dec. ¶ 29, Ex. 14 (State Insurance Fund File); McCormick Dec. ¶ 27; Roman Dec. ¶ 28).  Plaintiff Irizarry only worked as a Gristede's Night Manager for barely two months before quitting in a rage.  Indeed, during his brief tenure at Gristede's, his Store Manager observed that Irizarry's "job performance was generally inconsistent, and he was frequently absent from work." (Peters Dec. ¶ 13).  Hence, these three plaintiffs are clearly inadequate and unsuitable class representatives.  Accordingly, even if their individual claims somehow now survived dismissal, their class allegations would have to be stricken in any event.

Third, these plaintiffs are not similarly situated to other putative class members, not only because of their own questionable employment histories, but also because the question of whether an employee is exempt from the requirements of the FLSA is necessarily a fact-intensive inquiry not suited for class treatment.  See Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216, 220 (D. Conn. 2003); Dean v. Priceline.Com, Inc., No. 3:00 Civ. 1273, 2001 U.S. Dist. LEXIS 24982, at *5-6 (D. Conn. June 5, 2001) (both denying plaintiff's motion to proceed as a collective action on claims arising under FLSA where issue of "whether an employee is exempt" as an administrative employee required an individualized and "fact-intensive" inquiry).  Here, plaintiffs seek to bring a collective and class action on behalf of a group of employees who they claim were mischaracterized as "exempt" employees.  Thus, the individual inquiries required for each potential class member here are not suitable for collective or class treatment.  This action should therefore be dismissed with prejudice on this basis as well.

Fourth, should this Court decide to dismiss plaintiffs' federal FLSA claims, it should also dismiss plaintiffs' remaining state law claims brought pursuant to the New York Labor Law or else decline to exercise supplemental jurisdiction over them.  If this Court now dismisses plaintiffs' federal claims, such considerations "weigh in favor of dismissing the state claims" as well.  Henkin v. Forest Laboratories, Inc., No. 01 Civ. 4255, 2003 WL 749236, at * 10 (S.D.N.Y. March 5, 2003), aff'd, 88 Fed. Appx. 478, No. 03-7512, 2004 WL 436006 (2d Cir. Mar. 9, 2004).

Accordingly, for the reasons explained here, Gristede's moves to dismiss this case and to strike class allegations, pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(f), 23(a)(4), and 56.

3

## STATEMENT OF FACTS

**A.      The Parties.**

Plaintiffs Carlos Torres, Ruben Mora, and Bobby Irizarry are former managerial employees at Gristede's.

Torres was a Co-Manager from October 2002 to February 2004.  (See Maldonado Dec. ¶¶ 9-19, Ex. 1 & 8 (Employment Application and Summary of Investigation); McCormick Dec. ¶¶ 10-17; Roman Dec. ¶¶ 10-20; Am. Compl. ¶ 13).

Mora, a cousin of Torres, "worked for Gristede's from approximately November 2002 through approximately January 2004."  See Maldonado Dec. ¶¶ 24-30, Ex. 11 & 12 (Mora's Employment Application and Check Register); McCormick Dec. ¶¶ 22-26; Roman Dec. ¶¶ 23-27; Am. Compl. ¶ 61).  Mora was hired as a clerk, but he was soon promoted to a Night Manager position.  (See Maldonado Dec., Ex. 11 & 12 (Mora's Employment Application and Check Register); McCormick Dec. ¶ 25; Roman Dec. ¶ 25).  Before being promoted, Mora was an hourly employee and received overtime compensation.  (See Maldonado Dec., Ex. 11 & 12 (Mora's Employment Application and Check Register at 1-2); McCormick Dec. ¶ 23; Roman Dec. ¶ 24).

Gristede's operates a chain of almost 50 grocery stores throughout the New York area.  (Lang Dec. ¶ 3; Maldonado Dec. ¶ 2; McCormick Dec. ¶ 3; Roman Dec. ¶ 3).

**B.      Plaintiffs' Allegations Against Gristede's.**

Torres, Mora, and Irizarry bring claims under the Fair Labor Standards Act, 29 U.S.C. §§ 206 et seq. and N.Y. Labor Law art. 6, §§ 190 et. seq. and art. 19, §§ 650 et seq.  Plaintiffs bring their FLSA claims "on behalf of themselves and all similarly situated persons who work or have worked for Gristede's as department managers, night managers, assistant managers, co-managers (or other similar job titles) and in other non-union positions, in Gristede's retail grocery stores, between April 30, 2001 and the filing of this Complaint (the 'FLSA Class')."  (Am. Compl. ¶ 20).  Plaintiffs also bring "New York Labor Law claims on behalf of themselves and a class of persons under Rule 23 of the Federal Rules of Civil Procedure consisting of all similarly situated persons who work or have worked for Gristede's as department managers, night managers, assistant manager, co-managers (or other similar

4

job titles) and in other non-union positions, in Gristede's retail grocery stores, between April 30, 1998 and the filing of this Complaint (the 'Rule 23 Class')."  (Am. Compl. ¶ 22).

**C.      Torres, Mora, And Irizarry Were "Exempt" Managerial Employees.**

Torres, Mora, and Irizarry each supervised at least two people during their tenure at Gristede's, and each made well in excess of $250 per week.

### 1.      Co-Managers And Night Managers At Gristede's Are Supervisory Employees With Significant Managerial Responsibility.

Gristede's operates a chain of almost 50 grocery stores throughout the New York area.  Because Gristede's stores typically require staffing 24 hours a day, 7 days a week, and are typically open to the public 17 hours or more each day, each store requires a large staff, with up to 50 employees.  (Lang Dec. ¶ 3; Maldonado Dec. ¶ 2; McCormick Dec. ¶ 3; Roman Dec. ¶ 3).  As a result, each store also typically requires a supervisory staff, including a Store Manager, a Co-Manager or Assistant Manager, and a Night Manager.  (Lang Dec. ¶ 3; Maldonado Dec. ¶ 2; McCormick Dec. ¶ 3; Roman Dec. ¶ 3).  Gristede's selects these supervisory employees based on their reliability and trustworthiness.  (Lang Dec. ¶ 3; Maldonado Dec. ¶ 2; McCormick Dec. ¶ 3; Roman Dec. ¶ 3).

Although the Co-Manager and Night Manager report to the Store Manager, they have independent supervisory authority.  In addition, because the Store Manager is typically in the store only 50 hours a week, the Co-Manager and the Night Manager are often the chief supervisory employees for the store the rest of the time.  (Lang Dec. ¶ 4; Maldonado Dec. ¶ 3; McCormick Dec. ¶ 4; Roman Dec. ¶ 4).

Co-Managers, as their title implies, are the second-highest ranking supervisory employees at the store, and typically supervise much of, if not the entire, employee staff.  Co-Managers typically meet with the Store Manager to consider what needs to be done in the store and to review any problems in the store.  (Lang Dec. ¶ 5; Maldonado Dec. ¶ 4; McCormick Dec. ¶ 5; Roman Dec. ¶ 5). In addition, Co-Managers often count the money in the safe, check staffing in a store's various departments, deal with customers, and handle employee problems.  Co-Managers are responsible for ensuring store safety, both for customers and staff.  Co-Managers enforce the rules of the store, and are

generally free from supervision during their shifts, typically making them the primary authority during their shifts. (Lang Dec. ¶ 5; Maldonado Dec. ¶ 4; McCormick Dec. ¶ 5; Roman Dec. ¶ 5).

Co-Managers have the authority to make recommendations for hiring, to recommend disciplinary action, to issue written warnings, and to train new clerks how to do such work as unloading trucks. (Lang Dec. ¶ 6; Maldonado Dec. ¶ 5; McCormick Dec. ¶ 6; Roman Dec. ¶ 6).

Night Managers have full responsibility for the store during their hours of work.  Night Managers supervise the entire night crew, which can include up to ten employees.  A Night Manager's primary job responsibility is to make sure that the night crew, which typically includes clerks, a porter, and a floor waxer, performs various tasks to prepare the store to be ready to open for operation to the public. (Lang Dec. ¶ 7; Maldonado Dec. ¶ 6; McCormick Dec. ¶ 7; Roman Dec. ¶ 7).  Among other supervisory tasks, Night Managers direct the order in which the night crew performs their work.  In essence, the individual store depends on the Night Manager to make sure that the store is ready for operation for the next business day. (Lang Dec. ¶ 7; Maldonado Dec. ¶ 6; McCormick Dec. ¶ 7; Roman Dec. ¶ 7).

Store Managers, Co-Managers, and Night Managers typically receive keys and alarm codes to their stores when they are hired and trained, because they are in charge of the store during the hours they work.  However, lower-level employees are not entrusted with such keys. (Lang Dec. ¶ 8; Maldonado Dec. ¶ 7; McCormick Dec. ¶ 8; Roman Dec. ¶ 8).

Generally speaking, Store Managers, Co-Managers, and Night Managers are the only employees who may execute an employee warning notice for disciplinary action against another employee. (Lang Dec. ¶ 9; Maldonado Dec. ¶ 8; McCormick Dec. ¶ 9; Roman Dec. ¶ 9).

### 2. <u>Carlos Torres Was A Co-Manager In Charge Of More Than 20 Employees And Earning $550 Per Week.</u>

Carlos Torres applied for a position at Gristede's that he described in his application in his own handwriting as an "ASST MANAGER." (<u>See</u> Maldonado Dec. ¶¶ 9-10, Ex. 1 (Torres's Employment Application); McCormick ¶ 10; Roman ¶ 10).  He also listed on his application, again in his own handwriting, that he previously had been employed as an "Asst Manager" at "Royal Farms" from 199[illegible] to 2001, where he had "Taken care [of] whole store," and at "Western Beef" from 2001

6

to 2002, where he had "Take[n] care [of] complete store." Gristede's then hired him as a "Co-Manager" in October 2002. (Maldonado Dec. ¶¶ 9-10, Ex. 1 (Torres's Employment Application); McCormick ¶ 10; Roman ¶ 10).

As Torres's Employment Application shows, Torres received the "full-time weekly pay" of $550 per week and also $18 per hour for work on Sundays. Torres's check register also shows that Torres was paid on a full-time weekly basis of at least $550 per week at a rate of $11 per hour and $18 per hour on Sundays. (Maldonado Dec. ¶ 11, Ex. 1 & 2 (Torres's Employment Application and Check Register); see also Am. Compl. ¶¶ 47, 48 (noting that Torres's "effective hourly rate was $11.00" "[d]uring his entire tenure at Gristede's" and that Torres also received "a $100.00 bonus for most" "pay periods.")). Torres was also compensated for absences attributed to illness, bereavement, and vacation. (See Maldonado Dec., Ex. 2 (Torres's Check Register at 4-5, 7, 9, 11-12)).

Torres began his employment at Gristede's by training for approximately one month at Store 16, located at 1526 Grand Concourse, Bronx, New York 10457. Store 16 is open to customers seven days per week between the hours of 7 am and 10 pm, and has up to 42 employees. (Maldonado Dec. ¶ 12; McCormick Dec. ¶ 12; Roman Dec. ¶ 12). Torres next worked for approximately two weeks at Store 560, located at 2109 Broadway, New York, New York 10023, to help prepare for the store's grand opening. Store 560 is open to customers 24 hours per day, seven days per week, and has up to 90 employees. (Maldonado Dec. ¶ 12; McCormick Dec. ¶ 12; Roman Dec. ¶ 12). After the grand opening at Store 560, Torres was assigned to Store 98, located at 202 East 96th Street, New York, New York 10128. Store 98 is open to customers from 7 am to 11 pm, seven days per week, and has up to 43 employees. (Maldonado Dec. ¶ 12; McCormick Dec. ¶ 12; Roman Dec. ¶ 12). After four weeks, Torres returned to Store 16 where he worked as Co-Manager from early 2003 until his termination for cause in February 2004. (Maldonado Dec. ¶ 12, Ex. 8 & 9 (Summary of Investigation; New York State Department of Labor Determinations); McCormick Dec. ¶ 12; Roman Dec. ¶ 12).

### a.    Torres Supervised As Many As 25 Employees.

As Angelo Mendoza, Torres's former Store Manager at Gristede's Store 16 in the Bronx, New York, explains, "With respect to supervising employees and directing their work, Torres had the same authority as I did. As a Co-Manager, he had the right to oversee the work of 20 to 25 employees

regardless of whether I was in the store." (Mendoza Dec. ¶ 12). Among other supervisory tasks,

Torres "supervised store bookkeepers and cashiers on a daily basis"; "supervised and trained clerks to

do their work efficiently"; "had authority to recommend people for hiring, promotion, suspension or

termination"; "had authority to handle employee and customer complaints"; "ordered stock for the

store"; "monitored product orders and the amount spent on such orders"; and, like Mendoza, Torres

"had keys to the store." (Mendoza Dec. ¶ 12; Lozada Dec. ¶ 3; Trofel Dec. ¶ 4).

Further, numerous written statements by other Gristede's employees, both current and former,

collected before this litigation commenced as part of Gristede's investigation of the sexual harassment

charges against Torres, make clear that his primary duty was management. (See Maldonado Dec., Ex.

4 & 10 (Gristede's Employee Statements and 06/21/04 Unemployment Hearing Tr. at 53-56);

McCormick Dec. ¶ 21; Mendoza Dec. ¶¶ 11-14; Roman Dec. ¶ 22).[1]

---

[1] There is no real dispute that Torres supervised many other Gristede's employees. Indeed, the sworn statements of Torres at the Unemployment Hearing make this crystal clear. Moreover, the handwritten statement of Gristede's employees collected as part of the investigation of sexual harassment charges against Torres also show the supervisory role he played at Gristede's. For example, Lisandra Alicea, a cashier, asked Torres "the price of a case of Corona's" and he "told [her] the price." (Maldonado Dec., Ex. 4) (Statement of Lisandra Alicea, Employee at Store 16 (Jan. 27, 2004)). Cecilia Trofel, a bookkeeper, reported: "Carlos said no bookeeper [sic] should let a cashier pay when she is short that is not allowed in the company." (Id.). (Statement of Cecilia Trofel, Employee at Store 16 (June 3, 2003)). Zoila Lozada, a cashier who was a victim of Torres's sexual misconduct stated that one night Torres reacted poorly to the fact that she was talking to a male Gristede's employee, ordering her to "take out [her] register and go home with [the male employee]." She further described what happened: "I took out my register and Carlos started counting it. I told Carlos that I left my pen in my register and that I was going to go get it and to please watch my till. Suddenly he told me that I was $20 short and I told him that it couldn't be." (Id.). (Statement of Zoila Lozada, Employee at Store 16 (Jan. 29, 2004). Lozada stated that "5 minutes before [she] was leaving, Carlos told [her] that [she]was never $20 short and that he was just playing. That day [she] was really upset and [she] believe[d] that him [sic] as a manager cannot be playing with money like that." (Id.).

Torres also reported employees for insubordination: "Store manager 'Carlos' came to security officer and made a complaint about one of his employee [sic] 'Matthew' who work [sic] in the deli. Carlos stated to me that he ask Matthew to perform [sic] a deli procedure and he was met with resistance by Matthew." (Maldonado Dec., Ex. 7) (Red Apple Companies Department of Security Services Case/Incident Report (Jan. 16, 2004)). On another occasion a physical fight broke out between Torres and Larry Avery, an employee who worked overnight: "Ast. Mang. went outside before he locked the store doors to explain what should be done on the overnight in regards to store's appearance. The overnight floor guy miss-understood [sic] what the ast. mgr. told him, and [Footnote continued on next page]

Further, as a store Co-Manager, Torres had the authority to issue written disciplinary warnings to employees. (Maldonado Dec. ¶ 13, Ex. 3 (Employee Warning Notices)).  Moreover, as a Co-Manager, Torres was also responsible for signing bank deposit slips for the store.  (Lang Dec. ¶ 11; Maldonado Dec. ¶ 14; Roman Dec. ¶ 14).

### 3.    Ruben Mora Was A Night Manager Supervising As Many As Eight Employees And Earning $450 Per Week.

Ruben Mora, who was referred to Gristede's by his "COUSIN CARLOS TORRES" applied in his own handwriting for "ANY" "Full-time" position.  Gristede's then hired him as a "stock" clerk in November 2002.  (Maldonado Dec. ¶ 24, Ex. 11 (Mora's Employment Application); McCormick Dec. ¶ 22; Roman Dec. ¶ 23).

As Mora's Employment Application shows, Mora received the "part-time hourly rate" of $6.50 per hour.  As Mora's check register also shows, Mora received the hourly wage of $6.50 when he was hired as a stock clerk.  Mora was promoted to Night Manager in January 2003, and, upon receiving that position, received the salary of $450 per week and $15 per hour for work on Sundays.  Mora's check register reflects Mora's starting wage and his raise upon being promoted to Night Manager to $450 per week at a rate of $9 per hour and $15 per hour on Sunday.  (Maldonado Dec. ¶ 25, Ex. 12 (Mora's Check Register); McCormick Dec. ¶ 23; Roman Dec. ¶ 24).  As a salaried employee, Mora was also compensated for absences attributed to illness and personal leave.  (See Maldonado Dec., Ex. 12 (Mora's Check Register at 3-6, 8, 10).

Mora began his employment at Gristede's as a stock clerk at Store 562, located at 307 West 26th Street, New York, New York 10001 in November 2002.  (Maldonado Dec. ¶ 26; McCormick

---

[Footnote continued from previous page]
argument [sic] eruptted [sic] outside the front of the store." (Maldonado Dec., Ex. 7) (Red Apple Companies Department of Security Services Case/Incident Report (undated)).  (All emphases added).

These statements are not hearsay, because they are not offered for the truth of the matters asserted therein, but rather to show that Torres exercised discretion and supervisory authority at Store 16.  See Fed. R. Evid. 801.  Further, these statements are relevant to prove a fact determinative of the outcome in this case.  Such statements are admissible if they "are not offered for the truth of the matter asserted but for the fact that they occurred."  See Shafii v. PLC British Airways, 22 F.3d 59, 65 (2d Cir. 1994) (reversing the district court's ruling that statements were inadmissible hearsay).

Dec. ¶ 24; Roman Dec. ¶ 25). Store 562 is open to customers seven days per week between the hours of 6 am to 12 am, and has up to 90 employees. (Maldonado Dec. ¶ 26; McCormick Dec. ¶ 24; Roman Dec. ¶ 25). Mora worked at Store 562 for approximately two months before transferring as a Night Manager to Store 561, located at 80 West End Avenue, New York, New York 10023, to work as a Night Manager. Store 561 is open to customers seven days per week between the hours of 6 am to midnight, and has up to 59 employees. Mora worked at Store 561 from approximately February 2003 to approximately October 2003, and supervised up to eight employees. (Fama Dec. ¶¶ 12-14; Maldonado Dec. ¶ 26; McCormick Dec. ¶ 24; Ramos Dec. ¶¶ 4-6; Roman Dec. ¶ 25).

Mora then transferred to Store 413, located at 1365 Third Avenue, New York, New York 10021. Store 413 is open to customers seven days per week between the hours of 6 am and 12 am and has up to 29 employees. Mora had continuous problems with attendance and alienated his night crew, which consisted of up to five employees. (Maldonado Dec. ¶ 27; McCormick Dec. ¶ 25; Roman Dec. ¶ 26).

As a Night Manager, Mora consistently supervised at least three and as many as eight employees. His primary job responsibility was to make sure that his night crew, which included clerks, a porter, and a floor waxer, performed various tasks to prepare the store for the next business day. (Fama Dec. ¶ 14). Tony Fama depended on Mora as a Night Manager to ensure that the store was ready for operation the next business day. (Fama Dec. ¶ 14). Unfortunately, Mora was often late or absent from work and, thus, Fama could not always depend on him. (See Fama Dec. ¶ 12).

**4.**      **Bobby Irizarry Was A Night Manager, Supervising Five Employees And Earning $450 Per Week During His Four-Month Stint At Gristede's.**

Bobby Irizarry applied for a position at Gristede's that he described in his own handwriting as "MANAGER." (Maldonado Dec. ¶ 31, Ex. 15 (Irizarry's Employment Application); McCormick Dec. ¶ 29; Roman Dec. ¶ 30). He also advised Gristede's on his application, again in his own handwriting to "PLEASE SURVEY RESUME." That typed resume indicates that Irizarry, a 1988 graduate of Temple University, has held a number of positions with supervisory roles, including working as a "Foreman/Supervisor" from 1985 to 1995 at "Jalor Color Process" and as a "Shipping and Receiving Manager/Visual Merchandising Manager" from 1999 to 2001 at Staples. Gristede's then hired Irizarry

in November 2003 as a "Night Crew Chief" or "Overnight Manager." (Maldonado Dec. ¶ 31 , Ex. 15 (Irizarry's Employment Application); McCormick Dec. ¶ 29; Roman Dec. ¶ 30).

As Irizarry's Employment Application shows, Irizarry received the "full-time weekly pay" of $450 per week and also $15 per hour for work on Sundays. Irizarry's check register also shows that Torres was paid on a full-time weekly basis of at least $450 at a rate of $9 per hour and $15 per hour on Sundays. (Maldonado Dec.¶ 32, Ex. 16 (Irizarry's Check Register)).

As Night Manager, Irizarry had full responsibility for the store during his hours of work. (Peters Dec. ¶ 12). He trained employees on the overnight crew to do their jobs. Irizarry consistently supervised approximately five employees. (Id.). His primary job responsibility was to make sure his night crew, which included clerks, a porter, and a floor waxer, performed the various tasks needed to prepare the store for the next business day. (Id.). Irizarry had authority to recommend members of his crew for promotion. (Id.). Peters also depended on Irizarry to make sure that the store was ready for operation the next business day. (Id.). As with Mora, any decision Irizarry made to help his crew with their work was within his discretion. (Id.).

## D.    Torres Abused His Authority And Violated Company Rules.

If business in the store was slow, Torres could ask employees if they wanted to go home. However, he was not supposed to make the employees go home if they were unwilling. (Mendoza Dec. ¶ 14). As Angelo Mendoza, Torres's former Store Manager, swears, "It is my understanding that Torres did send employees home even though this was not permitted by Gristede's collective bargaining agreement with local unions." (Mendoza Dec. ¶ 14).

Torres also often had problems with the employees he supervised while he worked in Store 16. (Maldonado Dec. ¶ 17, Ex. 7 (Case Incident Reports); Mendoza Dec. ¶ 15). For example, on at least one occasion, he and a deli clerk engaged in a heated verbal argument and both raised their voices at each other in the store in front of patrons. (Maldonado Dec. ¶ 17, Ex. 7 (Case Incident Reports); Mendoza Dec. ¶ 15). On another occasion, Torres became involved in a near-physical altercation with a night porter. (Maldonado Dec. ¶ 17, Ex. 7 (Case Incident Reports)). As Mendoza concluded, "In my opinion, Torres had a tendency to pick fights with the employees he supervised." (Mendoza Dec. ¶ 15).

**E.**   **Torres Was Fired After An Internal Investigation Confirmed That He Sexually Harassed Four Female Subordinates.**

In December 2003, Annette Roman, a member of Gristede's Human Resources Department, began to receive complaints that Torres was sexually harassing women at Store 16. A total of four female employees, who worked under Torres's supervision at Store 16, reported such inappropriate conduct by Torres to Ms. Roman. (Lozada Dec. ¶ 10; Maldonado Dec. ¶ 15, Ex. 8 (Summary of Investigation); McCormick Dec. ¶ 14; Roman Dec. ¶ 15). In turn, Ms. Roman, reported these allegations to her supervisors, Jack Squicciarini, Vice President of Corporate Security, and Galo Balseca, Vice President of Operations. Maldonado Dec. ¶ 15; McCormick Dec. ¶ 14; Roman Dec. ¶ 15). Subsequently, Torres was suspended from his employment for three weeks without pay on February 3, 2004, pending an internal investigation of the sexual harassment charges brought against him by the four female employees under his supervision. (Maldonado Dec. ¶¶ 15-16, Ex. 5; McCormick Dec. ¶¶ 14-15; Roman Dec. ¶¶ 15-16). The investigation was conducted by Michael McCormick, a Human Resources Specialist, Ms. Roman, and Gristede's Deputy General Counsel, Rosalyn Maldonado. During the investigation, Mr. McCormick, Ms. Roman, and Ms. Maldonado interviewed witnesses including the Store Manager of Store 16 (Angelo Mendoza), a bookkeeper there, stock clerks there, a store security guard, and the four women who made the accusations against Torres. (Maldonado Dec. ¶ 15; McCormick Dec. ¶ 14; Roman Dec. ¶ 15).

Michael McCormick signed the report suspending Torres "pending [the] sexual harassment investigation." (Maldonado Dec. ¶ 16; McCormick Dec. ¶ 15; Roman Dec. ¶ 16).

One of Torres's victims was Zoila Lozada, a cashier at Store 16 who was supervised by Torres. (Lozada Dec. ¶ 3). As she swears, "On more than one occasion, Torres made unsolicited sexual advances towards me during work hours. This conduct made me very uncomfortable." (Lozada Dec. ¶ 4). On another occasion, "Torres actually entered the women's restroom and cornered me outside a bathroom stall inside the women's bathroom." After telling Lozada "how much he liked [her]" and saying "he would like for [the two of them] to go out on a date," Torres "grabbed" Lozada "and held [her] by the arms roughly and tried to kiss [her]." Lozada, terrified, could smell alcohol on Torres's breath, and "told him that someone was coming so that he would let go of me." (Lozada Dec. ¶ 5). On

another occasion, Torres tried to kiss Lozada "while [she] was working in an aisle of the store putting back merchandise that customers had moved." (Lozada Dec. ¶ 6).

Torres's harassment of Lozada did not end there. "Torres also used his position of authority in the store to further humiliate [her]." As a Co-Manager, Torres counted the cash in each cashier's register to make sure there were no shortages. (Lozada Dec. ¶ 8). One night, when a man approached Lozada to speak to her, Torres ordered her to cash out, and when Torres counted Lozada's money, "He suddenly told me that I was $20 short and I told him that was not possible. I was upset . . . . Shortly thereafter, before I was about to leave, [Torres] admitted that he was just playing a joke on me. I was upset because I did not think a manager should be joking with me like that." (Id.). Moreover, Lozada "was fearful that his actions were some form of retaliation against me because I rejected his disgusting and unsolicited sexual advances." (Id.).

Torres's sexual harassment was not the first time that Torres behaved badly while at Gristede's. Indeed, on three separate occasions, Torres was involved in verbal and/or physical altercations with subordinate employees, in direct violation of the Company's Policies and Procedures that Torres acknowledged and signed upon his hiring. (Maldonado Dec. ¶ 17, Ex. 7 (Case Incident Reports); McCormick Dec. ¶ 16; Roman Dec. ¶ 17).

Mr. McCormick, Ms. Roman, and Ms. Maldonado met with Torres on February 19, 2004, to inform him of the allegations against him. (Maldonado Dec. ¶ 18, Ex. 8 (Summary of Investigation); McCormick Dec. ¶ 17; Roman Dec. ¶ 18). Torres was provided with copies of the women's statements and a summary of the investigation. (Maldonado Dec. ¶ 18, Ex. 4 & 8 (Handwritten Statements & Summary of Investigation); McCormick Dec. ¶ 17; Roman Dec. ¶ 17). Torres read the statements and the summary and pushed the papers back at Mr. McCormick, Ms. Roman, and Ms. Maldonado. (Maldonado Dec. ¶ 18; McCormick Dec. ¶ 17; Roman Dec. ¶ 18). He refused to sign the summary of the investigation. On the basis of that investigation, Gristede's, having found these sexual harassment charges against Torres credible and substantiated, concluded that Torres should be terminated "[d]ue to the severity of the complaints and the sheer number of complaints" and that Torres "appears to not only have problems with female employees but also with male employees and customers." (Maldonado Dec. ¶ 18, Ex. 8 (Summary of Investigation); McCormick Dec. ¶ 17; Roman Dec. ¶ 18). On the same

day, Torres was terminated from his employment at Gristede's. (Maldonado Dec. ¶ 18, Ex. 8 (Summary of Investigation); McCormick Dec. ¶ 17; Roman Dec. ¶ 18).

**F.     The New York State Department Of Labor Determined That Torres Was Fired For Cause For Sexually Harassing Female Subordinates And, Therefore, Was Not Entitled To Unemployment Benefits.**

Despite being fired because of his shameful and egregious sexual harassment of the very women he supervised, Torres nevertheless had the audacity to seek unemployment benefits from the New York State Department of Labor. (Maldonado Dec. ¶¶ 21-22, Ex. 9 (New York State Department of Labor's Determinations); McCormick Dec. ¶ 19; Roman Dec. ¶ 20).

On March 30, 2004, after Gristede's provided, at the Department of Labor's insistence, specific information showing that Torres "sexually harassed two female workers under his supervision," the New York State Department of Labor determined that Torres was discharged for cause because he "violated the company's rules regarding inappropriate conduct" and, therefore, Torres was not entitled to unemployment benefits. (Maldonado Dec. ¶ 22, Ex. 9 (New York State Department of Labor's Determinations); McCormick Dec. ¶ 20; Roman Dec. ¶ 21). It was only after that March 30 determination that Torres consulted counsel and filed this action. (Maldonado Dec. ¶ 22, Ex. 10 (06/07/04 Unemployment Hearing Tr. at 15-16); McCormick Dec. ¶ 20; Roman Dec. ¶ 21). Torres is now appealing that March 30 determination before New York State Unemployment Insurance Appeal Board Administrative Law Judge Rebecca Davis. (Maldonado Dec. ¶ 22, Ex. 9 (New York State Department of Labor's Determinations); McCormick Dec. ¶ 20; Roman Dec. ¶ 21). Indeed, Torres's testimony before ALJ Davis further underscores the supervisory role he played at Gristede's. He admitted during this hearing that he supervised employees, specifically bookkeepers, at Store 16. He also testified that he "wrote up" employees for rules violations, a function well within the scope of his authority as a Co-Manager. Torres also admitted to counting cash in each cashier's register. (Maldonado Dec. ¶ 23, Ex. 10 (06/021/04 Unemployment Hearing Tr. at 53-56)).

**G.     Mora Voluntarily Abandoned His Employment At Gristede's Following Poor Work Performance.**

Soon after transferring to Store 413, Mora alienated his staff and demanded a transfer to another store. As the New York State Department of Labor found, Mora "stopped reporting to work

14

after being told [he] would not be transferred to another store." Mora abandoned his job on or about January 6, 2004, and he was officially terminated by Gristede's on January 16, 2004. (Maldonado Dec. ¶ 28, Ex. 13 (New York State Department of Labor Determination regarding Mora); McCormick Dec. ¶ 26; Roman Dec. ¶ 27).

**H.    The New York State Department Of Labor Has Determined That Mora Quit His Job At Gristede's "Without Cause" And, Therefore, Was Not Entitled To Unemployment Benefits.**

The New York State Department of Labor found Mora "quit without good cause." It therefore denied his application for unemployment benefits. (Maldonado Dec., Ex. 13 (New York State Department of Labor Determination regarding Mora); McCormick Dec. ¶ 26; Roman Dec. ¶ 27).

During his entire tenure, Mora never complained to Gristede's of any work-related injury. Incredibly, however, after he left Gristede's employ, Mora then filed a workers' compensation claim. The State Insurance Fund has found that claim to be meritless. (Maldonado Dec. ¶¶ 29-30, Ex. 14 (Gristede's File Relating to Mora's Workers' Compensation Claim); Roman Dec. ¶ 28). Indeed, investigators with the State Insurance Fund have confirmed to Gristede's as recently as July 27, 2004, that the State Insurance Fund is conducting an investigation to determine if Mora's workers compensation claim is fraudulent. (Maldonado Dec. ¶¶ 29-30, Ex. 14 (Gristede's File Relating to Mora's Workers' Compensation Claim); Roman Dec. ¶ 29).

**J.    Irizarry Voluntarily Abandoned His Employment At Gristede's Following Sporadic Attendance During His Four Months Of Employment.**

Irizarry's brief employment at Gristede's as a Night Manager was confined solely to Store 562, located at 307 West 26th Street, New York, New York 10001. (Maldonado Dec. ¶ 33, Ex. 15 (Irizarry's Employment Application; Peters Dec. ¶ 10). Store 562 is open to customers seven days a week from 6 am to 12 pm. As his check register reflects, Irizarry worked at Gristede's for barely two months. (Maldonado Dec. ¶ 33, Ex. 16 (Irizarry's Check Register); McCormick Dec. ¶ 31; Peters Dec. ¶ 10; Roman Dec. ¶ 32). Further, his attendance for that period was inconsistent and he eventually abandoned his job. (Maldonado Dec. ¶ 33; McCormick Dec. ¶ 31; Peters Dec. ¶ 13; Roman Dec. ¶ 32). Despite quitting his job without cause, Irizarry subsequently came to Gristede's main office in a rage, demanding his check and yelling profanities, in direct violation of the Company's Policies and

Procedures that Irizarry acknowledged and signed upon his hiring. (Maldonado Dec. ¶ 33; Roman Dec. ¶ 32).

## PROCEDURAL BACKGROUND

Plaintiffs' counsel has already brought to the Court's attention that there is some past history between that law firm and Gristede's. Three years ago, that same firm sued Gristede's, A&P and Duane Reade as alleged "joint employers" of the delivery workers of two independent contract delivery services that underpaid their own workers. In that case, Outten & Golden was joined by the New York State Attorney General's Office at the National Employment Law Project in claiming that each of these major retail chains should bear legal responsibility for minimum wage violations involving delivery workers whom these retail chains did not actually employ on a "joint employee" liability theory because the retail chains benefited from these workers' services. Ultimately, all three major retail chains, including Gristede's, settled those claims.

Here, in contrast, Outten & Golden stand alone, and nevertheless plow ahead with a second, wholly different case that never should have been brought.

First, Outten & Golden offered as its sole proposed plaintiff and class representative Carlos Torres, fired by Gristede's for sexually harassing female subordinates. Our counsel told Outten & Golden of Mr. Torres's sordid history and meritless case before this filing, but Outten & Golden nevertheless chose originally to bring this action with Mr. Torres as its sole plaintiff.

When our counsel then informed Outten & Golden of our intention to move to dismiss, that firm scrambled to find additional plaintiffs and was left with only Ruben Mora and Bobby Irizarry, each similarly unsuitable to act as a class representative here, both because each was an "exempt" manager who had no viable overtime wage claim and because each suffered from other infirmities (Mora, as the target of a State Insurance Department fraud investigation, and Irizarry, as the erratic, often absent gadfly who quit in a rage after barely two months on the job).

Plaintiffs' counsel nevertheless then filed an Amended Complaint as of right adding Mora and Irizarry as party plaintiffs. The Amended Complaint alleges overtime wage violations apply to all three plaintiffs and others "similarly situated" under both federal and state law. (Am. Compl. ¶¶ 6-8).

The only other claim in that pleading is a state law retaliation claim on behalf of plaintiff Mora that the parties stipulated to withdraw last month. Of note, the amended pleading effectively admits that each of these plaintiffs was paid by Gristede's at levels well above the minimum threshold for "exempt" managers under the FLSA and New York's Labor Law. (Am. Compl. ¶¶ 47-49, 57, 68, 75, 79, 90).

Gristede's then wrote to the Court requesting a pre-motion conference in anticipation of moving to dismiss and to strike these class allegations. At that conference, the Court cautioned plaintiffs' counsel that if they chose to proceed with these class representations, they would have to make their case through these three plaintiffs. Now, plaintiffs counsel will have to live with the consequences of that decision because these three plaintiffs are simply unfit to be class representatives and have no viable wage claims.

Hence, Gristede's has now had to make this motion to dismiss plaintiffs' action and, in any event, to strike these class allegations.

## ARGUMENT

### I.
### PLAINTIFFS' CLAIMS SHOULD BE DISMISSED
### FOR FAILURE TO STATE A CLAIM

Plaintiffs allege that they "were not compensated at all for some of the time that they worked in excess of forty hours in the work week." (Am. Compl. ¶ 4). Each of these plaintiffs, however, was "exempt" from such overtime compensation requirements as a "bona fide executive" employee under both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and the New York Minimum Wage Act ("NYWMA"), N.Y. Lab. Law § 650 et seq.[2]

"Bona fide executives" are exempted from the overtime pay and record-keeping requirements of 29 U.S.C. §§ 207, 211 (c). See 29 U.S.C. § 213 (a)(1); see also Donovan v. Burger King Corp., 675 F.2d 516, 517, 521-22 (2d Cir. 1982) (holding that assistant managers, who earned $250 or more per week and were often solely in charge of their restaurants, were bona fide executives). The Secretary of Labor has promulgated a regulation which defines in greater detail who is considered a "bona fide

---

[2] The complaint conspicuously omits those specific provisions of New York Labor Law which purportedly support plaintiffs' allegations against Gristede's.

executive." 29 C.F.R. § 541.1.  Employees who earn less than $250 per week must satisfy the "long

test":  "their 'primary duty' must be management;" "they must regularly direct the work of two or more

employees; they must have 'authority to hire and fire' or have their personnel recommendations

accorded 'particular weight'"; "they must regularly exercise 'discretionary powers'; they must not

devote more than 40% of their workweek to activities 'not directly and closely related' to

management." Donovan, 675 F.2d at 517-18 (quoting 29 C.F.R. § 541.1 (a)-(e)).  In contrast,

employees who earn more than $250 per week need only satisfy a "short test":  "their 'primary duty'

must be management, and they must regularly direct the work of two or more other employees." Id. at

518 (quoting 29 C.F.R. § 541.1(f)).

        Moreover, work that is "directly and closely related" to "the performance of the duties involved

in such managerial and supervisory functions or responsibilities" is "exempt" work.  29 C.F.R. §

541.108(a).  Examples of "directly and closely related" work include "distribution of materials or

merchandise and supplies," "setup work," and spot checks of "the work of" "subordinates to determine

whether they are performing their duties properly." Id. § 541.108(c)-(e).

**A.     Torres, Mora, And Irizarry Were "Exempt" From Federal Overtime Wage
        Requirements Because They Were Managerial Employees
        Paid More Than $250 Per Week And Their Time
        <u>Was Substantially Devoted To Supervisory Functions.</u>**

        First, in determining whether Torres, Mora, and Irizarry were exempt "bona fide executives,"

this Court need only find that they qualify under the FLSA's "short test" because they each earned well

over $250 per week.  Indeed, Torres earned a base full-time salary of at least $550 per week as a store

Co-Manager, and Mora and Irizarry earned a base full-time salary of at least $450 per week as store

Night Managers. (Maldonado Dec. ¶ 11, Ex. 1 & 2 (Torres's Employment Application and Check

Register); McCormick Dec. ¶ 10; Roman Dec. ¶ 10; see also Am. Compl. ¶¶ 47-48; Maldonado ¶ 25,

Ex. 12 (Mora's Check Register);  McCormick Dec. ¶ 23; Roman Dec. ¶ 24; Maldonado ¶ 31, Ex. 15

(Irizarry's Employment Application); McCormick Dec. ¶ 29; Roman Dec. ¶ 30)**.**

Moreover, their "primary duty" clearly was "management" of "two or more other employees" in that they performed "supervisory functions" or work "directly or closely related" to such functions.[3] 29 C.F.R. §§ 541.1(f) and .108(a).  Indeed, Torres supervised up to 25 employees as a store Co-Manager, Mora supervised up to 8 employees as a store Night Manager, and Irizarry supervised up to 5 employees as a store Night Manager. (Fama Dec. ¶ 14; Peters Dec. ¶ 12).  And there can be no doubt from plaintiffs' employment records, their own admissions, and the sworn statements of both those whom they supervised and those who supervised them that they were managerial employees who directed the activities of those under their supervision.  Accordingly, this is a straightforward case under the FLSA "short test":  These three plaintiffs were clearly "bona fide executives" "exempt" from the FLSA's overtime wage requirements.

**B.      Torres, Mora, And Irizarry Are Also "Bona Fide Executives"**
**Under New York's Identical Labor Law.**

Plaintiffs are also not entitled to overtime compensation under the applicable provisions of the New York Labor Law, which likewise exempts from its protection "bona fide executives."  New York has adopted the same exemptions found in the FLSA.  See N.Y. Comp. Codes R. & Regs. tit. 12, §§ 142-2.2, 142-2.14; see also Galasso v. Eisman, Zucker, Klein & Ruttenberg, 310 F. Supp. 2d 569, 575 (S.D.N.Y. 2004) (dismissing plaintiff's FLSA and state labor claims on summary judgment and noting that tests under both statutes exempting "learned professionals" are identical).[4]  For the reasons

---

[3]  The plaintiffs claim that "in some cases, for 80% or more of their work time, [the plaintiffs] have worked as cashiers, worked in the dairy department, built displays, stocked shelves, unpacked boxes, stacked merchandise, cleaned stores, unloaded trucks, taken out garbage, helped to prepare stores for grand openings, and performed other non-managerial duties." (Am. Compl. ¶ 3). However, even if performed as alleged, such tasks would have been directly and closely related to the plaintiffs' managerial functions at these grocery stores in supervising crews of workers and helping them to perform such tasks.

[4]  Under New York's Department of Labor regulations, a "bona fide executive" is an individual

(a) whose primary duty consists of the management of the enterprise in which such individual is employed or of a customarily recognized department or subdivision thereof; (b) who customarily and regularly directs the work of two or more other employees therein; (c) who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advancement and promotion or any other change of status of other employees will be given particular
[Footnote continued on next page]

previously explained, each of these plaintiffs' "primary duty" at Gristede's consisted of "management" in "regularly direct[ing] the work of two or more employees" at salary levels well in excess of the minimum qualifying levels under New York Law. See N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14. Hence, for these same reasons, plaintiffs' state claims should also now be dismissed with prejudice.

**II.**

## PLAINTIFFS' CLASS ALLEGATIONS SHOULD BE STRICKEN BECAUSE TORRES, MORA, AND IRIZARRY ARE INADEQUATE AND UNSUPPORTABLE CLASS REPRESENTATIVES

Plaintiffs' counsel now seeks to bring an action on behalf of a putative class that is rife with individualized questions of fact and law. Plaintiffs' allegations regarding Gristede's are merely speculative and were not "'formed after an inquiry reasonable under the circumstances.'" PFT of America, Inc. v. Tradewell, Inc., No. 98 Civ. 6413, 1999 WL 179358, at *2 (S.D.N.Y. March 31, 1999) (granting defendants' motion to strike plaintiffs' class allegations) (quoting Fed. R. Civ. P. 11(b)). Indeed, plaintiffs' counsel rushed into Court with these class allegations based only on the "say so" of plaintiff Torres, who plaintiffs' counsel knew at the time was fired by Gristede's for sexually harassing female subordinates, and now plaintiffs' counsel is scrambling to salvage their defective class action by amending this pleading to add two other plaintiffs of equally unsavory backgrounds, one of whom (Ruben Mora) is Torres's cousin and is now being investigated for fraud by the State Insurance Fund for making a false workers' compensation claim, and the other of whom (Bobby Irizary) was barely with Gristede's for two months when he quit in a profane rage after chronic absenteeism. In short, plaintiffs' counsel's class allegations based on these three putative class representatives are clearly insufficient and should be stricken.

---

[Footnote continued from previous page]
     weight; (d) who customarily and regularly exercise discretionary powers; and (e) who is paid for his services a salary of not less than: $318.75 per week on and after April 1, 1991; $386.25 per week on and after March 31, 2000 inclusive of board, lodging, other allowances and facilities.

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.14.

With respect to all three plaintiffs (and each of those whom they seek to represent), it has already become apparent that the issue of whether these individuals are "bona fide executives" under parallel federal and state laws will dominate the litigation. Although "the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) (finding no abuse of discretion by the district court in refusing to certify a class) (internal citations omitted); accord Baim & Blank, Inc. v. VIM Television & Appliance Stores, Inc., 139 F. Supp. 378, 379 (S.D.N.Y. 1955) (granting motion to strike portion of complaint because it did "not appear [that suit was] a proper class action or that representation by the plaintiff [would] insure adequate representation of the alleged class"). Moreover, "[r]egardless of whether the issue is framed in terms of the typicality of the representative's claims or the adequacy of its representation, there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it." Gary Plastic Packaging Corp., 903 F.2d at 180 (citations omitted).

These plaintiffs cannot sustain such a cause of action on each of their own behalf, let alone fairly and adequately represent the interests of a putative class. They have proven therefore to be untrustworthy in every way. "To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998) (holding that district court did not abuse its discretion in denying class certification where named plaintiff repeatedly changed positions as to whether he had received a letter and, thus, raised serious concerns about his credibility) (citing Kline v. Wolf, 702 F.2d 400, 402-03 (2d Cir. 1983)).

Therefore, this claim brought on behalf of a putative "Rule 23" class should be dismissed with prejudice.

**III.**
## PLAINTIFFS' CLASS ALLEGATIONS SHOULD BE STRICKEN BECAUSE THE DETERMINATION OF WHETHER EACH PLAINTIFF IS AN "EXEMPT" MANAGER REQUIRES INDIVIDUALIZED CONSIDERATION AND, THUS, IS INAPPROPRIATE FOR CLASS TREATMENT

Plaintiffs fail to meet the critical threshold requirement that they be "similarly situated" to those individuals whose interests they seek to represent. Section 216(b) only permits a collective action under the FLSA to be maintained by "one or more employees for and in [sic] behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b) (emphasis added). See also Madrid v. Minolta Business Solutions, Inc., No. 02 Civ. 2294, 2002 U.S. Dist. LEXIS 18539, at *2-*3 (S.D.N.Y. Oct. 1, 2002) ("To warrant the exercise of the court's discretion [to permit notice to potential plaintiffs], it is incumbent upon the plaintiffs to demonstrate that the potential members in the collective action are similarly situated."). Incredibly, plaintiffs suggest that they are similarly situated to other managers at Gristede's. (Am. Compl. ¶¶ 20-21, 99). Nothing could be further from the truth, given the numerous allegations of misconduct and sexual harassment that female employees have lodged against plaintiff Torres, the job abandonment and fraudulent workers' compensation scheme of his cousin, Mora, and the erratic attendance and temper of Irizarry.

Furthermore, courts have repeatedly held that the determination of whether plaintiffs are exempt from the overtime and record-keeping requirements of the FLSA is one requiring individualized consideration. See, e.g., Mike v. Safeco Ins. Co. of Am., 274 F. Supp. 2d 216, 220 (D. Conn. 2003); Dean v. Priceline.Com, Inc., No. 3:00 Civ. 1273, 2001 U.S. Dist. LEXIS 24982, at *5-6 (D. Conn. June 5, 2001) (both denying plaintiff's motion to proceed as a collective action on claims arising under FLSA where issue of whether plaintiff was an "exempt" administrative employee required individualized inquiry). "Determining whether an employee is exempt is extremely individual and fact-intensive, requiring a detailed analysis of the time spent performing [exempt] duties and a careful factual analysis of the full range of the employee's job duties and responsibilities." Mike, 274 F. Supp. 2d at 220 (internal citations omitted). Thus, the nature of these claims, which involve personalized scrutiny of each individual's status as a "bona fide executive," "necessarily precludes proceeding on a collective basis." Id. at 221.

The Amended Complaint here alleges as a "Classwide Factual Allegation" that Gristede's engaged in a "pattern, practice, and/or policy of violating the FLSA," including "willfully failing to record all of the time that its employees, including Plaintiffs and the Class Members, have worked for the benefit of Defendants" and "willfully failing to pay its employees, including Plaintiffs and the Class Members, a premium for hours that they worked in excess of 40 hours per week." (Am. Compl. ¶ 35). Despite this boilerplate language concerning a "pattern, practice, and/or policy of violating the FLSA," such allegations on behalf of these three plaintiffs and other similarly situated individuals are precisely the kind of allegations that require individualized scrutiny. See Madrid, 2002 U.S. Dist. LEXIS 18539, at *7 (plaintiff's "bald assertions that technicians were not appropriately compensated for overtime performed, that time sheets were inaccurate, and that these same payroll practices were utilized nationwide merits little weight."). Therefore, for this reason as well, these class allegations seeking to proceed by consolidated FLSA action and on behalf of a putative class should be stricken.

## IV.
## THIS COURT SHOULD ALSO DISMISS PLAINTIFFS' PENDING STATE LAW CLAIMS OR ELSE DECLINE TO EXERCISE SUPPLEMENTAL JURISDICTION OVER THEM

If this Court dismisses plaintiffs' federal FLSA claims, it should also dismiss their pending state law claims or decline to exercise supplemental jurisdiction over them. Pursuant to 28 U.S.C. § 1367 (c)(3), a "district court may decline to exercise supplemental jurisdiction if the district court has dismissed all claims over which it has original jurisdiction." Henkin v. Forest Labs., Inc., No. 01 Civ. 4255, 2003 WL 749236, at * 10 (S.D.N.Y. March 5, 2003) (declining to exercise supplemental jurisdiction over plaintiff's retaliation claim under N.Y. Lab. Law § 740), aff'd, 88 Fed. Appx. 478, No. 03-7512, 2004 WL 436006 (2d Cir. Mar. 9, 2004). "Once the federal claims in a case have been dismissed, the court, in its discretion, should consider whether the considerations of judicial economy, convenience, and fairness to litigants require that supplemental jurisdiction to be exercised." Id. (citing Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir. 1991)). If this Court now dismisses

plaintiffs' federal claims, such considerations "weigh in favor of dismissing the state claims" here as well.  Id.[5]

---

[5] See also Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . judicial economy, convenience, fairness, and comity . . .will point toward declining to exercise jurisdiction over the remaining state-law claims."); Castellano, 937 F.2d at 758 ("If the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.").

## **CONCLUSION**

For all of the foregoing reasons, this Court should now dismiss this Amended Complaint with prejudice and, in any event, strike these plaintiffs' class allegations.

Dated:      New York, New York
            August 4, 2004


GIBSON, DUNN & CRUTCHER LLP

By:_____
       Randy M. Mastro

200 Park Avenue
47th Floor
New York, New York 10166-0193

Telephone: (212) 351-4000
Facsimile: (212) 351-4035

Attorneys for Defendants
Gristede's Operating Corp., Namdor, Inc.,
Gristede's Foods, Inc., City Produce Operating
Corp., and Gristede's Foods NY, Inc.

80300967_10.DOC