UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CARLOS TORRES, RUBEN MORA, BOBBY ) CASE NO. 04 CV 3316
IRIZARRY, LEWIS CHEWNING, GILBERTO ) (PAC) (AJP)
SANTIAGO, WILLIAM HELWIG, ROBERT )
MISURACA, JOSEPH CREMA, MARIO )
DIPRETA, VICTOR PHELPS, JOSELITO )
AROCHO, ALFRED CROKER, DANIEL )
SALEGNA, FRANK DELEON, and ROBERT )
PASTORINO, on behalf of themselves and all )
others similarly situated, )

                     Plaintiffs, )

                         Vs. ) EXPERT REPORT OF

GRISTEDE'S OPERATING CORP., NAMDOR, ) MARK BERKMAN, Ph.D.
INC., GRISTEDE'S FOODS, INC.; CITY )
PRODUCE OPERATING CORP.; GRISTEDE'S )
FOODS NY, INC., JAMES MONOS, and GALO )
BALSECA, )

                   Defendants. )

1   **QUALIFICATIONS**

2   1.      I am a vice president of CRA International (CRA), an economic and management
3   consulting firm. Prior to joining CRA in 2002, I was a vice president of NERA Consulting from
4   1991 to 2002. From 1983 through 1991, I held progressively more senior positions at NERA.
5   Prior to joining NERA in 1983, I was a research fellow at the University of Pennsylvania from
6   1980 to 1983 and a budget and policy analyst at the Congressional Budget Office from 1977 to
7   1980. I earned a bachelors degree in urban affairs and economics from George Washington
8   University, a master's degree in planning and policy analysis from Harvard University, and a
9   PhD in public policy from the Graduate Group in applied economics and management at the
10  University of Pennsylvania's Wharton School. My resume is attached as Appendix A to this
11  report.

12  2.      During the course of my career, I have conducted numerous labor studies involving the
13  analysis of large databases. I have, for example, conducted or co-conducted seven disparity
14  studies for local and county governments regarding statistical evidence of discrimination in
15  contracting. I have also studied discrimination claims regarding pay, promotion, and termination
16  for a variety of clients including several corporations, government agencies, and the NAACP. I
17  have testified regarding my findings before both state and federal courts.

18  3.      Several CRA staff members including Benjamin Risk and Jonathan Terhorst assisted me
19  in conducting my analysis. Dr. Daniel Hamermesh, a professor of economics at the University
20  of Texas and a CRA senior consultant, also provided assistance. CRA charges $490 per hour for
21  my services. CRA staff members, working under my direct supervision, are billed at their normal
22  and customary rates, ranging from $100 to $180 per hour.

23  **PURPOSE AND SUMMARY OF CONCLUSIONS**

24  4.      I have been asked by the respective counsel for all the defendants named in this
25  proceeding to review data from Gristede's time management system, referred to as Novatime,
26  and Gristede's payroll system, referred to as ABRA, with respect to claims made by the named
27  plaintiffs who seek certification as class representatives regarding alleged violations of the Fair

2

1  Labor Standards Act and New York State law by Gristede's and the other defendants. In
2  response to this request I have:

3        a.  Studied Gristede's time management and payroll processes that lead to the
4             creation of the data maintained in Gristede's Novatime and ABRA systems.

5        b.  Examined whether, as alleged, edits to Gristede's timesheets and payroll
6             records have resulted in reduced hours and reduced pay for the regular
7             working week to the named plaintiffs and other Gristede's employees in co-
8             manager and department manager positions.

9        c.  Examined whether, as alleged, Gristede's management has edited time sheets
10           in order to reduce pay for additional hours for co-managers and department
11           managers.[1]

12       d.  Examined whether, as alleged, there is evidence from Gristede's time
13           management and payroll data that the plaintiff co-managers and other co-
14           managers were frequently paid for less than 50 hours per week and that
15           plaintiff department managers and other department managers were frequently
16           paid for less than 40 hours per week.

17       e.  Examined whether, as alleged, the named plaintiffs are similarly situated with
18           other Gristede's employees with the same job titles.

19       f.  Examined whether, as alleged, there is evidence that the named plaintiffs and
20           other employees who have the same respective job titles have experienced
21           common treatment with respect to timesheet/payroll edits and compensation.

22       g.  Critically reviewed the methodology and conclusions in the report filed on
23           behalf of plaintiffs by Dr. Stephen A. Schneider.

24  5.    In brief, I have concluded that:

---

[1] Throughout this report, I use "additional hours" to mean hours beyond the 40 hours that occur in a normal workweek for department managers, or 50 hours in the case of co-managers.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

a.  There is no empirical evidence that management edited the plaintiff co-
managers and department managers in a manner that resulted in reduced hours
and compensation. Indeed, the data shows that the named plaintiffs benefited
from edits to their time sheets. Editing resulted in a net gains for individual
employees that ranged from 1% to 4,016% in total credited hours over what
the plaintiffs would have received had management performed no editing.
This is also true for the other co managers and department managers who are
not named as plaintiffs .

b.  There is no evidence that the plaintiff department managers' time sheets were
edited in order to reduce pay for additional hours. Reductions in additional
hours are associated with corrections for missed punches. This also is true for
the other department managers who are not named as plaintiffs..

c.  There is no empirical evidence that Gristede's co-managers and department
managers have been systematically paid for less than 50 hours or 40 hours per
week, respectively. To the contrary, there are more instances where the
plaintiff co-managers and department managers were paid for in more than 50
or 40 hours per week. This also is the case for the other co-managers and
department managers.. Twenty percent of co-manager paychecks were for less
than 50 hours while 26% were for greater than 50 hours. Six percent of
department manager paychecks were for less than 40 hours while 18% were
for greater than 40 hours.

d.  The named plaintiffs do not appear to be similarly situated with other co-
managers and department managers For example, 4 of the 8 named plaintiff
co-managers worked at Gristede's for less than 1 year; another worked for just
over 1 year. In contrast, 60 percent of Gristede's co-managers have been with
company for more than one year, and 15 percent have been there for 5 years
or more. All, but two of the plaintiffs are former employees. In addition, co-

4

1  managers are not unionized, but department managers are. Consequently, they
2  are not similarly situated.

3      e.  Variation in the frequency of edits, the reason for edits and the consequence of
4          edits varies considerably among the named plaintiffs as well as among all
5          other co-managers and department managers. Each employee's records would
6          have to be examined to determine whether any observed edits or failures to
7          pay a full 50 or 40 hour week was unwarranted.

8      f.  Dr. Schneider's analyses on behalf of plaintiffs regarding edits, additional
9          time, and full work-week pay are seriously flawed and, when corrected,
10         contradict his conclusions. In addition, he does not consider whether the
11         named plaintiffs are similarly situated to the purported class, nor does he
12         consider whether the plaintiffs or purported class members share common
13         impacts from Gristede's alleged practices. By his own admission, he simply
14         "tabulated figures at plaintiff counsel's request."[2]

15 **DOCUMENTS RELIED ON**

16 6.  In the course of my analyses I have considered various documents including:

17     a.  Third Amended Class Action Complaint;

18     b.  Plaintiff's Memorandum of Law in Support Of Motion for Class Certification
19         and Collective Action Notice;

20     c.  Depositions of fact witnesses;

21     d.  Report of Stephen Schneider on behalf of plaintiffs;

22     e.  Deposition of Stephen Schneider;

23     f.  Declarations of several named plaintiffs.

---

[2] Deposition of Steven Schneider.

5

7. In addition, I have analyzed Novatime and ABRA data provided to me by counsel to Gristede's, Thomas Mawn of Automated Time Concepts, Inc., and by Dr. Schneider through discovery.

## BACKGROUND

8. The named plaintiffs include one current and seven former Gristede's co-managers and one current and five former Gristede's department managers.[3]

9. A report prepared by Dr. Steven Schneider at the request of plaintiff's counsel has been offered in support of plaintiff's claims. He concluded that co-managers received "a significant number of weekly paychecks for less than 50 compensable hours." Similarly, he concluded that department managers received "a significant number of paychecks for less than 40 compensable hours." He also concluded that edits to department managers' time sheets by Gristede's management resulted in "significant" losses in compensable hours and additional hours. In addition, he concluded that all of these practices were widespread across employees, stores and work weeks.

10. As a first step in analyzing the Gristede's time management and payroll data, I investigated how these data were assembled. I found that the Novatime system captures employee time card punches at every store. Each employee is required to punch four times a day: at the beginning and end of his or her shift and at the beginning and end of his or her lunch hour. The Novatime data is reviewed by store managers for accuracy. If a worker misses any one of these punches, Novatime will credit a number of hours that is different from the number of hours he or she actually worked. Accordingly, store managers can make manual corrections to Novatime punch data. These credited hours are exported to the ABRA payroll system.

---

[3] The named co-managers are: Lewis A. Chewning, Alfred L. Crocker, Frank DeLeon, William F. Helwig, Bobby Irizarry, Ruben D. Mora, Gilberto Santiago, and Carlos A. Torres. The named department managers are: Joseph Crema, Mario Dipreta, Robert Misuraca, Robert Pastorino, Victor Phelps, and Daniel J. Salegna.

1 **PLAINTIFFS' CLAIMS ARE NOT SUPPORTED BY EMPIRICAL EVIDENCE**

2 **Impact of Management Edits**

3 11.    Plaintiff's allegation regarding the negative impact of management edits to timesheets
4 and payroll on department manager compensation are not clearly supported by the empirical
5 evidence. To investigate this claim, I compared the overall hours credited to each employee with
6 the number of hours they would have been paid for if no editing had taken place. My findings
7 run contrary to those of Dr. Schneider: I found that editing took place to correct for missing
8 punches, and that employees gained on balance from the edits.

9 12.    As shown in Table 1, all of the named plaintiffs frequently failed to punch in or out.
10 Robert Pastorino, for example, punched in completely (four punches: at the beginning and end of
11 the shift and in and out for lunch) only once during the 440 days reviewed. Mario Dipreta
12 punched in completely only twice in 285 days reviewed. Missing punches requires Gristede's
13 management to edit department manager time sheets. Failing to punch at lunch for example, will
14 show up in the Novatime system as an extra hour worked. Consequently, Gristede's store
15 managers may find it necessary to edit timesheets to correct for this. Gristede's store managers
16 may also find it necessary to edit timesheets to increase hours. If a department manager fails to
17 punch out at the end of his or her shift – an action that as shown in Table 1 occurs with some
18 frequency given the days of no punches and less than four punches – then the Novatime system
19 fails to record that day's hours. An edit is necessary to credit the department manager for the
20 day. Table 2A presents the number of days with positive or negative edits for the named plaintiff
21 department managers specifically and the other department managers in aggregate. This table
22 shows that both positive and negative edits are frequent – not surprising in view of the number of
23 missed punches shown in Table 1. Table 2B shows the frequency of positive and negative edits
24 by week. I also examined how many of the edits coincided with missed punches and found that
25 edits to daily hours coincided with missed punches in the great majority of instances. Edits

7

coincides with missed punches 99% of the time for co-managers and 91% of the time for department managers.[4]

13.    Table 3 presents the consequences of these edits measured by the net number of hours added or subtracted from the plaintiff department managers over the entire period for which we have data.[5] able 3 clearly shows that edits to the named department manager plaintiffs' time sheets have resulted in more hours than would have been the case without edits. Edits have resulted in from a one percent to a 26 percent increase over originally punched hours. The same is true for all other department managers. Edits to this group have resulted in a 12 percent increase in hours.

## Editing of Additional Hours

14.    With respect to the claim that additional hours were frequently edited down, it appears that this occurred because of missed lunch punches. I investigated the relationship between edits to additional hours and missed lunch punches using econometric techniques. First, I defined a missed lunch punch when a worker punches only twice in a day and Novatime calculates greater than 7.5 hours between these two punches. Thus, a missed lunch constitutes two missed punches during a shift. I calculated the additional hours that would have been credited had no edits been made as the number of hours worked above 40 according to the unedited punch data, excluding Sundays.[6] I restricted my analysis to weeks in which editing resulted in a net reduction in additional hours. I found that there was a statistically significant one to one correspondence between the missed lunch punches and the reduction in additional hours.[7]

---

[4] The correlation is not perfect for a few reasons. In some instances, an employee may miss multiple lunch punches in a week, but the manager will edit the employee's hours for just a single day. Alternatively, a manager may edit an employee's hours on a day with four punches because the manager observed improper punching, such as the worker punching in but not beginning work until half an hour later.

[5] Novatime data covers the period February 2000 through April 2005.

[6] Unless otherwise noted, throughout my analysis I have excluded data on punches and compensation on Sundays, since they are not considered part of the normal workweek by Gristede's.

[7] I used a commonly apply econometric technique referred to as a probit model to test whether there was a statistically significant relationship between missed lunch punches and reduced additional hours. The probit model measures the likelihood of the reduction in hours as a function of missed lunch punches. The model indicated that

**Paychecks for Less Than a Full Workweek**

15.     With respect to the claim that department and co-managers received a significant number of weekly paychecks for less than 40 or 50 hours, respectively, these occurrences were negligible in terms of total hours worked. I examined paychecks for co-managers and department managers from June 1999 to April 2005. I eliminated paychecks that covered pay periods within two weeks of a hire date and paychecks that covered pay periods in which a worker was terminated. I also eliminated employees who worked at Gristede's for four weeks or fewer.

16.     As shown in Table 4, for three of the seven named co-managers, the number of weeks for which they were paid for less than 50 hours represents 3 percent or fewer of the weeks they have worked at Gristedes.[8] One of these plaintiffs – William F. Helwig – was never paid for less than 50 hours. Two of the remaining four worked at Gristedes for 10 weeks or less. A closer look at the data reveals that many of the instances where the named co-managers were paid for less than 50 hours were in 10 hour increments. Approximately 24 percent of the weeks paid for less than a full week are for multiples of a work day. The data also show that co-managers were often paid for more than a full week. For example, Gilberto Santiago was paid for less than 50 hours in 8 of 233 weeks, but he was also paid for more than 50 hours in 27 of 233 weeks. Frank Deleon was paid for less than 50 hours in 9 of 103 weeks reviewed, but he was also paid for more than 50 hours. Thus, I see no systematic effort by management to pay the named co-managers for less than 50 hours. In order to establish the reasons for any full day pay reductions, the specific circumstances would have to be reviewed.

17.     Among all co-managers other than the named plaintiffs, the number of weeks where one or more manager was paid for less than 50 hours represents about 20 percent of all co-manager weeks reviewed. At the same time, the number of weeks that these managers were paid for more

the relationship is one to one at the 95 percent confidence level. For a description of the probit model see for example, R. Pindyck and D. Rubinfeld, *Econometric Models and Economic Forecasts*, Second Edition, McGraw Hill.

[8] The eighth co-manager Lewis Chewning worked for only 19 days. There are no electronic payroll data for him.

9

1  than a fifty hour week represents 26 percent of all co-manager weeks. Evaluating the basis for
2  these payments in both directions would require a case-by-case review.

3  18.     For each department manager workweek with a paycheck for less than 40 hours, I
4  calculated hypothetical lost hours by summing difference between 40 hours and compensated
5  hours for each paycheck that had less than 40 compensated hours recorded. Had all paychecks
6  for less than 40 hours been increased to exactly 40 hours, excluding paychecks that were below
7  40 hours by a multiple of a full work day, I found that department managers would have received
8  a total of 6,145 additional compensated hours—roughly 0.5% of the total 1.3 million hours
9  worked during the period in question. Similarly, I found that co-managers would have received
10 an additional 16,695 compensated hours had their paychecks for less than 50 hours been
11 increased to 50 hours, again excluding paychecks that were below 50 hours by a multiple of a
12 full workday. Compared with the 680,000 hours worked during the period in question, this
13 represents roughly two percent.[9]

14 19.     Table 4 also provides information regarding the named department managers. As shown,
15 the number of weeks where these managers were paid for less than 40 hours represents a small
16 share of total weeks worked. With the exception of Robert Misuraca and Daniel Salegna, all of
17 the named department managers were paid for less than 40 hours per week in only 3 percent of
18 the work weeks or less. These named department managers were also paid in excess of 40 hours
19 more often than they were paid for less than 40 hours. Although Mr. Misuraca was paid for less
20 than 40 hours in 12 percent of the work weeks, he was also paid for more than 40 hours 11
21 percent of the work weeks. Mr. Salegna was paid for less than 40 hours in 6 percent of the time,
22 but for over 40 hours 53 percent of the time. Similar to co-managers, in a substantial share of the
23 weeks where these department managers were paid for less than 40 hours, a full day's pay was
24 eliminated, which suggests that either a day without pay was taken or a worker's pay was

---

[9] By calculating compensated hours that would have occurred but for edits made by Gristede's management, I am merely demonstrating that the quantities involved are minimal in nature. I am not concluding that these employees are owed additional compensation by Gristede's. Because there are many explanations for why an employee could have been compensated for less than a full workweek, a case-by-case review would be required to accurately calculate total correct hours for each member of the class.

10

reduced in an amount for an entire day. Evaluating the basis for these reductions requires case specific review.

20.     Among the other department managers, pay for less than 40 hours occurred on average 6 percent of the time. In contrast, pay for more than 40 hours occurred 18 percent of the time. Again, in a large fraction of the instances where compensation was for less than 40 hours, the reduction was a full day's pay, suggesting either an unpaid day or that a full day's pay was reduced. Evaluating the basis for these requires a case specific inquiry.

## THE ALLEGED PRACTICES OF GRISTEDE'S AND THE OTHER DEFENDANTS DO NOT HAVE A COMMON IMPACT ON THE NAMED PLAINTIFFS OR ON OTHER CO-MANAGERS AND DEPARTMENT MANAGERS

21.     There is considerable variation in the time punch practices of individual employees and variation in the way managers can elect to edit for missed punches. Moreover, there is no means to evaluate statistically validate the basis for all edits. As a result, employees timesheet punches and edits must be reviewed on a case by case basis.

22.     As discussed above, there is no systematic explanation for the observed instances of compensation for less than 40 or 50 hours. Evaluating these instances requires a case-by-case review. While employees may be compensated for less than a full week in some instances, they may also be compensated for more than a full week in other instances. The frequency of paychecks for greater than a full week occurs more often than for less than a full week (See Table 4).There is simply no common impact of Gristede's practices on either co-managers or department managers.

## CRITICAL REVIEW OF THE REPORT OF STEPHEN SCHNEIDER

23.     Dr. Schneider, at the request of plaintiff's counsel, measured the frequency and scope of co-manager paychecks for less than 50 compensable hours and department manager paychecks for less than 40 compensable hours and Gristede's changes to time records that under compensate department managers. As noted in paragraph 9, he concluded that co-managers received a "significant number of paychecks for less than 50 compensable hours" and that

11

1 "department managers received a significant number of paychecks for less than 40 compensable
2 hours." He also concluded that edits to department managers' time sheets by Gristede's
3 management resulted in "significant" losses in compensable hours and additional hours. In
4 addition, he concluded that all of these practices were widespread across employees, stores and
5 work weeks.

6 24.   Dr. Schneider did not, however, conduct any analyses of Gristede's data to study
7 whether his observations indicated that Gristede's was improperly editing timesheets or paying
8 employees for less than they actually worked. As he admitted in deposition, he simply compiled
9 data at the request of plaintiff's counsel.

10 25.   Although Dr. Schneider notes in a footnote at the beginning of his report that his use of
11 the word significant does not mean significant on a statistical basis, by failing to repeat this
12 qualification when he states his conclusions his report leaves the impression that each of his
13 conclusions are statistically significant when in fact he never performed the necessary statistical
14 testing.

15 26.   By failing to carefully analyze the data, Dr. Schneider's report leaves the false impression
16 that Gristede's management has purposefully reduced co-manager and department manager pay.

17 **The Empirical Evidence Does Not Support Dr. Schneider's Conclusion That Management Edits**
18 **Resulted in Widespread Lost Hours**

19 27.   Dr. Schneider's conclusion regarding the impact of management edits is in error because
20 he failed to account for all relevant edits. For example, in the event of a missed in- or out-punch,
21 Novatime does not credit the employee for any time worked for the day. Gristede's management
22 responds by adding one or more full workdays worth of time manually to the employee's
23 timecard. This action is a form of edit and should have been considered by Dr. Schneider. When
24 I reproduced his analysis changing only the data needed to account for these excluded edits, his
25 findings are substantially altered: there were 10,359 weeks with net positive edits for department
26 managers with a mean of 2.4 hours, and there were 8,870 weeks with net negative edits, with a
27 mean of .6 hours. These findings differ substantially compared to Dr. Schneider's original

12

findings of 3,831 weeks (mean of 1.1 hours) for positive edits and 13,671 weeks (mean of 3.4 hours) for mean negative edits. In the words of his analysis, my revisions show that Gristede's added 4.5 hours for every one hour it subtracted—that is, the 24,862 overall hours of positive edits is 4.5 times as large as the 5,499 overall hours of negative edits. This finding is depicted in Figure 1.

28.    I also found several errors in Dr. Schneider's data, which are summarized in Table 5. Correcting for these errors as well as including the edits he ignored, I found the average positive edit for department managers was 13.9 hours, and the average negative edit was -3.9 hours, as shown in Table 3. For co-managers the average positive edit was 31.7, while the average negative edit was -2.5.  Positive edits greatly outweigh negative edits. Overall edits added a net 89,000 hours for department managers.  This directly contradicts Dr. Schneider's conclusion that "department managers lost a significant number of compensable hours from changes to their time records by Gristede's management."

**The Empirical Evidence Does Not Support Dr. Schneider's Conclusion That Department and Co-Managers Were Significantly Affected by Paychecks for Less Than a Full Workweek**

29.    In addition to leaving a false impression regarding edits to time worked, Dr. Schneider also wrongly concludes that department and co-managers received a "significant" number of paychecks for less than 40 or 50 hours, respectively, resulting in docked pay. Once again, Dr. Schneider performs no statistical testing to support this conclusion. In fact, for department managers, the fraction of paychecks for more than 40 hours is actually larger than the fraction for paychecks below 40 hours. As discussed above, accounting for weeks below and above a full workweek shows that employees were compensated for more than a full workweek on average over the time period covered by Novatime.

13

1

2

3

4

*Mark C. Berkman*

Mark Berkman                                                    October 11, 2005

Oakland, California

14

Table 1. Days in Time Record Database and Missed Punches.

| Employee | Total Days in Time Record Database [1] | Days with Four Punches [2] | % [3] | Days with Less Than Four Punches [4] | % [5] | Days with No Punches [6] | % [7] | Days with One Punch [8] | % [9] | Days with Two Punches [10] | % [11] | Days with Three Punches [12] | % [13] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CHEWNING, LEWIS A | 17 | - | 0% | 17 | 100% | 1 | 6% | 4 | 24% | 12 | 71% | 0 | 0% |
| CROKER, ALFRED L | 57 | - | 2% | 56 | 98% | 1 | 2% | 5 | 9% | 49 | 86% | 1 | 2% |
| DELEON, FRANK | 370 | 5 | 1% | 365 | 99% | 105 | 28% | 56 | 15% | 204 | 55% | 0 | 0% |
| HELWIG, WILLIAM F | 11 | - | 0% | 11 | 100% | 5 | 45% | 5 | 45% | 1 | 9% | 0 | 0% |
| IRIZARRY, BOBBY | 22 | - | 0% | 22 | 100% | 12 | 55% | 10 | 45% | 0 | 0% | 0 | 0% |
| MORA, RUBEN D | 237 | 1 | 0% | 236 | 100% | 166 | 70% | 12 | 5% | 57 | 24% | 1 | 0% |
| SANTIAGO, GILBERTO | 510 | - | 0% | 510 | 100% | 489 | 96% | 10 | 2% | 11 | 2% | 0 | 0% |
| TORRES, CARLOS A | 255 | - | 0% | 255 | 100% | 213 | 84% | 23 | 9% | 19 | 7% | 0 | 0% |
| ALL OTHER CO-MANAGERS | 45,313 | 1,106 | 2% | 44,207 | 98% | 14,064 | 31% | 6,364 | 14% | 23,452 | 52% | 327 | 1% |
| CREMA, JOSEPH | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| DIPRETA, MARIO | 285 | 2 | 1% | 283 | 99% | 2 | 1% | 71 | 25% | 210 | 74% | 0 | 0% |
| MISURACA, ROBERT | 863 | 72 | 8% | 791 | 92% | 5 | 1% | 230 | 27% | 546 | 63% | 10 | 1% |
| PASTORINO, ROBERT | 440 | 1 | 0% | 439 | 100% | 54 | 12% | 79 | 18% | 303 | 69% | 3 | 1% |
| PHELPS, VICTOR | 1,080 | 671 | 62% | 409 | 38% | 13 | 1% | 23 | 2% | 349 | 32% | 24 | 2% |
| SALEGNA, DANIEL J | 190 | 54 | 28% | 136 | 72% | 31 | 16% | 19 | 10% | 84 | 44% | 2 | 1% |
| ALL OTHER DEPARTMENT MANAGERS | 107,016 | 20,125 | 19% | 86,891 | 81% | 4,509 | 4% | 14,583 | 14% | 65,714 | 61% | 2,085 | 2% |

*Source:*
NOVAtime Database of Gristede's time records (<timeclock.sas7bdat> in Schneider backup).
Manager lists (<gristedes @LST 052405 New Class List 051905.xls> and <Mgr List Legal 8-17-04.xls> in Schneider backup).

*Notes:*
[1] Excludes Sundays, holidays, vacation days, and sick days. Also excludes observations where a single edit was made to account for multiple days with zero punches.
[3]=[2]/[1]
[5]=[4]/[1]
[7]=[6]/[1]
[9]=[8]/[1]
[11]=[10]/[1]
[13]=[12]/[1]

## Table 2A. Number of Days with Positive or Negative Edits.

| Employee | Total Days in Time Record Database | Positive Edits | % | Negative Edits | % |
|---|---|---|---|---|---|
| | [1] | [2] | [3] | [4] | [5] |
| CHEWNING, LEWIS A | 17 | 8 | 47% | 3 | 18% |
| CROKER, ALFRED L | 57 | 11 | 19% | 13 | 23% |
| DELEON, FRANK | 370 | 175 | 47% | 9 | 2% |
| HELWIG, WILLIAM F | 11 | 5 | 45% | 0 | 0% |
| IRIZARRY, BOBBY | 22 | 22 | 100% | 0 | 0% |
| MORA, RUBEN D | 237 | 185 | 78% | 12 | 5% |
| SANTIAGO, GILBERTO | 510 | 495 | 97% | 8 | 2% |
| TORRES, CARLOS A | 255 | 234 | 92% | 1 | 0% |
| ALL OTHER CO-MANAGERS | 45,313 | 20,673 | 46% | 3,838 | 8% |
| | | | | | |
| CREMA, JOSEPH | n/a | n/a | n/a | n/a | n/a |
| DIPRETA, MARIO | 285 | 57 | 20% | 152 | 53% |
| MISURACA, ROBERT | 863 | 225 | 26% | 269 | 31% |
| PASTORINO, ROBERT | 440 | 132 | 30% | 236 | 54% |
| PHELPS, VICTOR | 1,080 | 51 | 5% | 94 | 9% |
| SALEGNA, DANIEL J | 190 | 57 | 30% | 107 | 56% |
| ALL OTHER DEPARTMENT MANAGERS | 107,016 | 20,795 | 19% | 37,332 | 35% |

*Source:*

NOVAtime Database of Gristede's time records (<timeclock.sas7bdat> in Schneider backup).
Manager lists (<gristedes @LST 052405 New Class List 051905.xls> and <Mgr List Legal 8-17-04.xls> in Schneider backup).

*Notes:*

[1] Excludes Sundays, holidays, vacation days, and sick days. Also excludes observations where a single edit was made to account for multiple days with zero punches.

[2] Edits to punched hours resulting in a gain in credited hours to a day. Differences between credited hours and punched hours of less than 7.5 minutes are due to rounding and are not included.

[3]=[2]/[1]

[4] Edits to punched hours resulting in a decrease in credited hours to a day. Differences between credited hours and punched hours of less than 7.5 minutes are due to rounding and are not included.

[5]=[4]/[1]

**Table 2B. Number of Weeks with Net Positive or Net Negative Edits.**

| Employee | Weeks in Time Record Database | Weeks with Net Positive Edits | % | Weeks with Net Negative Edits | % |
|---|---|---|---|---|---|
| | [6] | [7] | [8] | [9] | [10] |
| CHEWNING, LEWIS A | 4 | 2 | 50% | 1 | 25% |
| CROKER, ALFRED L | 13 | 8 | 62% | 3 | 23% |
| DELEON, FRANK | 133 | 88 | 66% | 4 | 3% |
| HELWIG, WILLIAM F | 11 | 5 | 45% | 0 | 0% |
| IRIZARRY, BOBBY | 6 | 6 | 100% | 0 | 0% |
| MORA, RUBEN D | 54 | 47 | 87% | 2 | 4% |
| SANTIAGO, GILBERTO | 124 | 119 | 96% | 0 | 0% |
| TORRES, CARLOS A | 60 | 56 | 93% | 0 | 0% |
| ALL OTHER CO-MANAGERS | 10,984 | 6,465 | 59% | 1,136 | 10% |
| | | | | | |
| CREMA, JOSEPH | n/a | n/a | n/a | n/a | n/a |
| DIPRETA, MARIO | 68 | 28 | 41% | 19 | 28% |
| MISURACA, ROBERT | 190 | 84 | 44% | 34 | 18% |
| PASTORINO, ROBERT | 98 | 39 | 40% | 44 | 45% |
| PHELPS, VICTOR | 233 | 45 | 19% | 39 | 17% |
| SALEGNA, DANIEL J | 37 | 19 | 51% | 15 | 41% |
| ALL OTHER DEPARTMENT MANAGERS | 23,401 | 8,799 | 38% | 8,273 | 35% |

*Source:*
NOVAtime Database of Gristede's time records (<timeclock.sas7bdat> in Schneider backup).
Manager lists (<gristedes @LST 052405 New Class List 051905.xls> and <Mgr List Legal 8-17-04.xls> in Schneider backup).

*Notes:*
[6] Works weeks in time record database.
[7] Weeks where the sum of edits to individual shifts was positive. Excludes Sundays.
[8]=[7]/[6]
[9] Weeks where the sum of edits to individual shifts was negative. Excludes Sundays.
[10]=[9]/[6]

**Table 3. Net Effect of Edits to Time Records.**

| Employee | Credited Hours [1] | Original Punched Hours [2] | Net Hours from Edits [3] | % Change from Original Punched Hours [4] | Average Number of Hours per Positively Edited Week [5] | Average Number of Hours per Negatively Edited Week [6] |
|---|---|---|---|---|---|---|
| CHEWNING, LEWIS A | 158 | 117 | 41 | 35% | 20.6 | -0.3 |
| CROKER, ALFRED L | 602 | 519 | 83 | 16% | 10.7 | -0.8 |
| DELEON, FRANK | 3,107 | 1,632 | 1,475 | 90% | 36.3 | -0.3 |
| HELWIG, WILLIAM F | 52 | 2 | 50 | 2416% | 50.0 | 0.0 |
| IRIZARRY, BOBBY | 220 | - | 220 | | 36.7 | 0.0 |
| MORA, RUBEN D | 2,288 | 573 | 1,715 | 299% | 36.5 | -0.4 |
| SANTIAGO, GILBERTO | 5,087 | 124 | 4,963 | 4016% | 46.6 | 0.0 |
| TORRES, CARLOS A | 2,663 | 277 | 2,386 | 861% | 44.0 | 0.0 |
| ALL OTHER CO-MANAGERS | 411,434 | 235,172 | 176,262 | 75% | 31.7 | -2.5 |
| | | | | | | |
| CREMA, JOSEPH | n/a | n/a | n/a | n/a | n/a | n/a |
| DIPRETA, MARIO | 2,102 | 1,844 | 258 | 14% | 12.7 | -5.1 |
| MISURACA, ROBERT | 6,934 | 5,507 | 1,427 | 26% | 18.3 | -3.3 |
| PASTORINO, ROBERT | 3,500 | 3,241 | 260 | 8% | 18.1 | -9.2 |
| PHELPS, VICTOR | 9,391 | 9,287 | 104 | 1% | 5.5 | -3.7 |
| SALEGNA, DANIEL J | 1,467 | 1,181 | 286 | 24% | 17.3 | -2.9 |
| ALL OTHER DEPARTMENT MANAGERS | 839,739 | 750,615 | 89,123 | 12% | 13.9 | -3.9 |

*Source:*

NOVAtime Database of Gristede's time records (<timeclock.sas7bdat> in Schneider backup).

Manager lists (<gristedes @LST 052405 New Class List 051905.xls> and <Mgr List Legal 8-17-04.xls> in Schneider backup).

*Notes:*

[1] Hours used in paycheck calculations.

[2] Hours based employee punches.

[3]=[1]-[2]

[4]=([1]-[2])/[2]

[5] Average net hours edited for weeks with net positive edits.

[6] Average net hours edited for weeks with net negative edits.

Table 4. Weeks in Payroll Data and Times Paid for More Than or Less Than Full Week.

| Employee | Weeks in Payroll Data [1] | Times Paid for Less than Full Week [2] | As a % of Full Week Weeks in Payroll [3] | for Less than Full Week But Multiple of Work Day [4] | As a % of Weeks in Payroll Data [5] | As a % of Weeks for Less than Full Week [6] | Times Paid for Greater than Full Week [7] | As a % of Weeks in Payroll Data [8] |
|---|---|---|---|---|---|---|---|---|
| CHEWNING, LEWIS A | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |
| CROKER, ALFRED L | 10 | 2 | 20% | 1 | 10% | 50% | 1 | 10% |
| DELEON, FRANK | 103 | 9 | 9% | 1 | 1% | 11% | 4 | 4% |
| HELWIG, WILLIAM F | 40 | 0 | 0% | 0 | 0% | n/a | 11 | 28% |
| IRIZARRY, BOBBY | 5 | 3 | 60% | 3 | 60% | 100% | - | 0% |
| MORA, RUBEN D | 48 | 12 | 25% | 3 | 6% | 25% | 2 | 4% |
| SANTIAGO, GILBERTO | 233 | 8 | 3% | 4 | 2% | 50% | 27 | 12% |
| TORRES, CARLOS A | 65 | 2 | 3% | 0 | 0% | 0% | 36 | 55% |
| ALL OTHER CO-MANAGERS | 12,400 | 2,521 | 20% | 602 | 5% | 24% | 3,207 | 26% |
| CREMA, JOSEPH | 98 | 2 | 2% | 0 | 0% | 0% | 10 | 10% |
| DIPRETA, MARIO | 115 | 0 | 0% | 0 | 0% | n/a | 18 | 16% |
| MISURACA, ROBERT | 229 | 28 | 12% | 22 | 10% | 79% | 26 | 11% |
| PASTORINO, ROBERT | 203 | 6 | 3% | 4 | 2% | 67% | 22 | 11% |
| PHELPS, VICTOR | 278 | 7 | 3% | 2 | 1% | 29% | 32 | 12% |
| SALEGNA, DANIEL J | 36 | 2 | 6% | 0 | 0% | 0% | 19 | 53% |
| ALL OTHER DEPARTMENT MANAGE[R] | 29,674 | 1,728 | 6% | 516 | 2% | 30% | 5,471 | 18% |

Source:
Payroll Data (table "all" in "aggregate paychecks.mdb" produced by Schneider).
Manager lists (<gristiecdes @LST 052405 New Class List 051905.xls> and <Mgr List Legal 8-17-04.xls> in Schneider backup).

Notes:
[1] Equal to the number of paychecks with earnings attributable to hours worked. Excludes paychecks that comprise Sundays, vacation, or sick days with no worked hours.
[2] Number of paychecks for less than 50 weeks if the employee is a co-manager. Number of paychecks for less than 40 weeks if the employee is a department managers. Excludes Sunday hours.
[3]=[2]/[1]
[4] Number of paychecks for 10, 20, 30, or 40 hours for co-managers. Number of paychecks for 8, 16, 24, or 32 hours for department managers. Excludes Sunday hours.
[5]=[4]/[1]
[6]=[4]/[2]
[7] Number of paychecks for greater than 50 hours for co-managers. Number of paychecks for greater than 40 hours for department managers. Excludes Sunday hours.
[8]=[7]/[1]

1

**Table 5: Summary of Criticisms of Schneider Analysis**

| Error | Effect |
|---|---|
| Does not account for edits to credited hours when calculating net edits | Understates net positive edits and overstates net negative edits |
| Inconsistent standards applied when analyzing missed punches | Increases number of perceived missed punches |

20



**Figure 1: Positive Edits Exceed Negative Edits by a Ratio of 4.5:1**

1 **MARK P. BERKMAN**—Vice President

2 Ph.D.       Program in Public Policy Analysis, Wharton School, University Of Pennsylvania—

3               Graduate Group in Managerial Science and Applied Economics

4 M.A.       Planning, Policy Analysis, and Administration Program, Harvard University

5 B.A.       Economics and Urban Affairs, George Washington University

6 Dr. Mark Berkman is an expert in labor economics. He has provided counsel to clients regarding labor
7 disputes often leading to testimony. He has studied the statistical evidence regarding claims of race, age,
8 and gender discrimination in hiring, promotion, termination, and pay for plaintiffs and defendants in
9 numerous industries including law enforcement, telecommunications, public transit, insurance, and
10 banking. He has also prepared damage estimates related to these claims. Damage claims have often
11 involved analysis and evaluation of pension benefits and stock options. Dr. Berkman has also estimated
12 the employment impacts of proposed government regulations and plant closures.

13 **EXPERIENCE**

14     2002–present      *Vice President,* Charles River Associates

15               Responsible for managing and conducting projects in labor and discrimination
16               cases.

17     1983–2002 National Economic Research Associates, Inc.

18               *Vice President*, 1993–2002

19               *Senior Consultant*, 1988–1993

20               *Senior Analyst*, 1984–1988

21               *Economic Analyst*, 1983–1984

22               Responsible for managing and conducting projects in labor and discrimination
23               cases as well as complex damage studies regarding antitrust, intellectual property,
24               and environmental claims.

25     1980–1983 *Research Fellow*, University Of Pennsylvania

26               Studied the regional economic impacts of federal coal policy under a dissertation
27               fellowship from the Regional Science Association and the Economic Development
28               Administration. Analyzed federal coal leasing policy for the Department of Energy.
29               Reviewed the market potential of solar energy technologies for the Energy Research
30               Advisory Board. Conducted a commercialization study of fuel cells for the Department of
31               Energy.

32     1977–1980 *Associate Budget Analyst*, Congressional Budget Office

1
2
3
4

Prepared cost estimates of pending energy and science legislation and developed five-year projections of the federal budget in these areas. Analyzed President's budget proposals and conducted energy policy studies. Testified before several Congressional committees.

5   1976–1977 *Teaching Assistant*, Harvard University

6
7

Conducted review sessions, graded papers, and provided extra help in two courses: Economics for Planners and Urban and Regional Economics.

8   1975–1976 *Research Assistant*, The Urban Institute

9
10

Prepared contract reports and working papers and collected and managed data on topics in the fields of housing and transportation.

11   1973–1975 *Staff Assistant*, United States Congress, Office of Congressman Charles Vanik

12

Conducted legislative research and prepared position statements.

13   **PROFESSIONAL ACTIVITIES**

14   American Economic Association

15   Association for Public Policy Analysis and Management

16   Association of Environmental and Resource Economists

17   Western Economic Association

18   **TESTIMONY AND CONSULTING REPORTS**

19
20

Trial Testimony of Mark P. Berkman in the matter of *Barbara Niesendorf v. Levi Strauss & Company* on behalf of the defendant, regarding alleged wrongful termination. San Francisco, CA, June 10, 2004.

21
22
23

Deposition Testimony of Mark P. Berkman in the matter of *Barbara Niesendorf v. Levi Strauss & Company* on behalf of the defendant, regarding alleged wrongful termination. San Francisco, CA, April 29, 2004.

24
25
26

Deposition Testimony of Mark P. Berkman in the matter of *Michelle Hamamura v. Kelly-Moore Paint Company, Inc.* on behalf of the defendant, regarding alleged gender discrimination. San Jose, CA, February 12, 2004.

27
28
29

Trial Testimony of Mark P. Berkman in the matter of *Willard E. Kopetski v. Chevron Corporation et al.,* Superior Court of the State of California in and for the County of San Francisco, on behalf of defendant Chevron Corporation, regarding alleged wrongful termination. San Francisco, CA, January 21, 2004.

30
31
32

Expert Report in the matter of *Michelle Hamamura v. Kelly-Moore Paint Company, Inc.* in the United States District Court, Northern District of California, on behalf of defendant Kelly-Moore Paint Company, Inc., regarding alleged gender discrimination. January 20, 2004.

33
34
35

Trial Testimony in the matter of *National Association for the Advancement of Colored People, et al. v. The State of Florida Department of Corrections, et al.,* In the United States District Court for the Middle District of Florida, Ocala Division, on behalf of the plaintiffs. Ocala, Florida, November 12-13, 2003.

36
37
38

Expert witness report of Mark P. Berkman, Ph.D., filed in the matter of *Jeri Hewitt v. Amerigas Propane, Inc.*, calculating damages estimates on behalf of the defendant with regard to alleged wrongful termination. November 5, 2003.

23

1
2
3
4
Supplemental expert report of Mark P. Berkman filed in the matter of *National Association for the Advancement of Colored People, et al. v. The State of Florida Department of Corrections, et al.*, In the United States District Court for the Middle District of Florida, Ocala Division, on behalf of the plaintiffs. October 20, 2003.

5
6
7
Trial Testimony in the matter of *Daniel Millar v. San Francisco Bay Area Rapid Transit District*, Superior Court for the State of California, For the County of Alameda, on behalf of San Francisco Bay Area Rapid Transit District, regarding alleged wrongful termination. Oakland, CA, October 8-9, 2003.

8
9
10
11
Deposition Testimony of Mark P. Berkman in the matter of *Willard E. Kopetski v. Chevron Corporation et al.*, Superior Court of the State of California in and for the County of San Francisco, on behalf of defendant Chevron Corporation, regarding alleged wrongful termination. San Francisco, CA, August 18, 2003.

12
13
14
Rebuttal Report of Dr. Mark P. Berkman in the matter of *Mark J. True v. Allstate Insurance Company et al.*, United States District Court, Eastern District of California, on behalf of the defendant. Report filed July 9, 2003.

15
16
17
Expert Witness Report of Dr. Mark P. Berkman in the matter of *Mark J. True v. Allstate Insurance Company et al.*, United States District Court, Eastern District of California, on behalf of the defendant, outlined proper methods for damage calculation. Report filed June 18, 2003.

18
19
20
Deposition Testimony in the matter of *Daniel Millar v. San Francisco Bay Area Rapid Transit District*, Superior Court for the State of California, For the County of Alameda, on behalf of San Francisco Bay Area Rapid Transit District, regarding alleged wrongful termination. Walnut Creek, CA, April 3, 2003.

21
22
23
Expert Witness Report in the matter of *Alpheus Ray Brokaw v. Qualcomm, Inc.*, U.S. District Court, Southern District of California, on behalf of Qualcomm, Inc. regarding alleged wrongful termination. Report filed San Diego, CA, January 23, 2003.

24
25
26
27
28
Deposition Testimony and Trial Testimony in the matter of *Lannie Staniford v. Acordia Inc., Acordia of California Insurance Services, Robert DeValle, James Wells, Wells Fargo and Company, and DOES 1 through 20 inclusive*, in the Superior Court of the State of California, in and for the County of San Francisco, on behalf of defendant Acordia, Inc. regarding alleged wrongful termination. Deposition December 23, 2002; Trial Testimony January 13, 2003, both in San Francisco, CA.

29
30
31
Declaration of Mark P. Berkman before the U.S. District Court, Southern District of California, in the matter of *Durante et al. v. Qualcomm, Inc.* on behalf of Qualcomm, Inc. regarding alleged age-based termination. San Diego, CA, November 6, 2002.

32
33
34
35
Trial Testimony on behalf of the NAACP in the matter of *NAACP v. State of Florida Department of Corrections*, U.S. District Court, Middle District of Florida, Ocala Division regarding statistical evidence of race discrimination in the promotion, training and discipline of black corrections officers, Ocala, Florida, November, 2002.

36
37
38
Expert testimony on behalf of the NAACP in the matter of *NAACP v. State of Florida Department of Corrections*, U.S. District Court, Middle District of Florida, Ocala Division regarding the adequacy of available data for statistical analysis, Ocala, Florida, September 14, 2001.

39
40
41
Trial testimony of Mark P. Berkman in the matter of *Dawn Goodman v. City of San Jose* before the Superior Court of the State of California on behalf of the City of San Jose regarding economic damages related to alleged wrongful termination, San Jose, CA, August 16, 2001.

42
43
44
45
Deposition of Mark P. Berkman in the matter of *Victoria Aguinaldo Boudakian v. Avco Financial Services, et al.* Testimony before the United States District Court for the Eastern District of California on behalf of Avco Financial Services, regarding alleged gender-based pay discrimination, termination and related damage claims, Oakland, CA, June 19, 2001.

46
47
48
Trial Testimony of Mark P. Berkman in the matter of *Lucy Sales et al. v. County of Contra Costa et al.*, before the U.S. District Court for the Northern District of California, on behalf of Contra Costa County, regarding the utilization of minority- and women-owned firms by the County, June 18, 2001.

24

1  Affidavit of Mark P. Berkman in the matter of *National Association for the Advancement of Colored People,*
2  *et al.* v. *State of Florida Department of Corrections, et al.*, to examine the Florida Department of
3  Corrections data regarding the hiring and promotion of staff and analyze it for evidence of race and
4  gender discrimination, April 4, 2001 and September 13, 2000.

5  Deposition of Mark P. Berkman in the matter of *Lucy Sales et al.* v. *County of Contra Costa et al.*, regarding
6  comments on reports filed by plaintiff's experts, February 16, 2001.

7  Deposition of Mark P. Berkman in the matter of *Lucy Sales et al.* v. *County of Contra Costa et al.*, regarding
8  the calculation of the utilization of minority- and women-owned firms in professional services and
9  purchasing by the County, October 17, 2000 and July 18, 2000.

10 Amended Declaration of Mark P. Berkman in the matter of *Lucy Sales et al.* v. *County of Contra Costa et al.*,
11 to calculate the utilization of minority- and woman-owned firms in professional services and purchasing by
12 the County, September 19, 2000 and July 14, 2000.

13 "A Statistical Analysis of Coaches' Salaries at California State University, Fresno. Prepared with Michael
14 Liu, (Confidential), March 2000.

15 "A Statistical Analysis of Fair Lending." Prepared with Anthony Yezer and Stuart Gabriel, (Confidential),
16 January 1999.

17 "The Availability of Minority and Woman-Owned Businesses for the Southern California Regional Rail
18 Authority." Prepared at the request of the Southern California Regional Rail Authority, December 1996.

19 Testimony before the California Public Utilities Commission, on behalf of The Joint Utilities Subcommittee,
20 consisting of 12 California utilities, regarding NERA's study to estimate the availability of service disabled
21 veteran-owned establishments within the geographic and product markets from which the California utilities
22 purchase goods and services, October 17, 1996.

23 "California Disabled Veteran Business Enterprise Availability Study." Prepared for The Joint Utilities
24 Subcommittee, consisting of 12 California utilities, October 15, 1996.

25 "An Analysis of the Utilization and Availability of Minority and Woman-Owned Businesses in the Los Angeles
26 Metropolitan Area." Prepared with D. Evans et al., March 7, 1996.

27 "The Oregon Health Plan Economic Impact Analysis for the Employer Mandate." Prepared with J. Gaisford
28 et al. for the Oregon Office of the Health Care Administrator, February 10, 1995.

29 "The Economic Impact of Health Care Reform in Arizona." Prepared for the Arizona Affordable Health Care
30 Foundation, February 8, 1994.

31 "The Utilization of Minority and Women-Owned Business Enterprises by Member Agencies of the Regional
32 Transit Association." Prepared with D. Evans et al., May 1993.

33 "The Utilization of Minority and Woman-Owned Business Enterprises by the San Francisco Redevelopment
34 Agency." Prepared with D. Evans et al., April 1993.

35 "The Utilization of Minority and Woman-Owned Business Enterprises by the City of Hayward." Prepared
36 with D. Evans et al., March 1993.

37 Declaration on behalf of San Francisco Bay Area Rapid Transit District in *RGW Construction, Inc.* v. *San*
38 *Francisco Bay Area Rapid Transit District, et al.*, regarding evidence of discrimination against minority
39 contractors in the Bay Area, October 8, 1992.

40 "The Utilization of Minority and Woman-Owned Business Enterprises by Alameda County." Prepared with
41 D. Evans et al., June 1992.

42 "The Utilization of Minority and Woman-Owned Business Enterprises by Contra Costa County." Prepared
43 with D. Evans et al., May 1992.

## PUBLICATIONS

"Where is the Market Failure? A Review of OSHA's Economic Analysis for Its Proposed Ergonomics Standard." With Jesse David. *Journal of Labor Research*, Vol. XXII, No. 1, winter, 2001.

"New Evidence on Racial Differences in Commuting Behavior." With J. Goodman, *Journal of Public Data Use*, Vol. 5, No. 4, 1977.

## SPEECHES

"The Use and Abuse of Statistics in Mortgage Lending Discrimination Cases," NERA Luncheon Seminar, Chicago, Illinois, June 1996.

"Two Myths Exposed: Why Losses Don't Go On Forever and Why Plaintiffs Actually Should Find Employment," NERA Luncheon Seminar, San Francisco, California, April 24, 1996.