UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CARLOS TORRES, BOBBY IRIZARRY,           :
RUBEN MORA, JOSELITO AROCHO, LEWIS       :
CHEWNING, JOSEPH CREMA, ALFRED           :
CROKER, FRANK DELEON, MARIO              :
DIPRETA, WILLIAM HELWIG, ROBERT          :
MISURACA, ROBERT PASTORINO, VICTOR       :
PHELPS, DANIEL SALEGNA, GILBERTO         :
SANTIAGO,                                :
                                         :
                    Plaintiffs,          :
          - against -                    :          04 Civ. 3316 (PAC)
                                         :
GRISTEDE'S OPERATING CORP.,              :
NAMDOR, INC., GRISTEDE'S FOOD, INC.,     :
CITY PRODUCE OPERATING CORP.,            :
GRISTEDE'S FOODS NY, INC., GALO          :
BALSECA, JOHN CATSIMATIDES, JAMES        :
MONOS,                                   :
                                         :
                    Defendants.          :
-------------------------------------------------------x
GRISTEDE'S FOODS NY, INC.,               :
GRISTEDE'S OPERATING CORP.,              :
NAMDOR, INC., GRISTEDE'S FOODS, INC.,    :
CITY PRODUCE OPERATING CORP.,            :
                                         :
                    Counter-Claimants,   :
                                         :
          - against -                    :
                                         :
CARLOS TORRES & LEWIS CHEWNING,          :
                                         :
                    Counter-Defendants.  :
-------------------------------------------------------x

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

TABLE OF CONTENTS

Page

Table of Authorities.......................................................................................................ii

Preliminary Statement ...................................................................................................1

Overview of Gristede's Opposition................................................................................4

The Facts........................................................................................................................6

ARGUMENT..................................................................................................................7

I.     BECAUSE A MULTITUDE OF MATERIAL FACTS ARE GENUINELY AT
       ISSUE CONCERNING THE PLAINTIFFS' EXEMPT STATUS, SUMMARY
       JUDGMENT IS NOT PROPER ON THE CORPORATE DEFENDANTS'
       FIFTH AFFIRMATIVE DEFENSE.........................................................................7

       A.     On This Motion, Plaintiffs Must Establish That There Is No Genuine Issue
              as to Any Material Fact .............................................................................7

       B.     There is Ample Evidence that the Plaintiffs Are Exempt from the
              Coverage of the FLSA and the NYLL........................................................9

              1.     The Plaintiffs Meet the "Primary Duties" Test for the "Executive"
                     and "Administrative" Exemptions......................................................10

              2.     The Plaintiffs Meet the "Salary-Basis" Test for the Exemptions.............18

II.    PLAINTIFFS ARE NOT ENTITLED TO LIQUIDATED DAMAGES, A
       THREE-YEAR STATUTE OF LIMITATIONS, OR A PRESUMPTION AT
       TRIAL ..................................................................................................................28

III.   THERE ARE GENUINE ISSUES OF MATERIAL FACT REGARDING
       GRISTEDE'S OTHER AFFIRMATIVE DEFENSES ..................................................29

IV.    THE COUNTERCLAIMS SHOULD NOT BE DISMISSED.........................................32

CONCLUSION ............................................................................................................36

# TABLE OF AUTHORITIES

## CASES

Ahearn v. County of Nassau,
  118 F.3d 118 (2d Cir. 1997) ...........................................................................23

Allen v. Coughlin,
  64 F.3d 77 (2d Cir. 1995) ................................................................................7

Am. Cas. Co. of Reading Pa. v. Nordic Leasing, Inc.,
  42 F.3d 725 (2d Cir. 1994) ..............................................................................8

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) ......................................................................................7, 8

Auer v. Robbins,
  519 U.S. 452 (1997) .......................................................................................19

Bandhan v. Laboratory Corp. of America,
  2002 U.S. Dist. LEXIS 25972 (S.D.N.Y. Mar. 27, 2002).............................33

Barrentine v. Arkansas - Best Freight,
  450 U.S. 728 (1981) .......................................................................................31

Basco v. Wal-Mart Stores, Inc.,
  216 F. Supp. 2d 592 (E.D. La. 2002) .............................................................24

Brock v. City of Cincinnati,
  236 F.3d 793 (6th Cir. 2001)..........................................................................28

Camp Summit of Summitville, Inc. v. Shellie Santay Visinski,
  2007 U.S. Dist. LEXIS 28496 (S.D.N.Y. Apr. 13, 2007) ..............................34

Chambers v. TRM Copy Centers Corp.,
  43 F.3d 29 (2d Cir. 1994)................................................................................8

Ciago v. Ameriquest Mortgage Company,
  295 F. Supp. 2d 324 (S.D.N.Y. 2003) ............................................................32

City of New York v. Bower,
  1991 U.S. Dist. LEXIS 1204 (S.D.N.Y. Jan. 31, 1991) .................................35

Design Strategies, Inc. v. Davis,
  384 F. Supp. 2d 649, (2d Cir. 2005)...............................................................34

Donovan v. Burger King Corp.,
    672 F.2d 221 (1st Cir. 1982) ................................................................14

In re Food Lion, Inc.,
    No. 94-2360, 1998 WL 322682 (4th Cir. June 4, 1998) ...........................14

Gallo v. Prudential Residential Servs., L.P.,
    22 F.3d 1219 (2d Cir. 1994) ............................................................7, 8

Harrison v. McDonald's Corp.,
    411 F. Supp. 2d 862 (S.D. Ohio 2005) ................................................23-24

Humayun v. Hudson News Co., Inc.,
    1996 U.S. Dist. LEXIS 19963 (S.D.N.Y. Nov. 24, 2006) ........................35

Jeffreys v. City of New York,
    426 F.3d 549 (2d Cir. 2005) ................................................................8

Jones v. Virginia Oil Co.,
    69 Fed. Appx. 633 (4th Cir. 2003) ......................................................13

Kahn v. Superior Chicken & Ribs, Inc.,
    331 F. Supp. 2d 115 (E.D.N.Y. 2004) ..............................................15, 16

Kelly v. City of New York,
    2001 WL 1132017 (S.D.N.Y. Sept. 24, 2001) .....................................24-25

Masilionis v. Falley's Inc.,
    904 F. Supp. 1224 (D. Kan. 1995) ......................................................15

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
    475 U.S. 574 (1986) ........................................................................7

McAllister v. Transamerica Occidental Life Ins. Co.,
    325 F.3d 997 (8th Cir. 2003) ............................................................13

Moore v. New York Cotton Exchange,
    270 U.S. 593 (1926) ........................................................................33

Murray v. Stuckey's Inc.,
    939 F.2d 614 (8th Cir. 1991) ............................................................14

Newsday, Inc. v. Long Island Typographical Union,
    915F.2d 840 (2d Cir. 1990) ..............................................................35

Phansalkar v. Anderson Weinroth & Co.,
   344 F.3d 184 (2d Cir. 2003) ...................................................................34

Powell v. Nat'l Board of Med. Examiners,
   364 F.3d 79 (2d Cir. 2004) ......................................................................7

Robinson-Smith v. Government Employees Inc. Co.,
   323 F. Supp. 2d 12 (D.D.C. 2004) ....................................................10 n.3

Rule v. Brine, Inc.,
   85 F.3d 1002 (2d Cir. 1996) ....................................................................8

Sinnett v. Friendly Ice Cream Corp.,
   319 F. Supp. 2d 439 (S.D.N.Y. 2004) ....................................................31

Torres et al. v. Gristede's Operating Corp. et al.,
   No. 04 Civ. 3316 (PAC), 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006) ..........9 n.2

Tran v. Tran,
   54 F.3d 115 (2d Cir. 1995) ....................................................................32

Treglia v. Town of Malius,
   313 F.3d 713 (2d Cir. 2002) .............................................................32, 33

Tyler v. City of New York,
   2006 U.S. Dist. LEXIS 29650  (E.D.N.Y. May 16, 2006) .........................31

Velazquez-Fernandez v. NCE Foods, Inc.,
   476 F.3d 6 (1st Cir. 2007) .....................................................................15

Volt Information Sciences Inc. v. Bd of Trustees of
   Leland Standford Junior University,
   486 U.S. 468 (1989)  ........................................................................31-32

Western Elec. Co v. Brenner,
   41 N.Y.2d 291, 360 N.E.2d 1091 (N.Y. 1977) .......................................34

Yourman v. Giuliani,
   229 F.3d 124 (2d Cir. 2000) .............................................20-21, 25, 27 n.4

## STATUTES

29 C.F.R. § 541.100(a)(1)............................................................................9

29 C.F.R. § 541.102...................................................................................12

29 C.F.R. § 541.106(a)..............................................................................11

29 C.F.R. § 541.200(a)(2)..........................................................................12

29 C.F.R. § 541.200(a)(3)..........................................................................14

29 C.F.R. § 541.202(b)..............................................................................13

29 C.F.R. § 541.602(a)..............................................................................19

29 C.F.R. § 541.602(b)(1)..........................................................................19

29 C.F.R. § 541.602(b)(2)..........................................................................19

29 C.F.R. § 541.602(b)(6)..........................................................................19

29 C.F.R. § 541.603(a)..............................................................................20

29 C.F.R. § 541.603(c)..........................................................................21, 22

29 C.F.R. § 541.700(a)..........................................................................13, 14

29 C.F.R. § 541.700(b)..............................................................................22

29 C.F.R. § 541.700(c)..............................................................................14

29 C.F.R. § 785.13....................................................................................24

Fed. R. Civ. P. 13(a).................................................................................32

Fed. R. Civ. P. 56(c)...................................................................................7

Local Rule 56.1(b)......................................................................................6

## MISCELLANEOUS

Defining and Delimiting the Exemptions for Executive, Administrative, Professional,
   Outside Sales and Computer Employees 69 Fed. Reg. 22122 (Apr. 23, 2004)...............10 n.3

Defendants Gristede's Operating Corp., Namdor, Inc., Gristede's Food, Inc., City

Produce Operating Corp., and Gristede's Foods NY, Inc. (collectively, "Gristede's"),

respectfully submit this memorandum of law in opposition to the motion of plaintiffs for partial

summary judgment.

## Preliminary Statement

For several decades, Gristede's has operated a chain of supermarkets throughout

Manhattan and neighboring areas without a hint of trouble or controversy with its co-managers

and department managers.  Consistent with customary industry standards and practices,

Gristede's employed salary-based supervisory personnel to head-up day-to-day business

operations, both with respect to the supermarket generally, and its various operating departments,

such as the meat, produce, grocery, and deli departments.

Although department managers (or in the parlance of collective bargaining

arrangements, "department heads") are upper-tiered union members, they nevertheless perform

important supervisory functions in conjunction with the store manager and co-managers.  A

Manhattan supermarket is a bustling enterprise, in some instances employing up to 100 part-time

and full-time employees working 2 to 3 eight-hour shifts per day.  The need for experienced

supervisory personnel is manifest given a supermarket's daily confluence of hundreds of vendors,

customers and employees.

Yet, in 2004, plaintiffs commenced the instant class action, which suspiciously

came on the heels of a prior litigation[1] involving the same law firm, to belatedly challenge the

---

[1]      This is the second of three cases involving Gristede's and plaintiffs' counsel.  It is noteworthy that after
commencement of this action, plaintiffs' counsel has commenced another class action suit against Gristede's (Hill v.
Gristede's – No. 06 CV 10193) alleging, in substance, that Gristede's steers women employees into cashier positions
so they can not advance to management positions in the supermarket.  The hypocrisy of this latest suit is alarming
since plaintiffs' counsel states in the present case that co-managers and department managers are manual laborers,

payment of overtime to co-managers and department managers. That the vast majority of the named plaintiffs (including all department managers) previously received significant overtime compensation during their tenure at Gristede's has been completely and conveniently ignored and misstated by plaintiffs. Instead, plaintiffs now claim that Gristede's is allegedly guilty of making wholesale edits to time and attendance reports to eliminate what they refer to as "unauthorized overtime." In the process, the plaintiffs likewise ignore the fact that Gristede's is compelled to make such edits, in the first instance, only because of employees' long-standing failure to punch in and out of work properly and completely. Nevertheless, forsaking all other possible explanations for editing, plaintiffs have labeled any editing whatsoever as creating deductions for "unauthorized overtime," a term which has varying meanings to different people, but has been used pejoratively against Gristede's to create the false impression of wrongful practices or policies.

Putting aside the fact that the evidence of alleged "editing" for "unauthorized overtime" is self-serving, undocumented, and the product of vague and speculative deposition testimony, there is an obvious disconnect in plaintiffs' theory of liability: Just because edits are made to rectify incomplete or missed punches for lunch does not mean that the employee was actually working -- or even in the store -- at these times. Indeed, if one believes plaintiffs' core contentions, then almost no class members ever took lunch while working at Gristede's. But, in reality, most everyone ate lunch and simply forgot or refused to punch in and out correctly. In any event, such matters can not be properly decided on a motion for summary judgment.

---

and then in the next breath sues Gristede's again, alleging that women were deprived from getting these "management" positions. This incongruity was noted during a deposition of Charles Criscuolo (see NDEC Appendix Exhibit "43").

From the start, Gristede's has contended that this lawsuit was initiated by a cabal of opportunistic former employees who take revisionist history to new heights. When plaintiffs were employed at Gristede's, they never complained about deductions and they have come forward only years after the fact. The belatedness of their claim is telling, and it would be an utter injustice for the Court to adjudicate such a highly disputed and charged matter on the basis of general statistical evidence or snippets of deposition testimony.

The sum and substance of the evidence put forward by plaintiffs confirms only that Gristede's required employees to work according to their scheduled shifts and that employees did not have the right to decide unilaterally to work overtime without permission. This is hardly remarkable, and it certainly does not establish that Gristede's forced employees to work, or tolerated employees' working, overtime without the intention of paying them. Nor does it suggest that random edits among more than 1,800 employees constitute a practice or policy of improper conduct.

Moreover, the fact that plaintiffs may have incurred isolated deductions to salary does not eliminate Gristede's proper invocation of the management-related exemptions under the FLSA and NYLL. Evidence of deductions in a vacuum is not dispositive of the question of exempt status; nor does it convert the entire class into non-exempt employees. To the contrary, the FLSA and NYLL regulations permit certain deductions, while tolerating deductions made inadvertently by mistake and error. Accordingly, Gristede's submits that the management exemptions remain very much in play, and it is insulting for plaintiffs to allege, for purposes of this lawsuit, that they were simply manual laborers dressed up in a manager's clothing.

### Overview of Gristede's Opposition

Determining whether employees are exempt from coverage under the FLSA and NYLL is intensely fact-sensitive. Thus in seeking summary judgment on that issue, the plaintiffs have taken on an especially high burden. They must show that there is <u>no</u> genuine issue as to <u>any</u> of the many material facts that go into the determination. As we show below, the plaintiffs have failed miserably in that effort.

Plaintiffs began the case by boldly claiming that Gristede's "require[ed] its workers . . . to work extensive overtime without paying them at a premium rate." (Third Amended Complaint ¶ 3.) That claim is false and it is gone. Now plaintiffs fall back on the far more modest assertion that Gristede's has a "policy" or "practice" of not paying its workers for what plaintiffs have called "unauthorized overtime."

This claim also is false. In fact, what is most striking about the plaintiffs' motion is that after they have collected dozens of depositions, tens of thousands of documents, and millions of computer entries, the plaintiffs have so little to show for it. They offer no document -- we repeat, <u>no</u> document -- in which any defendant states that if an employee performs unauthorized overtime, she will not be paid for it. To support the claim of a "practice," the plaintiffs even now rely primarily on the affidavits of the named class representatives, filed with the first complaint, and long since discredited. By now, those affidavits have been belied by, among many other things, the indisputable evidence that the affiants regularly received substantial sums in overtime, rarely experienced any deductions of any kind from their pay, and never during their time at Gristede's complained about their treatment to union representatives or company management.

Plaintiffs' attempt to tease a "practice" out of the testimony of Gristedes' witnesses is equally unpersuasive. Those witnesses consistently denied that Gristede's has the policy that plaintiffs claim. Such testimony was completely credible, since plaintiffs have no documents to dispute it. In the face of these facts, plaintiffs' typical mode of examination was then to confront the witnesses with isolated "edits" and ask the witnesses to "explain" them. Of course, none of the witnesses had any memory of those random instances, nor should they have. Undaunted, the plaintiffs then would ask the witness whether it might be "possible" that the edit had been intended to fix an instance of unauthorized overtime. If the witness could not rule out that "possibility," then the plaintiffs proclaimed that they had found their "practice."

Such testimony was wholly speculative and lacking in foundation, the defendants routinely objected to the questions that sought it, and its admissibility would be challenged at trial. Yet that is the evidence on which plaintiffs seek a summary judgment of liability. But the Court should recognize that it is barely evidence at all, and it certainly is not the sort of evidence on which so crucial a judgment should rest.

The genuine indisputable evidence makes a very different case. Gristedes' workers must record their time by punching in and out. But Gristedes' workers routinely fail to punch, and unless they punch in fully each day, the electronic payroll system will not issue them a paycheck. So to enable people to be paid, store managers correct the hours worked, consistent with their knowledge and observations of the employee. In this way, the employee's time for the week may be adjusted through "edits." Edits are perfectly lawful, and they do not defeat the exemptions. The effect of edits is to get workers paid, not to cheat them.

In relation to the total number of time entries that class members recorded in the six years of the class period, the number of edits is remarkably low. So too are the instances in

which plaintiffs experienced any deductions from their pay. The named plaintiffs experienced few deductions at all. For example, department manager Crema was paid less than his regular weekly wage in <u>one</u> week out of the 97 he worked. That is the opposite of evidence of an unlawful policy or practice. At the very least, it presents questions for the jury to decide as to the reasons for the deductions and whether they comport with the FLSA.

In short, the plaintiffs have failed to make a proper case for summary judgment. It is their burden to show that edits were directly and exclusively intended to deprive workers of pay for legitimate work that they performed. Plaintiffs have not done that in even one instance, while closing their eyes to the fact that edits had a beneficial effect and allowed employees to be paid even though they routinely punched incorrectly and incompletely. Accordingly, all of plaintiffs' claims must go to the jury. Because the plaintiffs do not merit summary judgment, they also do not deserve any of the ancillary relief they seek -- a three-year statute of limitations, liquidated damages, and a presumption at trial. And as we explain more fully below, the challenged affirmative defenses and the counterclaim against plaintiffs Torres and Chewning are sound and should be addressed at trial as well.

### The Facts

The facts that are relevant in deciding this motion are set forth in the Gristede's Counter-Statement of Facts pursuant to Local Rule 56.1(b) (dated July 20, 2007) ("GS"), in the Declaration of Kevin J. Nash in Opposition to Plaintiffs' Motion for Partial Summary Judgment (dated July 20, 2007) ("NDEC"), and in the Declaration of Deborah Clusan (dated July 20, 2007 ("CDEC"), and in the exhibits to those documents. Rather than summarize those facts here, we refer to them in the course of the arguments below.

# ARGUMENT

## I.

## BECAUSE A MULTITUDE OF MATERIAL FACTS ARE GENUINELY AT ISSUE CONCERNING THE PLAINTIFFS' EXEMPT STATUS, SUMMARY JUDGMENT IS NOT PROPER ON THE CORPORATE DEFENDANTS' FIFTH AFFIRMATIVE DEFENSE

A.   On This Motion, Plaintiffs Must Establish That
     There Is No Genuine Issue as to Any Material Fact

Summary judgment may be granted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87, (1986). A fact is material if it can affect the outcome of the action based on the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986). An issue is genuine if it can reasonably be resolved in favor of either party. Id. at 250-51.

The moving parties -- here, the plaintiffs -- bear the burden of showing that there is no genuine issue as to any material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). The non-moving parties, Gristede's, carry only "a limited burden of production" and need to come forward only with "specific facts showing that there is a genuine issue for trial." Powell v. Nat'l Board of Med. Examiners, 364 F.3d 79, 84 (2d Cir. 2004).

The Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 243. Summary judgment must be denied as long as there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248, see Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995). Put another way, the court decides just whether "there

are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson, 477 U.S. at 250.

In making its decision, the court "must view the evidence in the light most favorable to the non-moving party." Am. Cas. Co. of Reading Pa. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994) (quoting Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 572 (2d Cir. 1993)). "[A]ll ambiguities must be resolved and all inferences drawn in favor of" the non-moving party. Gallo, 22 F.3d at 1223. As the Supreme Court has put it, "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255.

"[A]ny weighing of the evidence is the prerogative of the finder of fact" at trial and not of the court on summary judgment. Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996). In particular, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir. 2005). In sum, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994) (emphasis added).

Plaintiffs seek summary judgment on the Corporate Defendants' Fifth Affirmative Defense, which contends that the plaintiffs are exempted from coverage under both the NYLSA and the NYLL, because the plaintiffs perform work that is genuinely managerial. As we show below, plaintiffs utterly fail to meet the high burden that their motion imposes on them.

- 8 -

B.    There is Ample Evidence that the Plaintiffs
      Are Exempt from the Coverage of the FLSA and the NYLL

"Bona fide" executive and administrative employees are exempted from the coverage of the FLSA and the NYLL.  There are three main requirements for this exemption.  The first is that the employee be paid more than a threshold amount in base compensation.  Plaintiffs do not deny that they exceed the pay threshold.[2]

The parties' dispute is over the other two requirements.  One is the "salary basis" test:  To be exempt, an employee must be "compensated on a salary . . . basis."  29 C.F.R. §§ 541.100(a)(1) and 541.200 (a)(1).  The other is the "primary duties" test:  To be exempt, an employee must perform duties that are genuinely executive or administrative in nature.  29 C.F.R. §§ 541.100(a) and 541.200(a).

Plaintiffs devote most of their attention to the "salary basis" test.  In fact, they make no serious effort to show that they do not meet the "primary duties" test for the exemption.  Instead, they rely on only a conclusory assertion, offered without citation in a throwaway footnote to their brief.  (Pl. Mem. at 9 n.9).  This alone calls for denying plaintiffs' request for summary judgment on the issue of their duties.  But to end any doubt that the plaintiffs do not merit summary judgment on either test, we address both of them.

---

[2]    As with the FLSA, the NYLL executive and administrative exemptions impose a "primary duties" requirement.  The primary duties tests for the NYLL exemptions track those for the comparable exemptions under the FLSA, and we will treat them as being identical.  This Court previously held that the NYLL exemptions also include a salary basis test and that the term "salary," which is not otherwise defined in the NYLL, means a "fixed, regular compensation" that is "not subject to weekly variations by hours worked."  Torres et al. v. Gristede's Operating Corp. et al., No. 04 Civ. 3316 (PAC), 2006 WL 2819730 at *13 (S.D.N.Y. Sept. 29, 2006).  For purposes of this motion, therefore, we will assume that the NYLL executive and administrative exemptions also impose a salary basis test, which is identical to that of the FLSA.

1.    The Plaintiffs Meet the "Primary Duties" Test
      for the "Executive" and "Administrative" Exemptions

Regulations of the Department of Labor (DOL) list a series of exempt job

classifications.  Two of them -- the "executive" and the "administrative" exemptions -- apply to

the plaintiffs here.  The "primary duties" tests for these two exemptions differ slightly, but they

overlap.

A bona fide executive is any employee:

- Whose primary duty is management of the enterprise in which the
  employee is employed or of a customarily recognized department or
  subdivision thereof;

- Who customarily and regularly directs the work of two or more other
  employees; and

- Who has the authority to hire or fire other employees or whose
  suggestions and recommendations as to the hiring, firing, advancement,
  promotion or any other change of status of other employees are given
  particular weight.

29 C.F.R. § 541.100(a).[3]

The DOL clarifies some of the elements of this regulation.  It lists examples of

genuinely executive duties, including:

- setting and adjusting the working hours of other employees

---

[3]    In August 2004, the Department of Labor adopted new regulations to "define and delimit" the exemptions
from FLSA coverage.  See Defining and Delimiting the Exemptions for Executive, Administrative, Professional,
Outside Sales and Computer Employees 69 Fed. Reg. 22122 (Apr. 23, 2004), Defining and Delimiting the
Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees Reg. Part 451
(Part A).  In 2005, the DOL stated that the 2004 regulations had been designed to clarify, rather than substantively
change, existing law.  DOL, Wage & Hour Op. Ltr., No. FLSA 2005-19 (August 2, 2005).  Thus it has been held
that the analysis of employee duties under the DOL regulations from before and after 2004 is essentially identical.
See, e.g., Robinson-Smith v. Government Employees Inc. Co., 323 F. Supp. 2d 12, 18 n.3 (D.D.C. 2004) (referring
to amended regulations and holding that "the outcome of this case would have been identical had the August 2004
Regulations not been considered").

- maintaining production or sales records for use in supervision or control

- handling employee complaints and grievances

- disciplining employees

- planning the work

- determining the types of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold

- controlling the flow and distributions of materials or of merchandise

- planning and controlling the budget

29 C.F.R. § 541.102.

The DOL also makes clear that the executive exemption will not be defeated simply because the employee performs both exempt and non-exempt duties. 29 C.F.R. § 541.106(a). The DOL gives an example that has particular force here:

> . . . an assistant manager in a retail establishment may perform work such as serving customers, cooking food, stocking shelves and cleaning the establishment, but performance of such nonexempt work does not preclude the exemption if the assistant manager's primary duty is management.

29 C.F.R. § 541.106(b).

Thus the assessment of an employee's primary duty "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Notably, "time alone" is "not the sole test," 29 C.F.R. § 541.700(b) (emphasis added), and employees may be exempt even if they spend more than 50 percent of their time in performing non-exempt tasks. Again, the DOL cites the example of "assistant managers in a retail establishment." If they "perform exempt executive work such as

- 11 -

supervising and directing the work of other employees, ordering merchandise, managing the budget and authorizing payment of bills," then the DOL regulations hold that such assistant managers "may have management as their primary duty even if [they] spend more than 50 percent of the time performing nonexempt work such as running the cash register." 29 C.F.R. § 541.700(c).

The plaintiffs also satisfy the "administrative" exemption, for which the regulations require two primary duties:

- That the employee have the primary duty of performing office or non-manual work directly related to the management or general business operations of the employer or the employer's customers, 29 C.F.R. § 541.200(a)(2); and

- That the employee have a primary duty that includes the exercise of discretion and independent judgment with respect to matters of significance, 29 C.F.R. § 541.200(a) (3).

As with the executive exemption, an exempt administrative employee may perform exempt and non-exempt tasks concurrently; the percentages of time that he devotes to particular tasks are not dispositive; and the court must assess the nature of the employee's job as a whole, on a case-by-case basis. See 29 C.F.R. § 541.200(b), which incorporates by reference the regulations concerning "primary duties" contained in 29 C.F.R. § 541.700.

The key question for the administrative exemption is whether the employee exercises the necessary discretion and independent judgment. Such discretion need not predominate in the employee's work; it is enough that the work "include" discretion and independent judgment. 29 C.F.R. § 541.200(a)(3).

As guidance for deciding whether an employee exercises the necessary discretion and independent judgment, the DOL offers a series of non-exclusive factors to consider. One

- 12 -

commentator has observed, "[F]ederal courts generally find that employees who meet at least

two or three of these factors are exercising discretion and independent judgment, although a

case-by-case analysis is required." Tilson and Glenn, The FLSA: Emerging Trends in Wage

and Hour Litigation, 35th Annual Institute on Employment Law (PLI, 2006) at 595 n.11, (citing

Bondy v. City of Dallas, 77 Fed. Appx. 731 (5th Cir. 2003) and McAllister v. Transamerica

Occidental Life Ins. Co., 325 F.3d 997 (8th Cir. 2003)).

> Examples of the factors to be reviewed include whether the employees
>
> - have authority to formulate, affect, interpret, or implement management
>   policies or operating practices;
>
> - carry out major assignments in conducting the operations of the business;
>
> - perform work that affects business operations to a substantial degree, even
>   if the employee's assignments are related to operation of a particular
>   segment of the business;
>
> - ha[ve] authority to waive or deviate from established policies and
>   procedures without prior approval;
>
> - [are] involved in planning long-or short-term business objectives;
>
> - represent[ ] the company in handling complaints, arbitrating disputes or
>   resolving grievances.

29 C.F.R. § 541.202(b).

Applying the DOL's regulations, the courts have regularly held, in cases covering

a range of industries, that working supervisors and foremen -- employees who manage

production workers and may themselves spend substantial time on the line -- are exempt. See,

e.g., Jones v. Virginia Oil Co., 69 Fed. Appx. 633 (4th Cir. 2003) (assistant manager of a Dairy

Queen convenience store was exempt even though she spent 75 to 80 percent of her time on line-

worker tasks); and <u>Murray v. Stuckey's Inc.,</u> 939 F.2d 614 (8th Cir. 1991) (managers of a combination gas station, convenience store, and restaurant were exempt even though they spent 65 to 90 percent of their time on non-management duties).

These principles apply with particular force in the grocery, restaurant, and food service industries, where supervisors often share in the basic work of preparing, handling, and serving the food, particularly during night shifts, when the business may not draw many customers. For at least the last 25 years, since the seminal decision in <u>Donovan v. Burger King Corp.,</u> 672 F.2d 221 (1st Cir. 1982), the federal courts have carefully reviewed the entire range of tasks performed by employees who carry the title of "manager" in these industries, and the courts have held that such managers are exempt.

In fact, the courts have held that grocery store employees who perform the same tasks as Gristedes' co-managers and department managers <u>are</u> exempt. A case involving the equivalent of the plaintiff co-managers is <u>In re Food Lion, Inc.,</u> No. 94-2360, 1998 WL 322682 (4th Cir. June 4, 1998). Assistant managers in the Food Lion stores brought overtime claims under the FLSA. These assistant managers were primarily responsible for running the Grocery Department, which was treated as a division in each store, but whenever the store manager was absent, the assistant manager was "primarily responsible for overseeing the entire store." <u>Id.</u> 1998 WL 322682, at *5. When they were running the store, the assistant managers performed some non-exempt work, but they also handled customer complaints, verified deposits, supervised the stockers, "kept an eye on" the grocery department, made sure that other employees were working, and recommended disciplinary actions. <u>Id.</u> at *8. The district court held that the assistant managers were exempt, it granted summary judgment for Food Lion, and the Court of Appeals affirmed.

- 14 -

Masilionis v. Falley's Inc., 904 F. Supp. 1224 (D. Kan. 1995), involved an FLSA overtime claim by the manager of a produce department in a grocery store. He supervised two or more employees, he set the tasks and scheduled the work for those employees, he received employee complaints, he "wrote up" employees, he ordered the produce, and he was responsible for stocking the produce, checking it for quality, and operating the department within its budget. Id. at 1229. The court held that the department manager was exempt, and it granted summary judgment for the store. See also Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 14 (1st Cir. 2007), in which the Court of Appeals affirmed a grant of summary judgment dismissing the FLSA overtime claim of the manager of a food warehouse, because the manager supervised six to nine other workers and was "in charge" of . . . purchase, sales, dispatch, [and] reporting in the warehouse.").

A case decided more recently in this Circuit, Kahn v. Superior Chicken & Ribs, Inc., 331 F. Supp. 2d 115 (E.D.N.Y. 2004), is also compelling. Kahn was brought as a purported class and collective action on behalf of night managers at a fast food restaurant. On the restaurant's motion for summary judgment, the court examined the duties of the named plaintiff, Kahn. He had the title of manager of his shift, he had no other supervisor present with him during the shift, there was no other employee with the title of manager on that shift, and he held himself out as the shift manager to the Health and Fire Departments. Kahn supervised four or five other employees each night, he prepared the work schedules for those employees, he was involved in handling any problems with those staff, and he was responsible for finding replacements when they were absent. Kahn had a key to the restaurant, he closed it at the end of his shift, he handled the cash drop in the safe, and he accounted to the restaurant's owner for cash receipts and inventory.

- 15 -

Kahn insisted that he did nothing more than cook and run the cash register, but drawing on Donovan, the court concluded that as with the Assistant Managers in Donovan, Kahn was "solely in charge of their restaurant" and was " the 'boss' in title and in fact" for "the great bulk of [his] working time." 331 S. Supp. 2d at 119 (quoting Donovan, 672 F.2d at 522). The court granted summary judgment on the administrative duties test for the defendant restaurant.

Here, if anyone is entitled to summary judgment on the primary duties test, it is the Corporate Defendants. In their depositions, each of the named plaintiffs demonstrated that within their respective areas of responsibility, they were -- in the words of Donovan and Kahn -- the "boss in title and in fact." Co-managers supervise each store whenever the store manager is not present. The plaintiffs concede that store managers are exempt employees. Yet, the plaintiffs ignore the fact that the co-managers perform the same tasks as the store managers do. Just like the store managers, the co-managers open and close the store, oversee daily business operations, direct all of the store employees who are on duty during that shift, retain keys to the store, count and deposit cash receipts, grant access to safes and alarm codes, deal with customers' complaints, handle employee problems, discipline employees, recommend potential employees for hire, and ensure the safety of the public and staff. (GS ¶¶ 47-54; NDEC ¶¶ 35-45).

The named plaintiffs and their own witnesses admitted all the key points. Plaintiffs' chief third-party witness, Thomas Daly, a former Gristede's store manager who was fired for cause, acknowledged that his co-manager (Juan) "ran the store" in Daly's absence (NDEC ¶ 38). Juan also had responsibility to "open" and "close" the store (id.), to handle cash receipts and deposits, to "[take] care of the money," and to discipline employees (id.).

The lead plaintiff, Carlos Torres, testified that he was "given keys to the various stores in which he worked (NDEC ¶ 39-43); no other person had keys to the stores besides Torres and the store manager (id.); Torres was responsible to close the store at the end of his shift and locked up (id.); Torres also counted out store receipts and made bank deposits (id.); Torres supervised employees in his capacity of co-manager in all the stores where he worked (id.); Torres wrote up more than 10 employees, including Ms. Malave Zully, a cashier, at least twice, for being short on cash (id.); he told Ms. Zully that if shortages continued then she would be suspended or terminated (id.).

Torres believed it was his responsibility to enforce company policies by writing people up (id.); believed that he was responsible for what happened during his shift (id.); stated that he was "in charge of the store" (id.); and believed it was his job to ensure people followed schedules (id.). Torres sometimes ordered staff to go home early (id.); ordered security to escort Matthew, a former employee, out of the store after Matthew refused to mop the floor as per Torres' orders (id.); thereafter filed an incident report about Matthew indicating that Torres asked Matthew to "perform a procedure" i.e. mop the floor, and that he was met with resistance (id.); and repeatedly signed disciplinary write-ups in a managerial capacity (id.).

Still another named plaintiff, William Helwig, headed Gristede's Express Grocer division. In this capacity, Helwig was responsible to supervise more than 40 employees. (NDEC ¶ 45). As head of the Express Grocer division, Helwig also set his own hours (id.), managed and edited payroll (id.) and wrote-up more than ten employees (id.). Moreover, as a former store manager Helwig also reviewed payroll and time attendance reports (id.) and sometimes made edits to ensure payroll accuracy (id.). On his current personal resume, Helwig listed his position at Gristede's as "Operations Manager -- Internet Shopping Division" and

described his duties in relevant part as follows: "managed Internet shopping division for a 50+ supermarket chain, managed 55+ employees in a pick-pack environment; oversaw orders for accuracy; reviewed employee performance and approved increases" (id.; see also NDEC ¶ 44 (testimony of plaintiff co-manager, Gilbert Santiago, which also shows that his primary duties were exempt).)

Department managers run the customarily recognized departments in each store. They supervise and discipline all of the employees in their departments. They decide on the types and quantities of products and merchandise ordered and sold, they handle quality issues and employee staffing, they develop budgets, they can recommend people for hire, and they are responsible for achieving budgeted gross profit margins. (GS ¶¶ 21-27; NDEC ¶¶ 48-52). Again, the testimony of the plaintiffs themselves proves our points. Crema, a meat department manager, supervised up to seven employees, and DiPreta, a deli department manager, supervised up to four employees. (NDEC ¶¶ 51-52). Phelps, a dairy department manager, has disciplined employees and he testified that a large part of his job was to decide on an "ordering strategy" and on determining the kinds and amounts of merchandise to purchase and stock for his department. (NDEC ¶ 50). Plaintiffs Phelps, Crema, Salegna, and DiPreta all testified that they set employees' schedules. (NDEC ¶¶ 50-52). There can be no doubt that the primary duty of these co-managers and department managers is precisely what Gristede's and the named plaintiffs themselves say it is -- bona fide management.

2.   The Plaintiffs Meet the "Salary-Basis" Test
     for the Exemptions

An employee is paid on a "salary basis" if he receives a predetermined amount constituting all or part of his compensation for a regular pay period either weekly or on a less

frequent basis. 29 C.F.R. § 541.602(a). At least on this motion, the plaintiffs do not deny that they receive such a "predetermined amount." Instead, they rest their case on the requirement that the pay not be "subject to" reduction because of variations in the quality or quantity of the work performed by the employee.

But certain deductions are permitted -- for example, for absences of a day or more for personal reasons other than sickness or accident, 29 C.F.R. § 541.602(b)(1); and for absences due to sickness or disability if compensation or benefits are provided in accordance with state law, 29 C.F.R. § 541.602(b)(2). Partial-day deductions are permitted in the first and last weeks of employment, 29 C.F.R. § 541.602(b)(6). And even deductions that are improper will not defeat the exemption if the deductions were "either isolated or inadvertent" and the employer makes the money up to the employee, 29 C.F.R. § 541.603(c).

Because some deductions are permitted, each case requires a judgment as to whether employees' pay is "subject to" improper deductions. Both the U.S. Supreme Court and the DOL have provided guidance. For the Supreme Court, the question is whether the employer has an "objective intention" of paying its employees on a "salary basis." Auer v. Robbins, 519 U.S. 452, 452-53 (1997). There are two possible indicators that the employer lacks such an intent. One is an "employment policy that creates a 'significant likelihood' of [pay] deductions." Id. at 461. For the policy to create such a "significant likelihood," the employer must have issued a "clear and particularized policy -- one which 'effectively communicates' that deductions will be made in specified circumstances." Id. The other relevant indicator is "an actual practice of making [pay] deductions." Id.

The DOL approach is similar. It calls on courts to look at several factors, including the number of improper deductions, particularly as compared to the number of

- 19 -

employee infractions warranting discipline; the time period during which the improper

deductions were made; the numbers of employees who received and the numbers of managers

who made improper deductions; and whether the employer has a clearly communicated policy

permitting or prohibiting improper deductions.  29 C.F.R. § 541.603(a).

 Our Court of Appeals has noted that the application of the salary basis test is a

"fact specific inquiry."  Yourman v. Giuliani, 229 F.3d 124, 130-31 (2d Cir. 2000).  In Yourman,

the Court quoted a DOL brief and held that there "can be no bright-line test for determining what

constitutes an 'actual practice' of making impermissible deductions" and that this is a "factual

determination . . . best left to the trial court."  Id. at 130.

 In its decision in Yourman, the Court reiterated three different times that the

required inquiry is far more than the arithmetic exercise of toting up the number of deductions.

The Court stated: "First and foremost, the existence vel non of an 'actual practice' of imposing

pay deductions cannot be decided by the simple expedient of dividing the number of

impermissible deductions by the number of managerial employees."  Id.  See also id. (the

"question [of the employer's intent] cannot be answered by simply dividing the number of

impermissible pay deductions by the number of managerial employees"); and id. at 130-31.  ("A

mechanical comparison of the number of deductions with the number of managerial employees

simply cannot capture the fact specific inquiry into an employer's intent. . . .").  The court's

"inquiry" must be "more nuanced" than that, and in conducting the inquiry, the trial court

"should weigh" a host of factors, including those that the DOL has listed "in addition to any

others relevant to the existence of an actual practice. . . ."  Id. at 131.

 In Yourman, the district court had counted up impermissible pay deductions,

assessed the deductions in relation to the number of potentially affected employees and had

granted summary judgment for the employees. But the Court of Appeals stressed that "the number of impermissible pay deductions is only one factor to consider among many," Yourman, 229 F.3d at 131, and it vacated the district court's judgment.

Here the plaintiffs have failed to establish that Gristede's has either a "policy" or an "actual practice" of docking the pay of co-managers and department managers who perform unauthorized overtime. There certainly is no such policy in writing. None of the named plaintiffs produced or referred to such a document. Lacking such documents, plaintiffs point to an assortment of papers from Gristedes' files. None of them says that the company will edit hours to eliminate "unauthorized overtime." One (the Loss Prevention Bulletin, dated February 1997) is eight years old and pre-dates the class period. As important, it does not apply at all to co-managers or to department managers. Rather, it refers to "overtime" in the context of the collective bargaining agreements covering part-time workers working 29 hours or more, not to overtime as defined by the FLSA and NYLL. (NDEC ¶ 67).

Another (Mr. Monos' e-mail of 2005) is a four-line e-mail that does nothing more than say that two employees (Rocco and Peter) are not entitled to overtime during a particular week. It says nothing about docking their pay for any reason. Still others are merely reminders to store managers (including co-managers and department managers) that during periods when business is likely to be slow, they should try to stay within their budgets by avoiding overtime and by limiting part-time employees to the contractual maximum of 29 hours of work per week. Again, these memos say nothing at all about docking the pay of department managers or co-managers. (NDEC ¶¶ 65-66, 68). And an employer is perfectly free to encourage its managers to set employee schedules so as to stay within the employer's budget. In fact, the DOL's

- 21 -

regulations make the point that an employer has the right to "exercise its control and see that the work is not performed if it does not want it to be performed." 29 C.F.R. § 785.13.

At least one of plaintiffs' cited memos shows that Gristede's had a policy against improper editing of time and that Gristede's acted in the utmost good faith in communicating that policy to its managers.. In a 2003 e-mail to the stores, district supervisor James Monos reminded store managers that hours for part-time employees should not exceed 29 per week, which is the cut-off between the full-time and part-time classifications for union purposes. Mr. Monos was adamant in saying that he would not tolerate any edits of the working hours of those employees to cause them to show fewer hours. The e-mail stated: "This is a complete violation of company policy and will result in disciplinary action against the individual responsible." (Emphasis added.) (NDEC ¶ 65).

Plaintiffs' oral, anecdotal evidence of a policy is no more persuasive. The plaintiffs mischaracterize certain statements by Gristede's witnesses, made in response to plaintiffs' counsel's repeated hypothetical questions regarding instances where an employee unilaterally works beyond his or her shift. (GS ¶¶ 97-111, 117-239). Plaintiffs ignore the vast amounts of evidence that there is no such policy of erasing hours for unauthorized overtime. Armed with more than five years of time records and payroll data for hundreds of Gristede's workers, plaintiffs failed to establish with any specificity even one instance where any of the plaintiffs worked overtime but were not paid for those hours. At most, the testimony established that Gristede's has a policy of requiring that employees receive authorization for their overtime. There is absolutely nothing wrong with that. See 29 C.F.R. § 785.13.

Plaintiffs make a futile attempt to establish the policy they seek in a snippet of deposition testimony by Deborah Clusan, Gristede's Director of Payroll and Human Resources.

- 22 -

Ms. Clusan speculated that if employees are "coming in three hours late every day, then somebody is going to dock their pay" and that if employees "are not putting in the hours close to the hours they are expected to work . . . they are not going to continuously get paid that minimum salary." (SOF ¶ 138) (emphasis added). But Ms. Clusan also has clarified that she was not aware of any policy or practice of making improper deductions from pay, and that her response to that hypothetical question was intended to indicate only that a situation in which an employee came in to work three hours late every day is so beyond company rules that it would invite scrutiny and disciplinary action, whatever the level of the employee involved. (CDEC ¶¶ 13-14). In any event, the theoretical possibility that a pay deduction may eventually result from the extreme behavior of an employee who consistently shows up to work three hours late is not the kind of "clear and particularized policy -- one which effectively communicates that the deductions will be made in specified circumstances" -- that is required by the Supreme Court in Auer. See Ahearn v. County of Nassau, 118 F.3d 118, 121 (2d Cir. 1997).

Plaintiffs also argue that Gristedes' policy against unauthorized overtime cannot provide a "defense" to a policy of making improper deductions, and they cite three cases for that assertion. See Pl. Mem. at 17-18. But plaintiffs miss the point, which is that they have failed to show that there was a policy of making improper deductions. As a result, the cases that plaintiffs cite have no application here.

The plaintiffs do no better in trying to show the existence of an "actual practice." In fact, their mass of "evidence" amounts to nothing more than the arithmetic exercise that Yourman repeatedly and resoundingly rejected. Plaintiffs claim that Gristede's makes too many "edits" to employee time records. But as one district court correctly observed, "there is nothing inherently improper or unlawful about editing the timekeeping records." Harrison v.

- 23 -

McDonald's Corp., 411 F. Supp. 2d 862, 870 (S.D. Ohio Sept. 2, 2005).  It "is often necessary to edit the records so that they accurately reflect the actual hours worked in order to ensure that the employees are properly compensated.  It is not enough for Plaintiff to show that the records were intentionally altered.  There are many legitimate reasons why the changes might have been made."  Id.

Where there was an edit to a time record, the fact-finder must examine the facts behind that work day to determine why the time was edited, whether it was justified, and whether the edit resulted in the employee being deprived of wages to which he or she was entitled.  Id.; see also Basco v. Wal-Mart Stores, Inc., 216 F. Supp. 2d 592, 603 (E.D. La. 2002) ("Defendants have the right to present their defenses as to each plaintiffs' claim that he/she was required to work off-the-clock to the jury.").  The plaintiffs here do not even pretend to explain the reasons for any of the edits on which they rely.  Indeed, the named plaintiffs fail to identify even one instance in which any one of them worked even a minute of unauthorized overtime and was not paid for it.

Lacking any particularized evidence of improper deductions from pay, plaintiffs point instead to the number of edits and claim that they create a "pattern" of improper conduct.  But that claim fails on its face.  When compared to the number of days worked by the class members during the class period, the number of deductions is strikingly small.  Thus plaintiffs make much of the fact that the department managers purportedly received less than their full salaries 1,724 times and that the co-managers purportedly received less than their full salaries 2,557 times.  (SOF ¶¶ 106, 107).  But these class members worked a total of 694,200 days during the class period.  Therefore, the percentage of instances in which class members received less than full salary was infinitesimal.  (CDEC ¶ 23).  See Kelly v. City of New York, 2001 WL

1132017, at *7 (S.D.N.Y. Sept. 24, 2001), where the court applied Yourman to deny employees'
summary judgment motion and grant employer's summary judgment motion.  The court held that
there was no actual practice of imposing improper deductions, because "[w]hile the total number
of improper suspensions was relatively high, the percentage of exempt employees suffering
improper pay deductions [was small]."

    Similarly, plaintiffs do not compare the number of pay deductions to the number
of class member infractions warranting discipline during the class period.  As Kelly points out,
under the Yourman analysis, an employer does not violate the salary test when the number of
cases resulting in suspensions were much less than "the total number of infractions warranting
discipline." Id.

    The payroll histories of the named plaintiffs also expose the weakness of their
case.  Deductions of any kind are hardly prevalent; instead, they appear to be isolated.  And
partial day deductions are even more rare.  For five of the six named co-manager plaintiffs, there
were no partial week deductions outside of the first and last weeks of employment, when such
deductions are perfectly lawful.  The sixth co-manager, Santiago, had eight partial week
deductions, which represents 3.26 percent of his total work weeks.  But such a low percentage is,
if anything, evidence of inadvertence or human error, and as important, all of his partial week
deductions were more than offset by additional pay in later weeks.  (NDEC ¶¶ 22, 24-25).

    The payroll histories of the plaintiff department managers are like those of the
co-managers.  Weeks in which they received less than their full scheduled wage were rare, and
the evidence hardly suggests any practice of making improper deductions.  For example, Crema
was paid less than his regular weekly wage one time out of 97 work weeks; Misuraca was paid

less than his regular weekly wage four times out of 209 work weeks; and Pastorino was paid less

than his regular weekly wage four times out of 198 work weeks. (GS ¶¶ 92-96; NDEC ¶ 23).

       Plaintiffs' own punching practices reveal why editing is common and necessary.

For the years that were reviewed, five of the eight named co-manager plaintiffs never punched

the full four times in a day. (NDEC ¶ 17). Of the six named department manager plaintiffs

(except for Crema, who does not have any time records in the database), Phelps punched in and

out correctly on only 62 percent of the days that he worked, Salegna punched correctly on 28

percent of the days worked, Misuraca punched correctly on 8% of the days worked, DiPreta

punched correctly on 1 percent of the days worked, and Pastorino punched correctly on only one

day out of the 440 days he worked. (Id.). Every one of the 13 plaintiffs with time records had

workdays in which they failed to punch in at all. (Id.). Six of the eight co-manager plaintiffs

failed to punch in at all anywhere from 28 percent to 96 percent of days worked. (Id.).

       Edits permit employees to be paid when they otherwise would not. Each daily

time card is supposed to have four punches in for work, out and then back for lunch, and then out

from work. On days when an employee does not punch in at all or punches in only once, the

employee will not be paid at all unless an edit is made to his or her time record. The record

makes clear that when employees fail to punch, Gristede's makes an edit that allows the

employee to be paid. (CDEC ¶¶ 15-17).

       There is a high correlation between edits and missed punches. Edits coincide with

missed punches 99 percent of the time with respect to co-managers and 91 percent of the time

with respect to department managers. (NDEC ¶ 17). Not surprisingly, then, as to the plaintiffs

and the class as a whole, edits resulted in a net overall gain in credited hours. (Id.). Thus,

though plaintiffs repeatedly refer to the "ubiquity" of edits as evidence of an "actual practice" of

improper deductions, they have ignored the fact that the vast majority of edits enabled class members to be paid on the days they did not punch correctly. (Id.). As for the small fraction of edits that may have been due to reasons other than missed punches, it is more plausible to infer -- in light of the absence of evidence of improper conduct -- that the deduction resulted from error and inadvertence, rather than from an intent to deprive workers of their earned pay. (CDEC ¶¶ 19-23). In any case, there is no way to determine the propriety of the edits without undertaking an individualized, fact-specific determination of the circumstances behind every single edit.[4]

Neither have plaintiffs demonstrated that even a single edit actually deprived an employee of pay for time that he worked. To the contrary, the evidence establishes that the norm was for the plaintiffs to receive overtime. Thus the actual payroll histories of the named plaintiffs (including co-managers) who worked longer than a few months show that they received significant overtime pay on many occasions in which they worked beyond their standard 40 or 50 hour work week. For example, of the seven named plaintiff department managers, at least four (Arocho, DiPreta, Pastorino, and Salegna) received overtime close to 50 percent of the weeks they worked, and of these, two (DiPreta and Salegna) received overtime almost every week. (NNDEC ¶ 14).

When carefully reviewed, therefore, the evidence yields a picture that is wholly at odds with the one the plaintiffs create. Apparently improper deductions are few, and certainly are within the bounds of human error. Overtime is being paid out in abundance. The only

---

[4]     On this motion, the plaintiffs continue to rely on the report of their expert, Stephen Schneider. But that report does nothing more than add up "edits," without any attempt to explain or find a basis for the edits. That is exactly the sort of exercise that is unacceptable in an FLSA case under Yourman. The Schneider report is unreliable for a host of other reasons as well. See NDEC ¶¶ 59-63. But, in any event, the parties' exchange of expert opinions only shows that the parties' competing explanations for the edits must be presented to a jury.

conduct that is widespread is the failure of the plaintiffs to punch in and out as they are supposed

to.  Without punches, there have to be edits, or else the plaintiffs would not be paid for that day

at all.  Thus the effect of the editing is to <u>increase</u> the pay of the plaintiffs from what it would

have been otherwise.  At an absolute minimum, these facts create a genuine issue, triable to a

jury, as to whether the Corporate Defendants intend to pay the plaintiffs on a salary basis and

thus as to whether the plaintiffs are exempt.

## II.

**PLAINTIFFS ARE NOT ENTITLED**
**TO LIQUIDATED DAMAGES, A THREE-YEAR**
**<u>STATUTE OF LIMITATIONS, OR A PRESUMPTION AT TRIAL</u>**

Despite having failed to establish that Gristede's pursues either a policy or an

actual practice of making improper deductions, the plaintiffs proclaim that they are entitled to all

of the trappings that come with the finding of a willful FLSA violation – liquidated damages, a

three-year statute of limitations, and a presumption at trial.  Because they have not made out a

violation at all, let alone a willful one, the plaintiffs are entitled to none of this.  <u>See</u> <u>Brock v.</u>

<u>City of Cincinnati</u>, 236 F.3d 793, 811 (6th Cir. 2001).  At the very least, these are all issues that

must be put to the jury.

Plaintiffs acknowledge, as they must, that each of its requests requires that it show

a FLSA violation <u>and more</u>.  Liquidated damages requires a violation plus willfulness.  A

three-year statute of limitations requires a violation plus bad faith.  A presumption at trial

requires a violation plus record-keeping which is so inadequate that damages cannot be

calculated from the existing documents.

- 28 -

Not only have plaintiffs failed to show a policy of improper deductions, but one of the very few documents that plaintiffs offered to evidence such a policy, Mr. Monos's memo of 2003, proved just the opposite -- that it was Gristede's policy that all time worked should be paid in full. <u>See</u> NDEC ¶ 65. At an absolute minimum, this document creates jury questions as to Gristede' good faith and as to the willfulness of any violations.

For at least two reasons, the attack on Gristedes' record-keeping has no basis. First, the claimed inaccuracies in those records are the supposedly improper payroll deductions. Again, plaintiffs have failed to show any impropriety. Second, as we previously demonstrated, the need for editing of those records is created principally by the refusal of the class members to record their time regularly and accurately. If the need for editing is introducing any inaccuracies into the records, the class members themselves are, to the greatest extent, responsible for it. (CDEC ¶ 15-17). The plaintiffs can hardly claim the extraordinary benefits of a presumption at trial when they and their fellow class members are ultimately responsible for the problem that the presumption is intended to redress.

### III.

### THERE ARE GENUINE ISSUES
### OF MATERIAL FACT REGARDING
### GRISTEDE'S OTHER AFFIRMATIVE DEFENSES

Besides the factual issues directly under the FLSA and NYLL, other material issues of fact exist with respect to Gristede's affirmative defenses of laches, unclean hands, and waiver and estoppel. These defenses have their genesis in Gristede's existing collective bargaining agreements which provide comprehensive arbitration and grievance procedures for a host of employment related matters, including potential pay and overtime violations. For

example, Gristede's collective bargaining agreement with Local 338 provides for arbitration, in

pertinent part, as follows:

ARTICLE 27
ARBITRATION

\*\*\*

(b) Should any dispute arise between the Employer and the Union
or any employees concerning the interpretation or application of
any of the terms and provisions of this Agreement, or any alleged
breach of this Agreement, and the Employer and the Union shall be
unable to adjust said dispute between themselves, the said dispute,
at the request of either the Employer or the Union, shall be
submitted to arbitration under auspices of and in accordance with
the then rules of the New York State Mediation Board or the
American Arbitration Association at the option of the Union. The
decision or award of the arbitrator shall be final and binding and
conclusive upon the Employer, the Union and the employees. The
compensation of the Arbitrator, if any, shall be borne equally by
the parties. No decision in arbitration shall constitute a precedent
in any subsequent case, and each case shall be considered solely on
its own merits and shall be based upon the terms of this
Agreement.

(c)      The sole remedy for any breach or threatened breach of this
Agreement shall be arbitration as provided. Resort shall not be
made to courts or government agencies except to compel
arbitration or to enforce the arbitration award.

(d)      A violation or breach of this Agreement by any employee
or employees shall not be considered a violation or breach of this
Agreement by the Union.

(e)      A grievance by an employee against an Employer
concerning disciplinary action, must be filed by the employee
within fifteen (15) days after written notice by the Employer to the
employee and to the Union of such discipline, otherwise the
grievance shall be deemed to be waived.

The failure of department managers to avail themselves of these arbitration and

grievance procedures raise issues of estoppel and waiver. Functionally, the defenses of laches,

- 30 -

unclean hands and waiver and estoppel are effectively inter-related and really constitute multiple heads of the same coin. Accordingly, they should be viewed in tandem.

Plaintiffs' attempt to side-step any consideration of these defenses through reference to the Supreme Court decision in Barrentine v. Arkansas – Best Freight, 450 U.S. 728 (1981), is misplaced. We do not quarrel with the proposition that employees can not waive their FLSA rights in the abstract, but there is a distinction to be drawn between a general waiver and the failure of some of the plaintiffs here to exercise rights and procedures provided to them to pursue possible FLSA claims. This distinction has been a topic of some debate in the New York federal courts confronted with FLSA claims in a collective bargaining context.

For example, in a recent case, the Eastern District dismissed plaintiffs' FLSA claims, and required them to arbitrate their grievances before bringing claims in federal court, where the collective bargaining agreement required the parties "to engage in a grievance procedure, and that grievance procedure does not abridge Plaintiffs' rights under the FLSA." Tyler v. City of New York, 2006 U.S. Dist. LEXIS 29650, at *15, (E.D.N.Y. May 16, 2006).

Likewise, the Southern District ruled that where the parties agreed to arbitration pursuant to the execution of the agreement, the parties must first arbitrate their FLSA claims. See Sinnett v. Friendly Ice Cream Corp., 319 F. Supp. 2d 439 (S.D.N.Y. 2004) (finding that the Supreme Court articulates a policy that favors arbitration and federal courts are directed to construe arbitration clauses as broadly as possible, and therefore dismissing plaintiffs' FLSA action, and compelling arbitration) (internal quotations and citations omitted); Volt Information Sciences Inc. v. Bd of Trustees of Leland Stanford Junior University, 486 U.S. 468 (1989) (requiring courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms).

While the Second Circuit appears to permit individuals to pursue single FLSA claims without first seeking arbitration, the rule should not apply on an across-the-board basis, particularly since Gristede's collective bargaining agreements with Local 338 gives individual union members the rights of enforcement through arbitration as an exclusive remedy as quoted above, [Compare Tran v. Tran, 54 F. 3d 115 (2d Cir. 1995) with Ciago v. Ameriquest Mortgage Company, 295 F. Supp. 2d 324 (S.D.N.Y. 2003)]. In any event, before the impact of the collective bargaining agreement arbitration procedures can properly be addressed, a factual record needs to be developed at trial.

## IV.

## THE COUNTERCLAIMS SHOULD NOT BE DISMISSED

Torres and Chewning cannot satisfy their burden of proof relating to their alleged retaliation claims. To prevail, Torres and Chewning must prove that (1) they engaged in a statutorily protected activity; (2) the employer was aware of this activity; (3) the conduct was legally actionable; and (4) retaliation was a motivating factor in the employer's decision. See Treglia v. Town of Malius, 313 F.3d 713, 719 (2d Cir. 2002). Because Torres and Chewning cannot possibly establish either the third or fourth element, their motion must be denied.

Assuming, arguendo, that Torres and Chewning could establish a prima facie case of retaliation, they still should not be granted summary judgment because once a prima facie case of retaliation is established, "the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason" for the employer's action. Id. at 721. Gristede's has a legitimate non-retaliatory reason for filing its counterclaims, namely that Gristede's was compelled to do so under the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 13(a). Plaintiffs were the ones who initiated this lawsuit against Gristede's. Once the lawsuit was started, Gristede's was bound

to examine whether any counterclaims exist and then to determine whether they are compulsory

or permissive.  Under Rule 13(a), a counterclaim is compulsory if it "arises out of the transaction

or occurrence that is the subject matter of the opposing party's claim."  Id.  The seminal Supreme

Court case on the "transaction" test emphasized the flexibility in the meaning of transaction: "It

may comprehend a series of many occurrences, depending not so much upon the immediateness

of their connection as upon their logical relationship."  Moore v. New York Cotton Exchange,

270 U.S. 593, 610 (1926).  Gristede's counterclaims here are plainly compulsory, and must be

asserted or they will be waived.

      Because Gristede's has demonstrated a legitimate reason for bringing its

counterclaims, the burden then shifts back to Torres and Chewning to "point to evidence that

would be sufficient to permit a rational factfinder to conclude that the employer's explanation is

merely a pretext for impermissible retaliation."  Treglia, 313 F.3d at 721. (internal quotation

omitted).  Plaintiffs argue that Gristede's retaliation is evident in the timing of the lawsuit and its

presumed effect on other employees.  As already stated, the timing of the suit was based on

Gristede's requirement to bring its counterclaims now.  Further, this Court has held that a

temporal proximity between the protected behavior and the alleged retaliation does not itself

create a causal nexus.  See Bandhan v. Laboratory Corp. of America, 2002 U.S. Dist. LEXIS

25972, at *20 (S.D.N.Y. Mar. 27, 2002). (dismissing plaintiff's claim of retaliation because he

fails to establish a prima facie case, and assuming plaintiff could, he failed to show a pretext in

defendant's behavior).

      Equally suspect, Torres and Chewning cannot show proof that these claims have

negatively affected the other plaintiffs in the action or themselves.  In fact, Torres and Chewning

both testified that they were not even aware of the counterclaims, making it impossible to conclude that the counterclaims influenced the thinking of the other plaintiffs or class members.

Substantively, the counterclaims have merit under the faithless servant doctrine. Phansalkar v. Anderson Weinroth & Co., 344 F.3d 184 (2d Cir. 2003).  Under New York law, an employee owes a duty of good faith and loyalty to his employer.  See Design Strategies, Inc. v. Davis, 384 F. Supp. 2d 649, 659 (2d Cir. 2005) (entering judgment for employer in the amount of compensation paid to disloyal employee).  Based upon this doctrine, an employee is prohibited from acting in any manner inconsistent with his agency or trust, and must exercise his duties in good faith.  See Western Elec. Co v. Brenner, 41 N.Y.2d 291, 295, 360 N.E.2d 1091 (1977) (finding that it is fundamental that an employee is to behave with utmost loyalty and is prohibited from behaving inconsistently with his agency or trust).  Further, a misappropriation of property constitutes a breach of this duty.  See Camp Summit of Summitville, Inc. v. Shellie Santay Visinski, 2007 U.S. Dist. LEXIS 28496, at *40 (S.D.N.Y. Apr. 13, 2007) (requiring employee to make restitution to employer for the monies she misappropriated during her employment).

Here, both Torres and Chewning acted improperly and easily fall under the faithless servant doctrine, subjecting them to damages.  Chewning engaged in fraudulent conduct involving various unauthorized credit card transactions.  Chewning's behavior was criminal, making him overtly disloyal to his employer, Gristede's.  This Court has determined that an employer is entitled to recover salary paid to an employee where it is found that the employee was disloyal.  See City of New York v. Bower, 1991 U.S. Dist. LEXIS 1204, at *3-7 (S.D.N.Y. Jan. 31, 1991) (granting the city restitution of salary paid to disloyal employee).

Torres was disloyal to Gristede's because he violated the terms of his employment by engaging in sexually inappropriate conduct and harassment of subordinate female employees. This Court has emphasized that an employer is justified in taking action against a sexual harasser. See Humayun v. Hudson News Co., Inc., 1996 U.S. Dist. LEXIS 19963, at *14 (S.D.N.Y. Nov. 24, 2006) (finding that employee failed to establish a pretext when he was terminated for sexually harassing other employees). Torres' behavior was certainly disloyal to Gristede's, which ensures that all employees are working in a safe environment. See Newsday, Inc. v. Long Island Typographical Union, 915 F.2d 840, 844 (2d Cir. 1990) (finding that an employer is responsible for maintaining a work place environment free from sexual harassment).

Even if the precise amount of damages remain an issue, Torres still may be held liable for loss of compensation when the employer has not suffered provable damage as a result of the breach of fidelity (emphasis added). See id. (internal quotation omitted). Therefore, Gristede's is entitled to a portion of Torres's salary for his disloyalty. See Bower, 1991 U.S. Dist. LEXIS 1204, at *3-7.

# CONCLUSION

For all of these reasons set forth above and in the papers that accompany this
memorandum of law, Gristede's respectfully urges the Court to deny the plaintiffs' motion in all
respects.

Dated: New York, New York
       July 20, 2007

                                        Respectfully submitted,

                                        FINKEL GOLDSTEIN
                                        ROSENBLOOM & NASH, LLP

                                        By: _____
                                             Kevin J. Nash (KJN-6274)
                                        26 Broadway - Suite 711
                                        New York, New York 10004
                                        (212) 344-2929

                                        Attorneys for Defendants
                                           Gristede's Operating Corp.,
                                           Namdor, Inc.,
                                           Gristede's Food, Inc.,
                                           City Produce Operating Corp.,
                                           and Gristede's Foods NY, Inc.

Of Counsel:

Arthur H. Aufses III (AA-8590)
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
212-715-9539

Attorneys for Defendants
  Galo Balseca,
  John Catsimatidis, and
  James Monos

<u>CERTIFICATE OF SERVICE</u>

I, Arthur H. Aufses III, certify that on the 20th day of July, 2006, I caused a copy of

Defendants Gristede's Operating Corp.; Namdor, Inc.; Gristede's Food, Inc.; City Produce

Operating Corp.; and Gristede's Foods NY, Inc.'s Memorandum of Law in Opposition to

Plaintiffs' Motion for Partial Summary Judgment, to be served by e-mail and by FedEx Priority,

on the following counsel of record:

> Justin M. Swartz, Esq.
> Outten & Golden LLP
> 3 Park Avenue, 29th Floor
> New York, New York 10016
> E-Mail Address: jms@outtengolden.com

Dated:    July 23, 2007
          New York, New York

                                        Arthur H. Aufses III (AA-8590)