# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CARLOS TORRES, BOBBY IRIZARRY,          :
RUBEN MORA, JOSELITO AROCHO, LEWIS
CHEWNING, JOSEPH CREMA, ALFRED          :
CROKER, FRANK DELEON, MARIO DIPRETA,
WILLIAM HELWIG, ROBERT MISURACA,        :
ROBERT PASTORINO, VICTOR PHELPS,
DANIEL SALEGNA, and GILBERTO            :
SANTIAGO, on behalf of themselves and all others
similarly situated,                     :

                   Plaintiffs,          :        04 Civ. 3316 (PAC)

         - against -                    :        ORDER AND OPINION

GRISTEDE'S OPERATING CORP., NAMDOR,     :
INC., GRISTEDE'S FOOD, INC., CITY
PRODUCE OPERATING CORP., GRISTEDE'S     :
FOODS NY, INC., GALO BALSECA, JOHN
CATSIMATIDES, and JAMES MONOS,          :

                   Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GRISTEDE'S FOODS NY, INC., GRISTEDE'S   :
OPERATING CORP., NAMDOR, INC.,
GRISTEDE'S FOODS, INC., and CITY        :
PRODUCE OPERATING CORP.,

                                        :
                   Counter-Claimants,
                                        :
         - against -
                                        :
CARLOS TORRES and LEWIS CHEWNING,
                                        :
                   Counter-Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiffs[1] are a class of current and former "managerial" employees of the New York supermarket chain Gristede's.  In their original Complaint, filed April 30, 2004, Plaintiffs alleged that Defendants[2] willfully failed to record, credit, and compensate similarly situated employees for hours worked in excess of forty hours per week in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and New York Labor Law ("NYLL") §§ 650 et seq.  They have subsequently alleged claims for common law fraud and retaliation pursuant to FLSA, 29 U.S.C. § 215(3), and NYLL § 215(2), against Defendant Gristede's only.  By Memorandum Decision and Order dated September 29, 2006, the Court approved Plaintiffs' motion to certify a collective action under the FLSA pursuant to 29 U.S.C. § 216(b) and to proceed as a class action on the state law claims under Federal Rules of Civil Procedure 23(a) and 23(b)(3). See Torres v. Gristede's Operating Corp. (Torres I), No. 04 Civ. 3316 (PAC), 2006 WL 2819730 (S.D.N.Y. Sept. 29, 2006).  Specifically, the Court certified a class of "all persons employed by defendants as Department Managers or Co-Managers who were not paid proper overtime premium compensation for all hours that they worked in excess of forty in a workweek any time between April 30, 1998 and the date of final judgment in this matter." Id. at *11.

Plaintiffs now move for partial summary judgment on nine legal claims for which they assert there are no material factual issues are left to be tried:

---

[1] The Individual and Named Plaintiffs are (1) co-managers Lewis Chewning ("Chewning"), Alfred Croker ("Croker"), Frank Deleon ("Deleon"), William Helwig ("Helwig"), Bobby Irizarry ("Irizarry"), Ruben Mora ("Mora"), Gilberto Santiago ("Santiago"), and Carlos Torres ("Torres") and (2) department managers Joselito Arocho ("Arocho"), Joseph Crema ("Crema"), Mario DiPreta ("DiPreta"), Robert Misuraca ("Misuraca"), Robert Pastorino ("Pastorino"), Victor Phelps ("Phelps"), and Daniel Salegna ("Salegna").
[2] Defendants are Gristede's Operating Corporation, Namdor, Inc., Gristede's Food, Inc., City Produce Operating Corp., and Gristede's Foods NY, Inc., (collectively, "Gristede's").  Plaintiffs reserve the right to move separately for a determination that the individual named defendants, Galo Balseca ("Balseca"), John Catismatides ("Catsimatides"), and James Manos ("Manos") are individually liable as joint employers. (See P. Mem. at 1.)

1) Defendants' Fifth Affirmative Defense—the "white collar exemption" to the FLSA and NYLL claims;

2) Defendants' liability for the overtime claims of the co-manager Plaintiffs and class members;

3) Plaintiffs' claim that Gristede's policy of deleting "unauthorized overtime" from class members' time records was unlawful and constituted a violation of the FLSA and NYLL;

4) Defendants' Second, Third, and Fourth Affirmative Defenses of laches, unclean hands and improper conduct, and waiver and estoppel, respectively;

5) Plaintiffs' demand for liquidated damages, based on their contention that Defendants cannot prove their allegedly unlawful actions were conducted in "good faith" and upon a "reasonable" belief of lawfulness;

6) Plaintiffs' demand for a three-year statute of limitations, based on allegations of willful misconduct;

7) Plaintiffs' claim that Gristede's failed to keep accurate records of class members' time, which would entitle Plaintiffs to appropriate presumptions, evidentiary rulings, and jury instructions at trial;

8) Defendants' allegedly frivolous counterclaims against Torres and Chewning; and

9) Plaintiffs' claim that Gristede's retaliated against the Individual Plaintiffs by filing the counterclaims.

For the reasons stated below, Plaintiffs' motion is GRANTED, with the exception of their seventh claim which is DENIED.

# I. Background

## A. Facts

For the purposes of this opinion, the Court assumes familiarity with <u>Torres I</u>.  That opinion provides a comprehensive description of Plaintiffs' FLSA, NYLL, and common law claims and requested relief.  <u>See id.</u> at *1.  It also contains a thorough statement of the relevant facts, dividing the factual discussion into four categories:  payroll practices; analysis of duties; unauthorized overtime; and working past the clock.  <u>See id.</u> at **2-5.  As the parties conducted no additional discovery subsequent to <u>Torres I</u>, the Court's factual summary was based on substantially the same source material—primarily expert reports, depositions, and affidavits—on which the parties rely for the present motion.  In lieu of a duplicative factual statement, the Court relies on <u>Torres I</u> and makes additional references to the record where appropriate for the discussion that follows.

## B. Procedural History and Counterclaims

On April 30, 2004, Plaintiff Carlos Torres filed an initial class action complaint alleging violations of federal and state wage and hour laws. (<u>See</u> Compl.)  On June 29, 2004, Torres amended the complaint to add Named Plaintiffs Mora and Irizarry. (<u>See</u> 1st Am. Compl.)  On March 25, 2005, Plaintiffs amended the complaint again, adding Defendants Balseca, Catsimatides, and Manos (the "Individual Defendants"), joining twelve more Named Plaintiffs, including Chewning, and alleging a new cause of action for common law fraud against Gristede's. (<u>See</u> 2d Am. Compl.)  On April 22, 2005, Defendants answered Plaintiffs' pleadings for the first time, denying all claims and asserting unspecified counterclaims against Torres and Chewning. (<u>See</u> Answer to 2d Am. Compl.)  Plaintiffs considered the counterclaims an impermissible act of retaliation and immediately filed a Motion for an Order to Show Cause on

April 26, 2005 seeking injunctive and other relief and sanctions. (See Neilan Decl., Ex. IIII ("Pls.' Mem. of Law in Support of Motion for an Order to Show Cause").)  A hearing on the Order to Show Cause went forth on April 27, 2005 before Magistrate Judge Andrew J. Peck, who declined to enter Plaintiffs' proposed order, but noted that the counterclaims appeared to be "somewhat retaliatory on the defendant." (See Neilan Decl., Ex. III ("OSC Tr.") at 16:21.) Plaintiffs then filed a Third Amended Complaint stating FLSA and NYLL retaliation claims on May 3, 2005. (See 3d Am. Compl.)

## C.  Legal Standard for Summary Judgment

A motion for summary judgment shall be granted if the pleadings demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).  The moving party initially bears the burden of demonstrating that no genuine issues of material fact remain. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once this showing is made, the nonmoving party may not rely solely on "[c]onclusory allegations, conjecture, and speculation," Niagara Mohawk Power Corp. v. Jones Chem. Inc., 315 F.3d 171, 175 (2d Cir. 2003) (internal citations and quotation marks omitted), but must present specific evidence in support of its contention that there is a genuine dispute as to the material facts. Fed. R. Civ. P. 56(e).  The Court resolves all ambiguities and draws all factual inferences in favor of the

nonmovant, but "only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 127 S. Ct. 1769, 1776 (2007) (citing Fed. R. Civ. P. 56(c)).

## II. Discussion

### A. The "White Collar" Exemption

As its Fifth Affirmative Defense, Gristede's maintains that it is under no obligation to pay co-managers and department managers overtime wages because they are executive or administrative employees covered by the so-called "white collar exemption" to the FLSA, 29 U.S.C. § 213(a)(1), and corresponding NYLL regulations, 12 N.Y.C.R.R. §§ 142-2.2, 142-2.14. Plaintiffs contend they are entitled to summary judgment on this affirmative defense because Gristede's cannot prove that class members perform work or earn compensation commensurate with executive or administrative employment.

The FLSA requires that all hours worked in excess of forty hours per week be compensated at one and one-half times the minimum wage. 29 U.S.C. § 207(a)(1). The statute exempts from overtime coverage, however, "any employee employed in a bona fide executive, administrative, or professional capacity . . . as such terms are defined and delimited . . . by regulations of the Secretary [of Labor]." Id. § 213(a)(1). The regulations promulgated by the Secretary of Labor (the "Secretary") define an executive, administrative, or professional employee as someone who performs certain duties and is paid on a salary basis at a rate of not less than $455 per week. See 29 C.F.R. §§ 541.100, 541.600.[3] The requirements are

---

[3] The duties are different for each category of employment. See 29 C.F.R. §§ 541.100 (executive), 541.200 (administrative), 541.300 (professional). Defendants do not claim that either co-managers or department managers could be exempt as a professional employee.

substantially the same under the NYLL.[4]  The parties do not dispute that co-managers and
department managers receive compensation that meets the minimum amount required.

Courts apply the salary basis test to distinguish bona fide white collar employees from
non-exempt, hourly employees, "i.e., employees who may be disciplined 'by piecemeal
deductions from . . . pay.'"  Yourman v. Giuliani, 229 F.3d 124, 130 (2d Cir. 2000) (quoting Auer
v. Robbins, 519 U.S. 452, 456 (1997)).  An employee is paid on a salary basis if the employee
receives "a predetermined amount" each pay period that is "not subject to reduction because of
variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a).  Absent
certain exceptions outlined in the Secretary's regulations, a white collar employee should expect
to receive "the full salary for any week in which the employee performs any work without regard
to the number of days or hours worked." Id.  This is because "[d]eductions from pay in less than
one week increments for disciplinary violations are inconsistent with compensation on a salary
basis." Yourman, 229 F.3d at 128 (citing Auer, 519 U.S. at 456); see also Martin v. Malcolm
Pirnie, Inc., 949 F.2d 611, 615 (2d Cir. 1991) ("[A]n employee who can be docked pay for
missing a fraction of a workday must be considered an hourly, rather than a salaried, employee."
(citations omitted)).

The fact that an employer has made an actual deduction is insufficient by itself, however,
to find an employee non-exempt. See Yourman, 229 F.3d at 130.  Rather, the relevant inquiry is
whether the employer engages in an actual practice of making impermissible deductions such

---

[4] New York's overtime provisions expressly incorporate the FLSA exemptions. 12 N.Y.C.R.R. § 142-2.2.  Courts
regularly look to the FLSA when considering the scope of overtime exemptions under the NYLL. See Zheng v.
Liberty Apparel Co., 355 F.3d 61, 78 (2d Cir. 2003); Debejian v. Atl. Testing Labs., Ltd., 64 F. Supp. 2d 85, 87 n.1
(N.D.N.Y. 1999); Lopez v. Silverman, 14 F. Supp. 2d 405, 411 n.4 (S.D.N.Y. 1998).  Like the FLSA, the NYLL
white collar exemption requires a "salary of not less than . . . [a fixed amount]." 12 N.Y.C.R.R. § 142-
2.14(c)(4)(i)(e).  In Torres I, the Court held that, under the NYLL, "salary" means "receipt of fixed, regular
compensation" that is "not subject to weekly variation by hours worked." 2006 WL 2819730, at *13; see also
Definition of "Salary," Op. N.Y. Dep't of Labor, File No. RO-06-0005 (Mar. 30, 2006) (submitted as Neilan Decl.
Ex. JJJJ).  Accordingly, the ensuing analysis focuses solely on federal law, but applies with equal force to Plaintiff's
claims under New York State law.

7

that the employer "necessarily has no intention of paying its employees on a 'salary basis.'" Id. (quoting Klem v. County of Santa Clara, 208 F.3d 1085, 1091 (9th Cir. 2000)); 29 C.F.R. § 541.603(a) ("An employer who makes improper deductions from salary shall lose the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis."). The question of the employer's intent "cannot be answered by simply dividing the number of impermissible pay deductions by the number of managerial employees." Yourman, 229 F.3d at 130. Instead, assessing this "objective intention" entails a more nuanced consideration of:

> the number of improper deductions, particularly as compared to the number of employee infractions warranting discipline; the time period during which the employer made improper deductions; the number and geographic location of employees whose salary was improperly reduced; the number and geographic location of managers responsible for taking the improper deductions; and whether the employer has a clearly communicated policy permitting or prohibiting improper deductions.

29 C.F.R. § 541.603(a). Accordingly, the Court weighs these factors to determine whether Plaintiffs are entitled to summary judgment.[5]

In Torres I, after reviewing Plaintiffs' evidence for the purposes of certifying a collective action, the Court determined that "Gristede's clearly sought to treat workers as 'hourly' for some purposes (i.e., docking them for hours not worked during the workweek), but 'salaried' for other purposes (i.e., not paying them overtime for hours worked in excess of the workweek)." 2006

---

[5] The Court need not address separately Plaintiffs' alternate contention that Gristede's maintains an employment policy that creates a significant likelihood of pay deductions. (P. Mem. at 14.) Though the Supreme Court, in Auer, held that the exemption does not apply "if there is either an actual practice of making [impermissible] deductions or an employment policy that creates a 'significant likelihood' of such deductions," 519 U.S. at 461 (emphasis added), the policy inquiry is ill-suited for the case at bar. The policy test was designed to alleviate somewhat the evidentiary burden on employees who are "subject to," but have not yet suffered, impermissible deductions. Id. (noting that this approach "rejects a wooden requirement of actual deductions"); see also Yourman, 229 F.3d at 130 ("Actual deductions from pay are [not] necessary for an employee to be found non-exempt."). Here, however, Plaintiffs' chief argument is not that co-managers and department mangers labor under the threat of impermissible salary deductions per Gristede's policy; rather, they contend that their salaries were actually reduced. When real deductions are alleged to have occurred, proving the policy rather than the actual occurrence of the deduction itself is superfluous. See Coleman-Edwards v. Simpson, No. 03 Civ. 3779 (DLI) (VVP), 2008 WL 820021, *7 (E.D.N.Y. Mar. 25, 2008) ("Engaging in post-hoc analysis to divine a policy of pay deductions would be inconsistent with the clarity that Auer requires."). Note, however, that the existence of a policy either "permitting or prohibiting improper deductions" remains a relevant factor in assessing whether the employer maintains an actual practice of making such deductions. 29 C.F.R. § 541.603(a).

WL 2819730, at *10.  Now, faced with substantially the same evidence, the Court discerns no legitimate justification for reaching any other conclusion.  The Court reaches this conclusion mindful that the burden of proving the exemption at trial ultimately falls upon Gristede's, the employer claiming the exemption. See Martin, 949 F.2d at 614.  Moreover, as with all exemptions to FLSA overtime coverage, the Court must construe the white collar exemption narrowly against the employer seeking to assert it and ensure that it applies only to those employees plainly and unmistakably within the exemption. Auer, 519 U.S. at 463; Martin, 949 F.2d at 614.  Here, the overwhelming weight of the evidence suggests just the opposite, i.e. that the class members were not salaried executives or administrators within the contemplation of the FLSA.  Instead, as discussed below, Gristede's co-managers and department managers received a regular paycheck that was tied automatically to the amount of hours they worked during the pay period.

### 1. The Number of Deductions

Gristede's payroll records demonstrate that there was no intention to pay class members a fixed, regular compensation "without regard to the number of days or hours worked." 29 C.F.R. § 541.602(a).  An employee paid on a salary basis should expect to receive regular paychecks with the same number listed in the gross pay column.  Though the Secretary's regulations allow for some lawful variations in gross pay,[6] regular receipt of payment in a predetermined amount is the hallmark of salaried compensation. See id.  Here, however, class members frequently received paychecks with a gross pay notation that ranged either above or below the expected

---

[6] For instance, the regulations explain that deductions may be taken when an employee is absent for a full day for reasons other than illness or accident, 29 C.F.R. § 541.602(b)(1), or if an employee violates a safety rule of major significance, id. § 541.602(b)(5). Cf. Ergo v. Int'l Merchant Servs., 519 F. Supp. 2d 765, 770 (N.D. Ill. 2007) ("Courts have specifically interpreted the phrase, 'subject to reduction,' to mean that the exemption is unavailable if the employer deducts from the employee's pay for violations of non-safety-related rules or partial-day absences.") (citation omitted).

compensation for the hours scheduled. That figure was tied directly to the number of hours actually worked.[7]

At oral argument, Plaintiffs' counsel set aside the findings of his own statistical expert, Dr. Stephen Schneider, regarding under- and over-payments of class members and relied instead on the report prepared by Gristede's expert, Dr. Mark Berkman. The Court does the same. Dr. Berkman's report demonstrates that class members' gross payments vary from week to week with considerable frequency. Dr. Berkman analyzed 42,074 weeks of payroll data for all co-managers and department managers other than the named plaintiffs and determined that they were paid less than a full week's salary 4,249 times, or slightly more than 10% of the total workweeks.[8] (Neilan Decl. Ex. UU, Expert Report of Mark Berkman, Ph.D. ("Berkman Report") Tbl. 4, cols. 1, 2.) He then subtracted from this total the weeks in which the underages were in multiples of a single work day—which, at least in many instances, indicate permissible pre-approved days-off without pay.[9] Id. Tbl. 4, col. 4; see also 29 C.F.R. § 541.602(b)(1) (allowing that "[d]eductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability"). This left 3,131

---

[7] To take one example, department manger Lead Plaintiff Robert Misuraca regularly earned $978.00 gross pay per week based on a workweek of forty hours. (See Neilan Decl. Ex. VVV.) However, for the check dated June 20, 2003, Misuraca received only $929.10 for 38 hours of work, a deduction consistent with compensation at an hourly rate of $24.45. (Id.)

[8] Co-managers received paychecks for less than their fifty scheduled hours 20% of the time. (Berkman Report, Tbl. 4, col. 3.) Department managers received checks for less than their forty scheduled hours in 6% of workweeks. (Id.)

[9] This corresponds to paychecks with compensation equal to 10, 20, 30, or 40 weekly working hours for co-managers and 8, 16, 24, or 32 hours for department managers. (Berkman Report, Tbl. 4, col. 4 & n.4.) The Court acknowledges that the experts' method for determining partial-day absences—i.e., discounting workweeks in which the total hours are a multiple of the per day hourly total, see infra note 10—is imprecise. It is, of course, possible that a co-manager could have been absent for an entire day (-10 hours) but worked two extra hours (+2) over the course of the week. This would result in a 42-hour workweek, from which the experts would infer a partial-day deduction when, in fact, that was not the case. Likewise, a co-manager could receive a partial-day deduction of four hours on one day and six hours on another day in the same week. This would result in a 40-hour workweek, which the experts would consider a permissible full-day deduction when, in fact, the co-manager was penalized for multiple partial-day absences.

employee workweeks—roughly 7.5% of the total workweeks—in which Gristede's made partial-day deductions from class members' purported salaries. (Berkman Report, Tbl. 4, col. 4.)[10]

      As noted above, assessing the employer's intent is more than an arithmetic exercise—there is no magic number of deductions that suffice to vitiate the exemption. See Yourman, 229 F.3d at 130 (noting the absence of a "bright-line test"). Plaintiffs cite a number of circuit court opinions, however, in which employers failed the salary basis test based on considerably fewer impermissible deductions. See, e.g., Block v. City of Los Angeles, 253 F.3d 410, 419 (9th Cir. 2001) (thirteen impermissible deductions); Takas v. Hahn Auto. Corp., 246 F.3d 776, 781 (6th Cir. 2001) (seven); Klem v. County of Santa Clara, 208 F.3d 1085, 1095 (9th Cir. 2000) (fifty-three).

      Dr. Berkman also reports a significant number of overages—weeks in which co-managers or department managers were paid for more than a full week's work (i.e., more than fifty hours for co-managers and more than forty hours for department managers). (Berkman Report, Tbl. 4, col. 7.) While overages are nowhere near as probative as underages, they are still relevant for two related reasons. First, they add context to the compensation practices at Gristede's. Even if class members were not underpaid, they still received a fluctuating weekly paycheck contingent on the amount of hours worked per week. This is inconsistent with executive compensation. Second, the fact that additional compensation was provided belies Gristede's claim that it paid its employees on a salary basis. The white collar exemption exists precisely because executive or administrative employees "are given discretion in managing their time and their activities and . . . are not answerable merely for the number of hours worked or number of tasks accomplished." Kinney v. District of Columbia, 994 F.2d 6, 11 (D.C. Cir. 1993).

---

[10] Gristede's made parital-day deductions on more than 15% of co-managers' paychecks and more than 4% of department managers' paychecks. (Berkman Report, Tbl. 4, col. 1, 4)

This discretion makes premium overtime unnecessary.  If class members, as purportedly executive or administrative employees, felt it necessary to work extra hours to accomplish that week's essential tasks, they should not have been entitled to additional compensation.

Defendants fail to submit any credible evidence to counter the logical conclusion to be drawn from the statistical data of its own expert—that Gristede's made a significant number of impermissible changes to the weekly compensation of allegedly salaried class members.  There is no showing, for instance, that <u>any</u> of the partial-day deductions identified above were permissible per the Secretary's guidelines.  Even more critically, Defendants do not identify even one instance where a class member worked fewer than the scheduled hours but still received a full salary.  Thus, based largely on the data compiled by Defendants' expert, the Court must conclude that this factor tips decidedly against a finding that Gristede's intended to pay class members on a salary basis.

### 2. The Breadth of Deductions

Plaintiffs offer the expert report of Dr. Stephen Schneider to demonstrate just how widespread the deductions were.  He analyzed 12,717 paychecks of 129 co-managers and determined that 2,693 co-manager paychecks were for less than 50 compensable hours. (Neilan Decl. Ex. TT, Dr. Stephen Schneider's Expert Report in Support of Class Certification for Plaintiffs ("Schneider Report") ¶ 22.)  He found that the co-manager paychecks for less than 50 compensable hours were issued to 110 (85%) of the 129 co-managers, at 48 (96%) of the 50 stores, and in 297 (97%) of the 306 workweeks. (<u>Id.</u>)  The numbers drop only slightly when the analysis is focused on impermissible partial-day absences.  Dr. Schneider found deductions for partial-day absences for 71% of all co-managers at 90% of the stores and in 92% of workweeks. (<u>Id.</u> ¶ 24.)

12

Dr. Schneider performed a similar analysis for department managers.  He analyzed 31,117 paychecks of 188 department managers and found that 1,724 department manager paychecks were for less than 40 compensable hours. (Id. ¶ 27.)  Paychecks of less than 40 compensable hours were issued to 158 (84%) of 188 department managers, at 48 (96%) of 50 stores, and in 296 (97%) of 306 workweeks. (Id.)  Partial-day absences were deducted for 78% of department managers at 96% of Gristede's stores in 84% of workweeks. (Id. ¶ 28.)

This unchallenged data demonstrates that instances of impermissible deductions were not confined to a handful of stores and cannot be explained by temporary phenomena like miscalculations or computer payroll problems.  Week in and week out, across the Gristede's chain, co-managers and department managers received less money than the terms of their employment required.  This factor weighs strongly in favor of an intention to pay on an hourly, not salaried, basis.

### 3. Policy Considerations

Next, Plaintiffs argue that Gristede's maintains an unwritten policy of making impermissible deductions from the purported salaries of co-managers and department managers.  They cite chiefly the deposition testimony of Deborah Clusan, Director of Payroll for Gristede's, who stated that co-managers and department managers are expected to work close to their expected number of hours per week in order to draw their full weekly "salary." (Neilan Decl. Ex. X ("Clusan Dep.") 343:8-18.)  She conceded that, if class members fail to reach this required number of hours, their pay is docked. (Id.)[11]  As the Second Circuit has noted, "a company's

---

[11] Clusan testified as follows:

    Q:  Actually, I want to know whether they are guaranteed a weekly minimum salary.
    A:  I don't know what you mean by "guaranteed."  They are supposed to work at least 50 hours to obtain that minimum salary.
    Q:  So what if they don't work 50 hours?
    A:  Well, if it's within reason and it's an hour one way or the other, they'll still get their 50 hours. If they're coming in three hours late every day, then somebody is going to dock their pay.

general requirement that its employees work at least eight hours a day strongly suggests that the company views these employees as hourly and not salaried." <u>Martin</u>, 949 F.2d at 617.[12]  Clusan also testified that, in the event of a partial-day absence for illness, for example, a salaried Gristede's employee would not be paid for the time missed if that employee had already used his allotted sick days. (Clusan Dep. 503:12-25.)

Several other upper-level Gristede's employees, including store managers responsible for payroll spending, testified that department manager class members were, in fact, hourly employees. (<u>See</u> Neilan Decl. Ex. II ("Molina Dep.") at 46:21-25; Neilan Decl. Ex. MM ("Paliophilos Dep.") at 54:23-56:6.)  Defendants only respond by claiming that Gristede's paid its department managers a "weekly wage" pursuant to the assorted collective bargaining agreements it negotiated with various unions. (<u>See</u> D. App'x Ex. 2-4.)  They fail to explain, however, why Gristede's classified class members as hourly employees on New York State Workers' Compensation Board C-240 forms. (Neilan Decl. Ex. DDD (Forms C-240).)

### 4. Other Considerations

Defendants speculate that partial-day deductions made in the first or last weeks of class members' employment may have skewed the statistical data in Plaintiffs' favor.  While Defendants are correct that such deductions are permitted under the regulations, see 29 C.F.R. § 541.602(b)(6), they overlook the fact that their expert excluded the first and last weeks of

---

. . .
Q:  Does that apply to all co-managers?
A:  It applies to all management people.  If they are not putting in the hours close to the hours that they are expected to work for that minimum salary, they are not going to continuously get paid that minimum salary.
(Clusan Dep. 343:8-344:2).
[12] Gristede's clearly does not have the kind of "clear and particularized policy . . . which effectively communicates that [impermissible] deductions will be made in specified circumstances." <u>Ahearn v. County of Nassau</u>, 118 F.3d 118, 121 (2d Cir. 1997).  Such a policy would be sufficient, by itself, to demonstrate that employee compensation is "subject to reduction," and render the employer's exemption claim meritless.  <u>Yourman</u>, 229 F.3d at 128-29.  Rather, Plaintiffs' proof with regard to Gristede's unofficial policies is probative of its intent to pay on a salaried basis. <u>See</u> <u>supra</u> note 7.

employment from his salary basis analysis (Berkman Report ¶ 15), yet still found underpayments in at least 20% of co-managers' workweeks and 6% of department managers' workweeks. Defendants' argument is therefore unavailing.

Defendants further protest, however, that the vast majority of weekly underpayments are the result of either inadvertent computational errors or the failure of class members to properly punch in and out of work. Defendants claim that some of its partial-day deductions may have been "inadvertent" and therefore fall within the FLSA's "window of correction," 29 C.F.R. § 541.603(c); but they fail to support this argument with reference to admissible evidence. An employer must demonstrate that it "reimburses the employees for such improper deductions" in order to invoke the window of correction. Id. Defendants never point to an improper deduction that was specifically corrected. In addition, given the sheer number of impermissible deductions, Gristede's cannot credibly claim inadvertence. Kelly v. City of N.Y., Nos. 91 Civ. 2567 (JFK), 91 Civ. 7343 (JFK), 91 Civ. 7755 (JFK), 2001 WL 1132017, at *2 (S.D.N.Y. Sept. 24, 2001) (holding that the "window of correction is not available to employers who exhibit no intention of paying the relevant employees on a salary basis" (citing Klem, 208 F.3d at 1092)). Finally, Gristede's is silent as to why the weekly wage of salaried employees was tied at all to the number of hours they were "punched in" at work. (See D. Mem. 28.) Gristede's reliance on a payment system designed to credit hourly work does not somehow excuse their failure to pay on a salary basis.

Having evaluated all of the evidence adduced by the parties, the Court must conclude that no reasonable juror could find that Gristede's intended to compensate the class members on a salary basis. Defendants cannot overcome both the overwhelming statistical evidence suggesting frequent and widespread impermissible deductions and the testimony of its payroll director, who

confirmed that class members are paid only for time worked.  The remainder of Defendants'
arguments are not supported with the credible evidence necessary to survive summary judgment.
Accordingly, class members do not receive compensation consistent with white collar
employment and Defendants cannot claim the exemption.[13]  The Court grants Plaintiffs' motion
for summary judgment on this issue.

## B.  Liability For Overtime Claims

Next, Plaintiffs seek summary judgment on Gristede's liability for back overtime pay for
co-manager class members.  Gristede's does not dispute that its co-managers worked more than
forty hours during many workweeks; in fact, they were scheduled to work fifty hours per week.
It is also undisputed that co-managers were not paid premium overtime compensation for hours
they worked in excess of forty each workweek.  Accordingly, in light of the Court's finding that
the class members are non-exempt, Gristede's is liable to the co-manager class members for
overtime compensation pursuant to 29 U.S.C. § 207(a)(1) and 12 N.Y.C.R.R. § 142-2.2.[14]

## C.  Unauthorized Overtime

Plaintiffs next argue that Gristede's maintained a company-wide policy not to pay
department manager class members for overtime hours they worked without prior authorization
(the "Unauthorized Overtime Policy").  The Court provided an extensive review of the facts
supporting Plaintiffs' contention in Torres I, noting the testimony of numerous employees that

---

[13] On the basis of this finding, the Court need not address the employer's second required showing to properly claim
the exemption: the duties test.  Executive and administrative employees are defined, not only by their receipt of a
salaried compensation in excess of $455 per week, but also by their performance of certain primary duties.  See 29
C.F.R. § 541.100(a)(2)-(4) (characterizing the duties of executive employees), 29 C.F.R. § 541.200(a)(2)-(3)
(characterizing the primary duties of administrative employees).  Here, because Defendants cannot show that class
members were compensated on a salary basis, the exemption cannot apply regardless of the types of duties
performed by the class members.

[14] At this time, the Court does not resolve the amount of damages owed to co-manager class members, which can be
set after additional proceedings. See Barfield v. N.Y. City Health & Hosps. Corp., 432 F. Supp. 2d 390, 395
(S.D.N.Y. 2006) (granting summary judgment on liability and directing counsel to submit an estimate of unpaid
wages for purposes of damages award), aff'd, --- F.3d ----, 2008 WL 3255130 (2d Cir. 2008); Bongat v. Fairview
Nursing Care Ctr., Inc., 341 F. Supp. 2d 181, 186 (E.D.N.Y. 2004) (granting summary judgment on liability—
without finalizing damages—for unpaid overtime after concluding plaintiffs were non-exempt).

Gristede's did not pay overtime to department managers unless it had been pre-approved. See

2006 WL 2819730, at **4-5. Both central office employees and store managers testified that

they eliminated overtime hours for hourly workers by editing employees' time records. See id.

Plaintiffs now seek a declaration that this policy and the payroll practices conducted thereunder

constitute a violation of the FLSA and the NYLL.

  An employer is responsible for compensating an employee for any work it suffers or

permits the employee to work. See 29 U.S.C. § 203(g). Thus, if an employer has knowledge that

an employee is working hours in excess of forty per week, it is responsible for compensating that

employee "even where the employer has not requested the overtime be performed or does not

desire the employee to work." Chao v. Gotham Registry, Inc., 514 F.3d 280, 288 (2d Cir. 2008);

see also Barfield v. N.Y. City Health & Hosps. Corp., --- F.3d ----, 2008 WL 3255130 (2d Cir.

2008). With regard to unauthorized overtime, the Department of Labor's regulations state:

> In all such cases it is the duty of the management to exercise its control and see
> that the work is not performed if it does not want it to be performed. . . . The
> mere promulgation of a rule against such work is not enough. Management has
> the power to enforce the rule and must make every effort to do so.

29 C.F.R. § 785.13. Thus, an employer with knowledge of its employees' overtime work cannot

insulate itself simply by promulgating a maximum forty-hour workweek policy. See Reich v.

Dep't of Conservation & Natural Res., 28 F.3d 1076, 1083 (11th Cir. 1994).

  In Chao v. Gotham Registry, the Second Circuit addressed the steps an employer must

take to prevent unwanted overtime. 514 F.3d at 280. In that case, a nursing referral agency

maintained a well-articulated policy that, in order to be compensated for overtime work, its

employee nurses had to notify the agency in advance and receive authorization for extra shifts.

Id. at 284. It claimed this was sufficient to disclaim compensation for unwanted overtime in

light of the fact that the nurses worked their additional hours off-site at client hospitals without

either the agency's prior knowledge or supervision. Id. at 287, 290-91.  The Second Circuit

disagreed, holding that the agency could not overcome the presumption "that an employer who is

armed with knowledge has the power to prevent work it does not wish performed," id. at 290,

because it did not demonstrate that it had adopted "all possible measures" to dissuade

unauthorized overtime, id. at 291 (citing 28 C.F.R. § 785.13).  In concluding its analysis, the

Second Circuit noted it was "skeptical whether an employer with full knowledge respecting the

activities of its employees ever lacks power, at the end of the day, to require those it retains to

comply with company rules that implicate federal law." Id.

These principles apply with even greater force to the case at bar.  Unlike the nursing

agency in Chao, which at least compensated its employees for unauthorized extra shifts with

straight-time, rather than premium, pay, id. at 284, Gristede's does not pay its department

manager class members at all for unauthorized overtime.  Gristede's offers no evidence that it

exhausted all possible options before taking this drastic measure.  The record reflects that

Gristede's undertook only minimal measures to ensure compliance.  For instance, Regional

Director Christopher Lang testified that employees were given a warning when they worked

hours in excess of their scheduled allotment, though he does not describe the nature of this

warning or indicate how often the warning was given. (Neilan Decl. Ex. FF (Lang Dep.) at

116:8-23.)  Gristede's also posted a bulletin indicating that its employees would not be paid for

extra work absent the approval of a manager. (Neilan Decl. Ex. YY (Bulletin to All Employees).)

Given that store managers observed overtime work contemporaneously and reviewed department

managers' time records after the fact in order to "correct" the hours for payroll, these efforts are

plainly insufficient to demonstrate that Gristede's took all reasonable efforts to minimize

instances of unwanted overtime.

Having established that Gristede's Unauthorized Overtime Policy was unlawful,

Plaintiffs urge that department manager class members should be accorded a presumption that all

edits to their time records were made pursuant to this unlawful policy.  In support of this

contention, Plaintiffs rely primarily on Teamsters v. U.S., 431 U.S. 324 (1977).  In Teamsters,

the Court found that Petitioners' pattern and practice of racial discrimination in violation of Title

VII of the Civil Rights Act of 1964 constituted "standard operating procedure," id. at 336, and

therefore gave rise to a presumption "that any particular employment decision, during the period

in which the [unlawful] policy was in force, was made in pursuit of that policy."  Id. at 362.

Consequently, the burden shifted to Petitioners to demonstrate a lawful basis for their

employment decisions.  Id.  Plaintiffs analogize the illegal hiring practices at issue in Teamsters

to Gristede's editing of employee time records; and claim that all such edits should be presumed

to have been performed pursuant to the Unauthorized Overtime Policy.

While the Court has determined that Gristede's Unauthorized Overtime Policy is

unlawful under both the FLSA and NYLL, it cannot conclude that Plaintiffs are entitled to the

presumption that all edits to time records were made because of this policy.  First, the cases upon

which Plaintiffs rely apply the pattern-or-practice burden-shifting analysis solely within the

context of Title VII employment discrimination cases.  See Teamsters, 431 U.S. at 324; see also

Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147 (2d Cir. 2001).  In the absence of

case law applying Teamsters-style burden shifting to FLSA violations, the Court will not apply

that analysis to the present case.[15]  Moreover, there are sufficient factual disputes over the

---

[15] Plaintiffs point to Brennan v. General Motors Acceptance Corp., 482 F.2d 825 (5th Cir. 1973), as an example of the application of the pattern-or-practice burden-shifting framework to an FLSA violation.  Brennan, however, cannot be said to reflect the Teamsters-style burden shifting Plaintiffs seek for the simple reason that it was decided four years before Teamsters.  Moreover, in sharp contrast to Teamsters' extensive Title VII burden-shifting analysis, Brennan's discussion of burden shifting in the FLSA context is highly perfunctory.  It does not provide a sufficient basis for this Court to draw a presumption in favor of Plaintiffs in the case at bar.

reasons for Gristede's edits to refrain from presuming that all such edits were made pursuant to the Unauthorized Overtime Policy.  Specifically, Gristede's contends that many of the edits Plaintiffs cite as unlawful overtime deletions actually corrected department managers' improper "punching" practices—that is, they ensured that the hour logs and payroll reflected the hours that class members actually worked.  At the remedial stage, Gristede's will have an opportunity to prove that the Unauthorized Overtime Policy was not the reason it deleted recorded work time for particular individuals, just as Plaintiffs will have the opportunity to prove that it was.  At present, there is no basis for drawing a presumption in favor of either party.

## D. Gristede's Additional Affirmative Defenses

Gristede's cannot maintain its affirmative defenses of laches, unclean hands, and waiver and estoppel.

### 1.  Laches

Laches "is an equitable defense that bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." Ikelionwu v. U.S., 150 F.3d 233, 238 (2d Cir. 1998).  "When a limitation on the period for bringing suit has been set by statute, laches will generally not be invoked to shorten the statutory period." Id. (internal quotation omitted).  Here, the doctrine is inapposite because Plaintiffs' wage and hour claims are rooted in statutory, not equitable, law, and were raised within the applicable statutory limitations period.

### 2.  Unclean Hands

The doctrine of unclean hands holds that "the equitable powers of th[e] court can never be exerted in behalf of one who has acted fraudulently, or who by deceit or any unfair means has gained an advantage." PenneCom B.V. v. Merrill Lynch & Co., Inc., 372 F.3d 488, 493 (2d Cir.

2004) (internal quotation omitted). Again, the Court need not invoke its equitable powers to adjudicate Plaintiffs' statutory claim. Defendants also fail to adduce evidence tending to show that Plaintiffs engaged in any misconduct. The doctrine is inapplicable.

### 3. Waiver and Estoppel

Finally, Defendants argue that Plaintiffs waived their wage and hour claims by failing to avail themselves of the arbitration and grievance procedures stipulated in Gristede's assorted collective bargaining agreements ("CBAs"). (D. Mem. 29-31.) As a matter of law, the CBAs cannot waive Plaintiffs' FLSA rights. See Barrentine v. Arkansas-Best Freight Sys., 450 U.S. 728, 744 (1981) (FLSA rights unwaivable). Defendants rely on Tyler v. City of N.Y., where the Court enforced an arbitration provision precisely because it did not purport to waive the plaintiffs' FLSA rights. No. 05 Civ. 3620 (SLT) (JO), 2006 WL 1329753 (E.D.N.Y. May 16, 2006). Here, however, the CBA cited by Defendants stipulates that "[t]he sole remedy for any breach or threatened breach of this Agreement shall be arbitration as provided." (D. App'x Ex. 2 at 17.) This cannot constitute a waiver.

Defendants' estoppel defense must also fail. The Second Circuit has deemed estoppel inconsistent with both the language and the policy of the FLSA. Caserta v. Home Lines Agency, Inc., 273 F.2d 943, 946 (2d Cir. 1959).

Accordingly, Plaintiff is entitled to summary judgment on these affirmative defenses.

## E. Liquidated Damages

Plaintiffs also seek a judgment that any damages they are ultimately awarded should be liquidated under the FLSA because Gristede's cannot meet its burden of demonstrating good faith and reasonableness. Under the FLSA, a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages. See 29 U.S.C. § 216(b). A

district court can deny liquidated damages, however, in an exercise of its discretion where the employer demonstrates that it acted in subjective "good faith" with objectively "reasonable grounds" for believing that its conduct did not violate the FLSA. See 29 U.S.C. § 260. As the Second Circuit recently reiterated, the employer's burden in this regard is "a difficult one." Barfield, 2008 WL 3255130, at *14 (quotation omitted). Here, Gristede's fails to make any credible evidentiary showing that it, for instance, took "active steps to ascertain the dictates of the FLSA and then act to comply with them." Id. (quoting Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 142 (2d Cir.1999)). Accordingly, Defendants cannot meet their burden, and Plaintiffs are entitled to liquidated damages as a matter of law.

**F. Statute of Limitations**

For similar reasons, Plaintiffs are entitled to a three-year statute of limitations. Given Gristede's failure to demonstrate that it undertook to inquire whether its conduct was in compliance with the FLSA, see 29 C.F.R. § 578.3(c)(3), there are no genuine issues of material fact as to whether Gristede's violations of the FLSA were willful, see 29 U.S.C. § 255(a). See Reich v. Waldbaum, Inc., 52 F.3d 35, 41 (2d Cir. 1995) (finding employer's violations willful because "the law was clear . . . that employees compensated on an hourly basis are subject to the FLSA, and that the 'bona fide executive' exemption is inapplicable to such employees").

**G. Recordkeeping**

The FLSA and its implementing regulations require employers to maintain adequate employment records. 29 U.S.C. § 211(c); 29 C.F.R. § 516.2(a)(7) (requiring that employers maintain records of "[h]ours worked each workday and total hours worked each workweek" by employees); see also N.Y. Comp. Codes R. & Regs. Tit. 12, § 142-2.6(a)(4) (requiring employers to keep records of employees' hours worked for six years). Here, there is

considerable evidence that Gristede's failed to maintain accurate records for its class member employees; however, it is equally clear that a key complicating factor in assembling such data was the failure of class members to properly "punch in and out." The Court cannot give Plaintiffs the presumption they seek given their involvement in the problem. As to this issue, Plaintiffs' summary judgment motion is denied.

## H. Gristede's Counterclaims

On April 22, 2005, Gristede's filed barebones counterclaims against Individual Plaintiffs Carlos Torres and Lewis Chewning as part of its Answer to the Plaintiffs' Second Amended Complaint, but alleged neither a statutory nor a common law basis for these counterclaims. (See Answer to 2d Am. Compl. ¶¶ 58-61 (Torres), 62-65 (Chewning).) Essentially, these same counterclaims were repeated in the Answer to Plaintiffs' Third Amended Complaint dated May 23, 2005. (See Answer to 3d Am. Compl. ¶¶ 63-70 (Torres), 71-77 (Chewning).) Now, for the first time in its opposition memorandum, Gristede's finally asserts a faithless servant claim. (D. Mem. 34.) Plaintiffs argue that these counterclaims are ripe for dismissal because: (1) the Court lacks subject matter jurisdiction over claims so factually distinct from Plaintiffs' wage-and-hour cause of action; and (2) the counterclaims are predicated on vague and conclusory evidence and do not support a cause of action under the faithless servant doctrine. As the following discussion indicates, Plaintiffs are entitled to summary judgment on both grounds.

### 1. The Faithless Servant Counterclaims

Under New York law, "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation." Phansalkar v. Andersen Weinroth & Co., L.P., 344 F.3d 184, 200, 203 (2d Cir. 2003) (internal quotation omitted). An employer is entitled to recover compensation paid to a faithless servant

upon a showing "(1) that the employee's disloyal activity was related to 'the performance of his duties,' and (2) that the disloyalty 'permeated the employee's service in its most material and substantial part.'" Sanders v. Madison Square Garden, L.P., No. 06 Civ. 589 (GEL), 2007 WL 1933933, at *3 (S.D.N.Y. July 2, 2007) (quoting Phansalkar, 344 F.3d at 200, 203).

Gristede's claims are small beer. They invoke the Individual Plaintiffs' purported misconduct in the course of their employment as co-managers. It is alleged that Torres sexually harassed coworkers and falsified information on his employment application. Gristede's claims it was forced to incur costs of $13,848.91 for an investigation of Torres's misconduct and the legal defense against the unemployment insurance claim Torres raised subsequent to his termination. The claim against Chewning, which alleges the fraudulent misuse of a customer credit card, amounts only to about $2,000 for investigation costs.

### 2. The Hearing Before Magistrate Judge Peck

Considering the flimsy nature of the counterclaims, Plaintiffs thought them to be retaliatory and filed a Motion for an Order to Show Cause on April 26, 2005 seeking injunctive and other relief, and sanctions. (See Neilan Decl., Ex. IIII.) At the April 27, 2005 hearing on the Order to Show Cause, Magistrate Judge Andrew J. Peck asked why the counterclaims were "surfacing for the first time now," and Gristede's counsel, Kevin Nash, replied, "[b]ecause the answer was served—this is the first pleading with the time to counterclaim." (OSC Tr. at 5.) Magistrate Judge Peck said the counterclaims seemed to be made for the purpose of "sending a message to people as to opt-in issues, to say hey, you opt in and we will investigate you and bring retaliation claims against you." (Id. at 4.) Nash replied, "I think it is a fair comment and I thought about it before I filed the counterclaims." (Id.) Ultimately, Magistrate Judge Peck declined to enter Plaintiffs' proposed order for injunctive relief, but noted that the counterclaims

appeared to be "somewhat retaliatory on the defendant." (Id. at 16.) Plaintiffs then filed their Third Amended Complaint stating FLSA and NYLL retaliation claims on May 3, 2005. (See 3d Am. Compl.)[16]

### 3. Analysis

### a) Subject Matter Jurisdiction Over The Counterclaims

Plaintiffs argue that the Court lacks subject matter jurisdiction over the counterclaims because they do not "derive from a common nucleus of operative facts" as Plaintiffs' overtime compensation claims and, therefore, are not subject to the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a). (See P. Mem. 34 (citing United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 725 (1966)); P. Reply 18 (same).) Gristede's fails to address this point directly, arguing instead that its counterclaims are "compulsory" under Federal Rule of Civil Procedure 13(a). (D. Mem. 32-33.) Thus, the Court addresses: (1) whether Gristede's counterclaims are compulsory or permissive under Rule 13(a); and (2) if they are permissive, whether they fall within the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

### i) The Counterclaims Are Permissive, Not Compulsory

A compulsory counterclaim is defined as:

> any claim that—at the time of its service—the pleader has against an opposing party if the claim:
> (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and
> (B) does not require adding another party over whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a). Any counterclaim that is not compulsory by this definition is considered "permissive." Fed. R. Civ. P. 13(b). The Second Circuit has instructed that:

---

[16] Plaintiffs made a final, ultimately unsuccessful attempt to urge Defendants to drop the counterclaims by a letter dated November 21, 2006 in which Plaintiffs characterized the counterclaims as "patently retaliatory" and noted their failure to state a claim—contentions they maintain in the present motion. (See Neilan Decl., Ex. HHH.)

> [w]hether a counterclaim is compulsory or permissive turns on whether the counterclaim arises out of the transaction or occurrence that is the subject matter of the opposing party's claim, and this Circuit has long considered this standard met when there is a logical relationship between the counterclaim and the main claim. Although the logical relationship test does not require an absolute identity of factual backgrounds, the essential facts of the claims must be so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.

Jones v. Ford Motor Credit Co., 358 F.3d 205, 209 (2d Cir. 2004) (internal citations, quotation marks, and brackets omitted).

Gristede's faithless servant counterclaims are clearly not compulsory; they are permissive. The Plaintiffs' wage-and-hour claims center on Gristede's chain-wide compensation practices for all co-managers and department managers. Gristede's faithless servant counterclaims are not related to any aspect of these practices; rather, they focus on discrete allegations of misconduct—sexual harassment and credit card fraud—pertaining to only two Plaintiffs. The only possible connection between Plaintiffs' overtime claims and the counterclaims is that they arise out of the same employer-employee relationship. This slender reed will not support a finding that the counterclaims are compulsory. See Williams v. Long, No. 07 Civ. 3459 (JFM), 2008 WL 2388042, at *4 (D. Md. June 11, 2008) (concluding that the defendant's counterclaims were permissive where the only connection was the plaintiff's status as an employee). In addition, the essential facts for proving the counterclaims and the overtime claims "are not so closely related that resolving both sets of issues in one lawsuit would yield judicial efficiency." See Jones, 358 F.3d at 210. The complete absence of facts in the record regarding the counterclaims, see infra Part II.H.3(b)(i), as opposed to the abundant evidence of wage-and-hour violations, demonstrates exactly that. Thus, the Court concludes that the counterclaims are non-compulsory.

### ii) The Court Lacks Supplemental Jurisdiction Over The Counterclaims

Supplemental jurisdiction exists over "all other claims" in a civil action "so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Thus, even where, as in the case at bar, the Court lacks an independent basis for its exercise of subject matter jurisdiction over permissive counterclaims, it must still determine whether the claims fall under its supplemental jurisdiction pursuant to 28 U.S.C. § 1367. See Jones, 358 F.3d at 213 (court may have supplemental jurisdiction over counterclaims even where their factual relationship to the underlying claim "is not such as would make the counterclaims compulsory"). Under the Supreme Court's classic formulation, counterclaims raising issues of state law are part of the "same case or controversy" where they share a "common nucleus of operative fact" with the plaintiff's underlying claim. Gibbs, 383 U.S. at 725; Padilla v. Clovis & Roche, Inc., No. 07 Civ. 267 (TJM), 2007 WL 4264582, at *3 (N.D.N.Y. Nov. 30, 2007). But see Jones, 358 F.3d at 213 (positing, apparently in dicta, that § 1367 may require only "'[a] loose factual connection between the claims,' a standard that appears to be broader than the Gibbs test" (quoting Channell v. Citicorp Nat'l Servs., Inc., 89 F.3d 379, 385 (7th Cir. 1996))).

Gristede's fails to make a showing sufficient to ground its counterclaims within the Court's supplemental jurisdiction. Critically, none of the events alleged in Gristede's state law faithless servant claims are relevant to Plaintiffs' overtime claims. See Bu ex rel. Bu v. Benenson, 181 F. Supp. 2d 247, 254 (S.D.N.Y. 2001) (claims were not part of the same case or controversy where state law claims "involve[d] different rights, different interests, and different underlying facts" than the federal law claims). Gristede's does not allege, for instance, that it did not pay Torres and Chewning premium overtime compensation because of their alleged

misconduct. Again, the only possible connection between the parties' claims is that they both arise out of Individual Plaintiffs' employment at Gristede's. As in the compulsory versus permissive counterclaim context, however, the employment relationship does not establish a "common nucleus of operative fact" where it is the sole fact connecting Plaintiffs' federal overtime claims and Gristede's state law counterclaims. See Wilhelm v. TLC Lawn Care, Inc., No. 07 Civ. 2465 (KHV), 2008 WL 640733, at *3 (D. Kan. Mar. 6, 2008) (dismissing state law counterclaims "[b]ecause defendant relie[d] solely on its employer-employee relationship with plaintiffs to support supplemental jurisdiction, and [did] not identify a more specific factual connection between its counterclaims and plaintiffs' FLSA claim"); Kirby v. Tafco Emerald Coast, Inc., No. 3:05CV341 (RV/MD), 2006 WL 228880, at *2 (N.D. Fla. Jan. 30, 2006) (finding that, while "[t]he FLSA claims deal[t] only with the question of the number of hours worked and the compensation paid[,]" the state counterclaims for breach of contract and non-payment of a promissory note "necessarily involve[d] different and separate factual matters"). Cf. Rivera v. Ndola Pharmacy Corp., 497 F. Supp. 2d 381, 395 (E.D.N.Y. 2007) (holding connection between plaintiff's state law sexual harassment and federal overtime claims too tenuous when based solely on employment relationship). Accordingly, Gristede's counterclaims under the faithless servant doctrine do not arise out of a "common nucleus of operative fact" and, thus, are not subject to the Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

In light of the foregoing, Gristede's state law counterclaims are hereby dismissed. In light of Plaintiffs' FLSA retaliation claims, see infra Part II.I, however, the Court addresses Plaintiffs' second argument that Gristede's counterclaims lack sufficient evidentiary support to survive the motion for summary judgment.

**b) The Counterclaims Are Ripe For Summary Judgment**

**i) Gristede's Fails To Produce Sufficient Evidence Of Misconduct**

Gristede's does not meet its burden of proving the Individual Plaintiffs' alleged misconduct underlying its faithless servant claims. As a general matter, Gristede's completely fails to cite any evidence in its memorandum in opposition to Plaintiffs' motion for summary judgment with regard to its faithless servant claims. There is not a single reference to Defendants' Counter-Statement of Material Facts in Dispute Pursuant to Local Rule 56.1(b) ("D. 56.1"), nor to Defendants' voluminous appendix of supporting exhibits. (See D. Mem. 34-35.) Gristede's fares no better in its responsive statement of facts, where its only responses to Plaintiffs' statements as to the counterclaims lack any evidentiary attribution whatsoever. (D. 56.1 ¶¶ 266-280.) Gristede's apparently neglected to consult Local Civil Rule 56.1(b), which permits non-movants to provide "additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civil Rule 56.1(b). Thus, even though Plaintiffs specifically argued that the counterclaims lacked "any factual support" (P. Mem. 34), Gristede's failed to clearly and specifically set forth evidence in the record supporting those claims. Instead, the Court was forced to do exactly what Local Civil Rule 56.1 was designed to prevent: scour the record on its own in a search for evidence which might support Gristede's contention that certain facts regarding its counterclaims were in dispute. See Global Vision Prods., Inc. v. Pfizer Inc., 04 Civ. 9198 (LAK), 2006 WL 344757, at *2 (S.D.N.Y. Feb. 14, 2006).

Gristede's cites no real evidence of the Individual Plaintiffs' alleged misconduct because whatever Gristede's has, it is plainly insufficient to sustain a cause of action under the faithless servant doctrine. As to the first counterclaim, Gristede's offers only a report dated February 17,

2004 summarizing the findings of an internal investigation into complaints of sexual harassment allegedly filed against Torres by his female co-workers. (See Appendix of Defs.' Exhibits ("D. App'x"), Ex. 37.)  Plaintiffs argue that the entire investigatory report prepared by Gristede's, including the statements of female employees and other witnesses contained therein, is hearsay and therefore inadmissible. (P. Reply 16.)  Evidence submitted in support of a summary judgment motion must be admissible at trial, and the proponent of the evidence bears the burden of showing that the evidence is admissible. See Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219-220, 222 (2d Cir. 2004) (proponent needed to submit affidavit stating that prior testimony he proferred would be admissible under Fed. R. Evid. 804(b)(1)).  Generally, an investigatory report like that prepared by Gristede's would be hearsay, and therefore inadmissible at the summary judgment stage, unless it qualified as a business record under Federal Rule of Evidence 803(6). See Vahos v. Gen. Motors Corp., No. 06 Civ. 6783 (NGG) (SMG), 2008 WL 2439643, at *4 (E.D.N.Y. June 16, 2008).  Gristede's has not authenticated the report as a business record and does not identify any other applicable exception to the hearsay rule.  Accordingly, the Court will not consider the contents of the report for the purposes of the present motion.

Aside from the inadmissible report, Gristede's offers no evidence of Torres's alleged misconduct.  It does not identify potential witnesses to corroborate its allegations nor does it put forth any formal complaints of sexual harassment.  Even though Torres is accused of misrepresenting his prior work history (see Answer to 3d Am. Compl. ¶ 69), Gristede's does not offer the testimony of Torres's prior employer, police records verifying his prior arrest, or the original employment application containing the misstatement.  Although Gristede's seeks to recover the more than thirteen thousand dollars it claims it spent in its internal investigation of

Torres's misconduct (see id. ¶ 70), it provides no itemization of the supposed costs of the investigation. In short, Gristede's offers only an ipse dixit.[17]

Gristede's second counterclaim, which alleges Chewning engaged in "fraudulent conduct involving various unauthorized credit card transactions" (id. ¶ 73), is also untenable. Gristede's offers two cashier checkout forms and a credit card receipt for $200 (see D. App'x, Ex. 37), but fails to explain the significance of these documents or how they are probative of Chewning's alleged fraud. Accordingly, this claim, too, cannot survive summary judgment. See Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) ("The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts, or defeat the motion through mere speculation or conjecture.") (internal quotations and citations omitted).

### ii) The Counterclaims Fail As A Matter Of Law

Gristede's does not even allege, let alone prove with competent evidence, that the alleged disloyal conduct "permeated the employee's service in its most material and substantial part." Sanders, 2007 WL 1933933, at *3. Poorly described and unsubstantiated incidents of alleged wrongdoing are insufficient as a matter of law to support application of the faithless servant doctrine. See Phansalkar, 344 F.3d at 201-2 & nn.12-13 (addressing requirement that agents' disloyalty is "substantial"). Nor can it be, as Gristede's apparently supposes, that every routine termination for sexual harassment or credit card fraud necessarily raises faithless servant claims.

Moreover, by seeking damages incurred in its investigations of both Torres and Chewning, Gristede's fundamentally misapplies the faithless servant doctrine. The doctrine provides that an employer is entitled to the return of compensation paid to the employee during

---

[17] The only admissible evidence in the record on this issue is Torres's deposition testimony that he did not sexually harass anyone. (See D. App'x, Ex. 21 (Torres Dep.) at 173:2-5, 182:7-183:11, 184:4-186:17, 190:13-17.)

his period of disloyalty. See Phansalkar, 344 F.3d at 200; Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc., 474 N.Y.S.2d 281, 287 (N.Y. App. Div. 1st Dep't 1984).  The doctrine derives from agency law, which provides that "[o]ne who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary." Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 928 (1977) (citing Restatement (2d) of Agency (1958), § 469).  Gristede's offers no support for its claim of entitlement to reimbursement for non-compensation expenses related to the alleged misconduct.

Accordingly, even if the Court had supplemental jurisdiction over Gristede's counterclaims, given the manifestly deficient evidentiary record, the Court would grant Plaintiffs' motion for summary judgment as to those claims.

## I. Individual Plaintiffs' Retaliation Claims:  FLSA § 15(a)(3) & NYLL § 215

As Magistrate Judge Peck surmised, these counterclaims are so flimsy that they must have been made for another purpose: to punish the Individual Plaintiffs for joining the FLSA suit and having the temerity to name certain Gristede's officers.  Plaintiffs now contend that Individual Plaintiffs Torres and Chewning are entitled to summary judgment on their claims pursuant to FLSA § 15(a)(3) and NYLL § 215 that Gristede's now-dismissed counterclaims are retaliatory.[18]  They argue that the counterclaims are a "mean-spirited, patently frivolous" attempt to deter the participation of both actual and potential class members in the present suit. (P. Mem. 35.)

---

[18] NYLL § 215 and FLSA § 15(a)(3) are "nearly identical" provisions. See Perez v. Jasper Trading, Inc., No. 05 Civ. 1725 (ILG), 2007 WL 4441062, at *7 (E.D.N.Y. Dec. 17, 2007) (finding it acceptable to rely on cases analyzing FLSA retaliation claim when adjudicating similar claims under the NYLL).  Though the Court addresses Plaintiffs' retaliation claims under FLSA § 15(a)(3), its analysis is also applicable under NYLL § 215.

The FLSA's anti-retaliation provision makes it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA] . . . ." 29 U.S.C. § 215(a)(3). At the summary judgment stage, courts address FLSA retaliation claims under the familiar "burden-shifting" framework set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248 (1981), for the analysis of claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u> <u>See</u> <u>Brock v. Casey Truck Sales, Inc.</u>, 839 F.2d 872, 876 (2d Cir. 1988); <u>Fei v. WestLB AG</u>, No. 07 Civ. 8785 (HB) (FM), 2008 WL 594768, at *2 n.2 (S.D.N.Y. Mar. 5, 2008); <u>see also</u> <u>Beltran v. Brentwood N. Healthcare Ctr., LLC.</u>, 426 F. Supp. 2d 827, 833 (N.D. Ill. 2006) ("FLSA retaliation claims are governed by the same legal analysis applicable to retaliation claims under Title VII.").[19]

In order to establish a prima facie case of retaliation under the FLSA, a plaintiff must show "(1) participation in protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." <u>Mullins v. City of N.Y.</u>, 554 F.Supp.2d 483, 488 (S.D.N.Y. 2008) (citation and internal quotation omitted). The burden of proof at the prima facie stage is <u>de minimis</u>. <u>See</u> <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 42 (2d Cir. 2000). If the plaintiff meets this burden, the defendant must offer a legitimate non-retaliatory reason for its actions. <u>See</u> <u>Holcomb v. Iona Coll.</u>, 521 F.3d 130, 138 (2d Cir. 2008). If the defendant puts forth such a

---

[19] Both Title VII and the FLSA are remedial statutes whose effectiveness depends on the employee's ability to bring claims thereunder with impunity. Thus, the same basic analysis applies to retaliation claims under either statute. <u>See</u> <u>Robinson v. Shell Oil, Co.</u>, 519 U.S. 337, 346 (1997) ("[A] primary purpose of antiretaliation provisions [is] [m]aintaining unfettered access to statutory remedial mechanisms."); <u>Darveau v. Detecon, Inc.</u>, 515 F.3d 334, 342 (4th Cir. 2008) ("Although the two statutes [Title VII and the FLSA] seek to combat separate workplace problems, the purpose of their retaliation provisions is one and the same—namely, to secure their substantive protections 'by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees.'").

reason, the plaintiff must demonstrate that there is sufficient evidence for a reasonable juror to find that the reason offered by the defendant is mere pretext for retaliation. See Weinstock, 224 F.3d at 42.

### 1. Plaintiffs' Initial Burden

Gristede's concedes that the Individual Plaintiffs satisfy the first element of a prima facie claim of retaliation,[20] but argues that the second and third showings have not been satisfied.

### a) Adverse Employment Action

In order to establish an adverse employment action, a plaintiff alleging retaliation must "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (analyzing adverse actions in the context of Title VII retaliation claims) (citations and internal quotations omitted).  Thus, the category of conduct that constitutes actionable retaliation includes more than just "adverse employment actions" or "ultimate employment decisions." Wright v. Stern, 450 F. Supp. 2d 335, 373 (S.D.N.Y. 2006) (citing White, 548 U.S. at 67).

Courts have held that baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions, even though they do not arise strictly in an employment context. See Bill Johnson's Restaurant v. NLRB, 461 U.S. 731, 740 (1983); see also Darveau v. Detecon, Inc., 515 F.3d 334, 343 (4th Cir. 2008) (finding

---

[20] There is no question that Torres and Chewning participated in a statutorily protected activity when they filed formal complaints alleging overtime violations under the Fair Labor Standards Act. See Correa v. Mana Prods., Inc., No. 04 Civ. 2344 (DGT), 2008 WL 728903, at *9 (E.D.N.Y. Mar. 17, 2008) (citing McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486-87 (10th Cir. 1996) (defining statutorily protected activity as filing or instituting a proceeding under the FLSA, or related to the FLSA, and testifying in an FLSA or FLSA-related proceeding)).  Gristede's knowledge of the Class's engagement in protected activity is also undisputed:  Gristede's answered the Class's initial complaint. See Kessler v. Westchester County Dep't of Soc. Serv., 461 F.3d 199, 210 (2d Cir. 2006) (stating that the defendant's submissions in support of its opposition motion plainly evidenced the defendant's knowledge that the plaintiff was engaging in protected activity).

allegation that plaintiff's employer filed a lawsuit against him alleging fraud with a retaliatory motive and without a reasonable basis in fact or law an actionable adverse employment action under FLSA); Centeno-Bernuy v. Perry, 302 F. Supp. 2d 128, 136 (W.D.N.Y. 2003) (reporting plaintiffs to the INS and making baseless allegations to the government that plaintiffs are terrorists, constitute an adverse employment action). Bad faith or groundless counterclaims and other legal proceedings against employees who assert statutory rights are actionable retaliation precisely because of their in terrorem effect. See Bill Johnson's, 461 U.S. at 740 (1983) (acknowledging that "by suing an employee who files charges . . . an employer can place its employees on notice that anyone who engages in such conduct is subjecting himself to the possibility of a burdensome lawsuit"); Jacques v. DiMarzio, 200 F. Supp. 2d 151, 162-63 (E.D.N.Y. 2002) (discussing retaliatory effect of bad faith counterclaim to plaintiff's NYLL claim); Gliatta v. Tectum, Inc., 211 F. Supp. 2d 992, 1008-09 (S.D. Ohio 2002) (noting the "adverse chilling effect" of baseless retaliatory counterclaims).[21]

Here, the Court has already concluded that Gristede's counterclaims have no credible evidentiary support and fail to state a cause of action under New York's faithless servant doctrine. See supra Part II.H.3(b). They are completely baseless. Furthermore, as Plaintiffs note, by countersuing, Gristede's sent both the Individual Defendants and other actual and potential class members a strong message that, by initiating and/or maintaining claims against Gristede's, they would be subject to burdensome countersuits. (P. Mem. 37.) Accordingly, the

---

[21] Gristede's does not challenge Plaintiffs' retaliation claim on First Amendment grounds. It is clear, however, that, even though "the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances," Cal. Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972), Gristede's baseless and unsupported counterclaims are not entitled to First Amendment protection, see Bill Johnson's, 461 U.S. at 743 ("The first amendment interests involved in private litigation—compensation for violated rights and interests, the psychological benefits of vindication, public airing of disputed facts—are not advanced when the litigation is based on intentional falsehoods or on knowingly frivolous claims.").

Individual Plaintiffs have established the second element of their FLSA retaliation claim: by initiating its groundless counterclaims, Gristede's engaged in an adverse employment action.

### b) Causal Connection

An inference of retaliation is established by a causal connection between the protected activity and the adverse action. Patane v. Clark, 508 F.3d 106, 115-16 (2d Cir. 2007) (addressing standard for Title VII claim). Here, the causal connection may be established by (1) "evidence of retaliatory animus directed against a plaintiff by the defendant"; or (2) a close temporal proximity between the protected activity and the adverse employment action. DeCintio v. Westchester County Medical Ctr., 821 F.2d 111, 115 (2d Cir. 1987) (Title VII).

Plaintiffs raise a compelling inference of retaliatory motive due to close temporal proximity. Initially, in their Complaint dated April 30, 2004 and First Amended Complaint dated June 29, 2004, Plaintiffs filed wage and hour claims only against Gristede's and a number of related corporate entities. (See Compl. ¶¶ 13-14; 1st Am. Compl. ¶¶ 19-20.) Almost a year later, on March 25, 2005, Plaintiffs amended their complaint to state overtime claims for the first time directly against Defendants (1) Catsimatidis, Gristede's owner, Chief Executive Officer, and President, (2) Monos, Gristede's District Manager, and (3) Balseca, Gristede's Vice President. Less than a month later, on April 22, 2005, Gristede's interposed its counterclaims against Individual Plaintiffs Torres and Chewning.

Causation can be inferred here because the 28 days between the protected activity and an adverse employment action is "very close." Clark County School District v. Breeden, 532 U.S. 268, 273-74 (2001); see also Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed., 444 F.3d 158, 168 (2d Cir. 2006) ("[T]he lapse of only several months after the letter and several weeks after the press conference between the protected speech and adverse employment action is sufficient to

support an allegation of a causal connection strong enough to survive summary judgment."); Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 555 (2d Cir. 2001) (passage of up to five months short enough for causal connection); Richardson v. N.Y. State Dep't of Corr. Service, 180 F.3d 426, 446-47 (2d Cir. 1999) (acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier). The fact that Gristede's had almost an entire year to raise its counterclaims, but chose to do so only three weeks after Plaintiffs amended their complaint to allege wrongdoing by top-level corporate executives, strongly suggests an impermissible retaliatory motive.

Other considerations strengthen this inference. First, Gristede's filed its counterclaims without stating a legal basis. This sends a strong message to other potential claimants that participation in the lawsuit will result in costly legal action, whether or not there is a legal justification for such claims. Second, by half-heartedly supporting the counterclaims and failing even to reference evidence supporting those claims in its opposition brief, Gristede's leaves no doubt that the counterclaims are frivolous and unworthy. It suggests that Gristede's does not care whether the counterclaims are successful because the real purpose of their filing—to deter other claimants—is no longer a key concern.[22]

In light of the foregoing, Plaintiffs have established a prima facie case of retaliation under the FLSA.

---

[22] Magistrate Judge Peck noted the huge disparity between the costs of litigating this matter and the amount of relief sought from Torres and Chewning (Neilan Decl., Ex. III, Apr. 27, 2005 Tr. at 9), indicating that, in his view, Gristede's would not benefit in any meaningful way from the counterclaims, even if successful. Indeed, counsel for Gristede's admitted at oral argument that he did not devote considerable attention to the counterclaims, stating "We haven't really pressed it" and "It hasn't gotten a lot of time in the case." (Transcript of Oral Argument dated Jan. 15, 2008 ("Oral Ar.") at 34.)

### 2. Defendant's Burden: A Legitimate, Non-Retaliatory Justification

Gristede's argues that, even if it is assumed that the Individual Plaintiffs could establish a prima facie case of retaliation, it has articulated a legitimate, non-retaliatory reason for filing its counterclaims—namely, that it was bound to do so under the pleading requirements for compulsory counterclaims. (D. Mem. 32-33.)  Other federal courts have held that a compulsory counterclaim is not actionable for retaliation unless it is totally baseless. See Ergo v. Int'l Merch. Servs., 519 F.Supp.2d 765, 781 (N.D. Ill. 2007). Accord Orr v. James D. Julia, Inc., Civ. No. 07-51-B-W, 2008 WL 2605569, at *17 (D. Me. June 27, 2008) ("[D]efendants' filing of the counterclaim does not generate a genuine issue of retaliatory motive, especially where [the plaintiff] fails to demonstrate in his presentation that the counterclaims are baseless on factual or legal grounds.").  Here, however, the Court has already held that Gristede's counterclaims are permissive, not compulsory, and furthermore they lack any factual basis or evidentiary support. See supra Part II.H.

Absent any additional justification, no reasonable jury could conclude on the basis of the evidence presented that the counterclaims were brought for any legitimate, non-retaliatory purpose.  Accordingly, the Court grants Plaintiffs' motion for summary judgment and finds that Individual Plaintiffs Torres and Chewning are entitled to relief for Gristede's retaliatory conduct pursuant to FLSA § 15(a)(3) and NYLL § 215.

### III. Conclusion

For the reasons stated above, Plaintiffs' motion for summary judgment is GRANTED, with the exception of its seventh issue for summary judgment—recordkeeping—which is DENIED.

The parties should meet and confer regarding matters post-summary judgment and should

contact the Court no later than Monday, September 8, 2008 to schedule a status conference. The

Clerk of Court is directed to terminate this motion.

Dated: New York, New York
      August 28, 2008

                SO ORDERED

                PAUL A. CROTTY
                United States District Judge