UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x

CARLOS TORRES, et al., on behalf of
themselves and all others similarly situated,

Plaintiffs,

vs.                                                              Case No. 04-CV-3316 (PAC)

GRISTEDE'S OPERATING CORP., et al.,

Defendants.

OSCAR AMARO, et al., on behalf of
themselves and all others similarly situated,

Plaintiffs,

vs.                                                              Case No. 08-CV-8531 (PAC)

GRISTEDE'S OPERATING CORP., et al.,

Defendants.

DAVID BARRETO, et al., on behalf of
themselves and all others similarly situated,

Plaintiffs,

vs.                                                              Case No. 08-CV-9627 (PAC)

GRISTEDE'S OPERATING CORP., et al.,

Defendants.

**DECLARATION OF JUSTIN M. SWARTZ IN SUPPORT OF
PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS**

I, JUSTIN M. SWARTZ, pursuant to 29 U.S.C. § 1746, declare under penalty of perjury as follows:

1.      I am a partner at Outten & Golden LLP ("O&G"), a 30+ attorney law firm,

headquartered in New York, New York and with offices in Chicago, Illinois and Westport,

1

Connecticut. I am the lead attorney for Plaintiffs and the Class in the above-referenced action. I am an attorney in good standing admitted to practice in the State of New York and before this Court. I have personal knowledge of the facts stated in this declaration.

2.　　　I make this declaration in support of Plaintiffs' Motion for Attorneys' Fees and Costs.

## PROCEDURAL BACKGROUND

3.　　　On April 30, 2004, Plaintiff Carlos Torres filed a class action wage and hour complaint alleging violations of the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL"). (Dkt No. 1.) He subsequently amended the complaint to add fourteen named Plaintiffs, three corporate officers as Defendants, and causes of action for fraud and retaliation. (Dkt. Nos. 10, 95, 115.) After class certification, Plaintiffs sent Court-authorized notice to approximately 482 class members, 56 of whom filed consents to join the FLSA action and 28 of whom opted out of the Rule 23 case. In total during the litigation, Plaintiffs deposed 21 Gristede's witnesses, interviewed dozens of class members and other employees, obtained supportive declarations, worked with two experts who produced reports, and analyzed volumes of hard copy and electronic time and payroll records. Gristede's deposed 14 plaintiffs and two experts.

### *Defendants Rejected Plaintiffs' Repeated Attempts to Settle the Case*

4.　　　Plaintiff Torres attempted to settle the case even prior to filing the lawsuit, but was forced to initiate the litigation when Defendants rebuffed these attempts. (*See* E-mail from Adam Klein to Randy Mastro (Apr. 13, 2004, 17:43 EST) (Ex. 16); E-mail from Adam Klein to Randy Mastro  (Apr. 27, 2004, 19:53 EST) (Ex. 17).)

5.      Until the settlement negotiations on the eve of trial that ultimately led to a resolution, the only "offer" Defendants ever made was that Plaintiffs should abandon their class claims and this litigation, and engage in arbitrations to resolve their individual claims.

6.      At the Court's direction, the parties participated in several settlement conferences in the fall of 2004 and the spring of 2005.  Defendants, however, failed to meet the agreed-upon preconditions for the negotiations and failed to make a monetary offer.

7.      First, despite agreeing to do so as a precondition for negotiations, Defendants failed to produce time records and payroll data which were necessary in order to have meaningful settlement negotiations.  (*See, e.g.*, Letter from Justin Swartz to Judge Berman (Nov. 3, 2004) (Ex. 18) (describing Defendants' failure to produce the data despite repeated promises to do so).)  When they finally produced data, it was deficient—for example, it was missing records for many class members.  (*See* Letter from Justin Swartz to Randy Mastro (Nov. 19, 2004) (Ex. 19) (enclosure omitted).)

8.      Defendants also failed to produce a witness for 30(b)(6) payroll depositions for more than 8 months.  This was also an agreed-upon precondition to settlement negotiations.  Plaintiffs asked Defendants to produce a witness approximately 18 times.  (Letter from Adam Klein to Kevin Nash (Mar. 21, 2005) (Ex. 20).)

9.      Defendants also stalled for weeks before communicating a response to Plaintiffs' settlement demand, only to restate the same unacceptable "offer" that Defendants made at the beginning of the case—that Plaintiffs abandon the putative class and litigation, and engage in individual arbitrations.  (Letter from Adam Klein to Judge Berman (Mar. 14, 2005) (Ex. 21).)  Based on this, Plaintiffs reasonably concluded that Defendants entered settlement negotiations in bad faith, solely in order to delay the prosecution of the case.

10.      Later in the case, after class certification and in response to one of my many invitations to Defendants to attempt to settle the case, Defendants' counsel, Kevin Nash, told me that Defendants were not willing to talk about settlement because he wanted to see if I "can try a case." My contemporaneous email to myself documents this statement. (E-mail from Justin Swartz to Justin Swartz (Dec. 29, 2006, 12:24 EST) (Ex. 22).)

***Defendants Filed a Meritless Motion to Dismiss Class Allegations and Retaliatory Counterclaims***

11.      Instead of attempting to settle the case in good faith, Defendants filed a meritless motion to dismiss and to strike Plaintiffs' class allegations on August 4, 2004. Before Defendants filed this motion, Plaintiffs suggested that they reconsider because Plaintiffs had already amended their complaint rendering the motion moot. (*See* Letter from Justin Swartz to Randy Mastro (June 30, 2004) (Ex. 23).) Nevertheless, Defendants filed the motion, forcing Plaintiffs to draft a substantive response, only to withdraw it after Plaintiffs had spent approximately 245 hours responding.

12.      On March 11, 2005, Defendants' counsel, Gibson, Dunn & Crutcher, LLP withdrew as counsel, and Defendants replaced them with new counsel, Finkel, Goldstein, Rosenbloom, and Nash, LLP.

13.      Through their new counsel, Defendants asserted retaliatory counterclaims against Plaintiffs Torres and Chewning in their answer to Plaintiffs' Second Amended Complaint. Plaintiffs promptly wrote to Defendants suggesting that they drop the counterclaims but Defendants refused, telling Plaintiffs, "[i]f you don't like the counterclaim, go to the Court." (Deborah Clusan Deposition 603:11-606:19, Apr. 25, 2005 (Ex. 24).)

4

14.     Plaintiffs moved for an order to show cause and temporary restraining order enjoining Defendants from further retaliation.  (Court Conference Tr. 2:1-3, Apr. 27, 2005 (Ex. 3).)

15.     Plaintiffs also filed their third amended complaint adding retaliation claims.

16.     The Court ultimately dismissed the counterclaims and granted Plaintiffs' motion for summary judgment on the resultant retaliation claims.

***Defendants Obstructed Discovery***

17.     Defendants' repeated failure to fulfill their discovery obligations in a timely manner, if at all, required Plaintiffs to engage in numerous meet and confer calls, write dozens of letters to Defendants and the Court, and appear at more than ten discovery conferences with the Court.  Defendants stalled in scheduling Rule 26(f) meet-and-confers and in proposing a discovery plan, refused to answer Plaintiffs' document requests or produce any witnesses for the depositions, and when they did produce documents did so in non-usable formats (e.g., hard copies and without bates-stamps).  For example, scheduling the initial Rule 26(f) meet-and-confer took over two weeks and several phone calls and letters.  (Letter from Justin Swartz to Randy Mastro (July 29, 2004) (Ex. 25).)  Similarly, although Defendants were quick to reject Plaintiffs' discovery plan as "totally unacceptable," they stalled for about a month—until the day before the deadline set by the Court for the parties to agree to a discovery plan—before proposing their own plan.  (*Id.* (detailing at least five attempts by Plaintiffs to have Defendants reconsider Plaintiffs' plan or make their own proposal); E-mail from Mark Bini to Adam Klein, et al. (June 24, 2004 14:56 EST) (Ex. 26).)

18.     Plaintiffs repeatedly had to seek Court intervention to obtain discovery.  (*See, e.g.*, Letter from Justin Swartz to Judge Berman (Nov. 3, 2004) (Ex. 27); Letter from Justin

Swartz to Judge Peck (May 25, 2005) (Ex. 28); Letter from Justin Swartz to Judge Peck (June 10, 2005) (Ex. 29); Letter from Justin Swartz to Judge Peck (June 21, 2005) (Ex. 30); Letter from Justin Swartz to Judge Crotty (Oct. 27, 2006) (requesting, post-certification, that Defendants produce a current class list) (Ex. 31); Letter from Molly Brooks to Judge Crotty (Jan. 27, 2009) (Ex. 32); Letter from Justin Swartz to Judge Crotty (Feb. 17, 2009) (Ex. 33).) The parties appeared at more than ten court conferences before the class certification motion could be filed, and the Court repeatedly ordered the production of documents that Plaintiffs sought, in the format that Plaintiffs requested. (*See, e.g.*, Court Conference, Apr. 1, 2005 (Docket Minute Entry) (ordering production of electronic data, ordering response to third and fourth document requests, ordering 30(b)(6) deposition to go forward); Court Conference, May 2, 2005 (Docket Minute Entry) (ordering production of additional electronic payroll data, archived time records, pre-2000 time records, emails, privilege log, and updated class list, document production supplementation).)

19.      Furthermore, even after the Court ordered production of the documents, Defendants often continued to refuse to produce the records as required, in a usable, bates-stamped format, thus requiring Plaintiffs to incur the costs of seeking additional court intervention in order to enforce the Court's orders. (*See, e.g.*, Letter from Justin Swartz to Judge Peck (Apr. 13, 2005) (Ex. 34); Letter from Justin Swartz to Judge Peck (May 25, 2005) (Ex. 28); Letter from Justin Swartz to Judge Peck (June 10, 2005) (Ex. 29); Letter from Justin Swartz to Judge Peck (June 21, 2005) (Ex. 30); Letter from Justin Swartz to Judge Crotty (Jan. 6, 2009) (Ex. 35).) The Court repeatedly warned Defendants' counsel not to violate the Court's orders and to produce documents as had been ordered, at times using the threat of sanctions. (*See, e.g.*, Court Conference Tr. 11:3-22, Apr. 14, 2005 (warning Defendants that there will be sanctions

6

for further violations of the Court's order) (Ex. 36); Court Conference Tr. 11:8-18, May 26, 2005 (telling Mr. Nash that if he can't meet a deadline set by the Court, he needs to get a stipulation or apply for an extension from the Court) (Ex. 37); Court Conference Tr. 21:4-9, May 2, 2005 (noting problems with the way Defendants have handled discovery so far and instructing them that they have to play "fast catch-up") (Ex. 38).)

20.     The depositions in this case were arduous affairs because of Defendants' disruptive behavior and deficient production of documents.

21.     Defendants also arrived late for almost every deposition, forcing Plaintiffs to sit and wait for them.  (*See e.g.* John Catsimatidis Deposition 203:2-15, Aug. 5, 2005 (Ex. 39).)

22.     At nearly every deposition, Defendants' counsel Kevin Nash made lengthy speaking objections, coached the witnesses, and/or began testifying himself.

23.     At one deposition Mr. Nash interrupted the deposition 65 times, speaking for 27.5 minutes total on the first day and 26.5 minutes total the next day.  (Jack Squicciarini Deposition 13:10-19, May 18, 2005 (Ex. 40).)

24.     At the deposition of individual defendant John Catsimatidis, Mr. Catsimatidis shouted, "You're in fantasyland" at Plaintiffs' counsel and unilaterally ended the first day of the deposition after arriving approximately 20 minutes late.  (John Catsimatidis Deposition 203:2-15, Aug. 5, 2005 (Ex. 39).)

25.     These actions wasted time and transcript space, interrupted Plaintiffs' line of questioning, and sometimes required Plaintiffs to prepare for a second day of questioning.[1]

---

[1]     Defendants' counsel also acted inappropriately when taking Plaintiffs' depositions, asking irrelevant and harassing questions and wasting even more time.  For example, Defendants persisted in asking Mr. Robert Pastorino questions about his personal life, including with whom he lived and what kind of car he drove, which have no possible relation to the subject of this lawsuit.  (Robert Pastorino Deposition 17:10-23:5, Aug. 6, 2005 (Ex. 41).)

26.     Defendants' deficient document productions further prolonged the depositions. For example: Defendants often came unprepared to depositions, requiring breaks in order to make copies of documents. (*See, e.g.*, Stephen Alan Schneider Deposition 48:20-50:18, Oct. 6, 2005 (Ex. 42).)

27.     They produced new documents during depositions that Plaintiffs had been demanding for months, sometimes requiring Plaintiffs' counsel to take breaks during the deposition to review them and determine whether the witness should be questioned on any of the new documents. (*See, e.g.*, Deborah Clusan Deposition 602:10-20, Apr. 25, 2005 (Ex. 43); Galo Balseca Deposition 183:12-24, Aug. 2, 2005 (Ex. 44) (noting that deponent's e-mails were produced in the middle of the deposition).)

28.     They produced the documents without bates-stamps, making it difficult to identify them during the deposition, forcing Plaintiffs to stamp thousands of Defendants' documents themselves, and requiring Plaintiffs to demand reproduction. (*See, e.g.*, Deborah Clusan Deposition 345:14-17, Apr. 18, 2005 (Ex. 45); Robert Montalvo Deposition 83:4-21, July 1, 2005 (Ex. 46).)

29.     Defendants also wasted time with last-minute and repetitive cancellations of depositions—including the deposition of Deborah Clusan which was noticed and rescheduled 17 times—which required Plaintiffs to prepare for the same depositions multiple times. (*See* Deborah Clusan Deposition 6:5-12, Apr. 18, 2005 (Ex. 47).)  Sometimes these cancellations occurred the day before the deposition, after Plaintiffs had prepared for it.  (E-mail from Justin Swartz to Nick Katsoris et al. (Jan. 30, 2009 14:03 EST) (Ex. 48).)  Other times, Plaintiffs were forced to cancel depositions because Defendants failed to produce necessary documents that

were long overdue.  (E-mail from Justin Swartz to Arthur Aufses (July 5, 2005 10:30 EST) (Ex. 49).)

***Defendants Refused to Stipulate to Class and Collective Certification***

30.     Prior to moving for class and collective certification, Plaintiffs suggested to Defendants that the parties negotiate a stipulation "in order to prevent all parties from accruing substantial legal fees and costs through briefing and arguing such a motion." (Letter from Justin Swartz to Kevin Nash (May 4, 2005) (Ex. 5).)  Defendants refused.  In Plaintiffs' counsel's experience, Defendants fairly often stipulate to collective action notice in order to avoid unnecessary motion practice, for this reason.

***Defendants Failed to Cooperate in the Class Notice Process***

31.     Defendants stalled in providing comments to Plaintiffs' proposed class notice, requiring Plaintiffs to file draft notices with the Court without Defendants' input in order to meet the Court's deadlines.  Despite Plaintiffs' repeated requests, Defendants refused to comment on Plaintiffs' proposed class notice for almost two weeks.  (E-mail from Adam Klein to Nick Katsoris, et al. (Oct. 24, 2006 10:27 EST) (Ex. 50); Letter from Justin Swartz to Judge Crotty (Oct. 27, 2006) (Ex. 51).)  Because the statute of limitations under the FLSA continued to run during this period, Plaintiffs were forced to apply to the Court for an order approving Plaintiffs' proposed notice and for tolling of FLSA statute of limitations.  (*Id.*)  Even then, Defendants continued to stall in providing comments to the proposed class notice, forcing Plaintiffs to file the proposed class notice on the date of the extended deadline for filing without having received a response from Defendants.  (Letter from Justin Swartz to Judge Crotty (Dec. 12, 2006) (Ex. 52).)

32.     Defendants also refused to produce a complete class list with contact information, although it was undeniably relevant to the case.  (Letter from Linda Neilan to Judge Crotty (June 19, 2007) (exhibits thereto omitted) (Ex. 53).)

33.     Defendants further objected to the common practice of having class counsel collect exclusion requests.  Defendants provided no reason for deviating from this practice and hiring a third-party.  (E-mail from Justin Swartz to Kevin Nash (Dec. 29, 2006 10:54 EST) (Ex. 54).)  They also refused to provide a concrete proposal for hiring a third party.  (E-mail from Justin Swartz to Kevin Nash (Jan. 11, 2007 17:07 EST) (Ex. 55); E-mail from Justin Swartz to Kevin Nash (Jan. 17, 2007 9:23 EST) (Ex. 56).)  Plaintiffs therefore again had to apply for Court intervention.  (Letter from Justin Swartz to Judge Crotty (Jan. 24, 2007) (Ex. 57).)  The Court ruled in Plaintiffs' favor.

***Defendants Forced Plaintiffs to File Two New Lawsuits***

34.     In the fall of 2008, Plaintiffs repeatedly asked Defendants if they would agree to allow late-filing opt-in plaintiffs to join *Torres* instead of filing new lawsuits, warning them that Gristede's would be responsible for attorneys' fees and costs related to any new suits that had to be filed.  (E-mail from Linda Neilan to Kevin Nash (Oct. 2, 2008 14:55 EST) (Ex. 7); E-mail from Linda Neilan to Kevin Nash et al. (Sept. 16, 2008 14:29 EST) (Ex. 58); E-mail from Linda Neilan to Arthur Aufses et al. (Nov. 6, 2008 15:55 EST) (Ex. 59).)  Defendants ignored this warning, resulting in the filing of the *Amaro* lawsuit on October 6, 2008 and the *Barreto* lawsuit on November 7, 2008.

35.     In my experience in dozens of FLSA cases, Defendants almost never object to late filing of consent forms.  For example, in *Cruz v. Hook SuperX, L.L.C.,* No. 09 Civ. 7717,

currently pending before this Court, Defendants' counsel Nancy Rafuse agreed to allow

Plaintiffs to file approximately thirty late consent forms.

***Defendants' Refusal to Settle Forced Plaintiffs to Prepare for Trial***

36.    Because of Defendants' refusal to discuss settlement, the case entered another

expensive discovery stage in preparation for a jury trial scheduled to commence on June 15,

2009.  During this discovery period, the parties exchanged updated responses to existing

document requests and interrogatories.  Plaintiffs also served supplemental document requests,

interrogatories, and requests for admission, and took the depositions of six of Gristede's trial

witnesses.  Defendants deposed Plaintiffs' expert witness.  Plaintiffs reviewed thousands of

pages of Defendants' time and attendance records and audits of those records, payroll records,

and other evidence of time worked by Plaintiffs and the Class Members, and calculated damages.

37.    As with the earlier discovery period, Defendants continued to refuse to produce

relevant documents in usable, bates-stamped formats, including time records, and witnesses for

depositions, again requiring Plaintiffs to apply for court intervention.   (*See, e.g.*, Letter from

Molly Brooks to Judge Crotty (Jan. 27, 2009) (Ex. 32); Letter from Justin Swartz to Judge Crotty

(Feb. 17, 2009) (Ex. 33); Court Conference Tr. 21:25-24:5, Jan. 7, 2009 (noting that Defendants

had been ordered to produce bates-stamped documents before) (Ex. 60).)

38.    Preparation for trial, including the drafting of the pre-trial statement and

preparation of exhibits and witnesses, was equally intensive.  Plaintiffs prepared dozens of the

173 individuals on their witness list as the number of representative witnesses were not limited,

prepared more than 600 exhibits, drafted trial examinations, culled data for use in demonstrative

exhibits, selected trial exhibits, and worked with a trial graphics vendor.  The parties filed

motions *in limine* and oppositions to those motions.  Defendants filed a motion *in limine* (Dkt.

No. 327) arguing that parties should be prohibited from using *any* representative evidence, which forced Plaintiffs to brief the issue in opposition and prepare many additional witnesses.  The parties filed competing jury instructions and *voir dire* questions.

39.     The parties also filed a Joint Pre-trial Statement which included proposed jury instructions and *voir dire*.  Unlike in a usual trial preparation process, however, Defendants refused to cooperate in drafting the pre-trial order.  Defendants stalled even discussing the pre-trial order, requiring Plaintiffs to apply to the Court for an extension of the pre-trial order deadline.  (E-mail from Justin Swartz to Kevin Nash (May 21, 2009 23:29 EST) (Ex. 61) ("If you refuse to cooperate, you will succeed only in wasting more of your clients' money (as you know, your client is responsible for your fees and all of ours) and making the trial much more difficult for the Court."); Letter from Justin Swartz to Judge Crotty (June 2, 2009) (Ex. 62).) Because of Defendants' refusal to cooperate in this process, Plaintiffs' counsel incurred the costs of drafting and compiling much of the pre-trial order by themselves.

### Defendants Have Failed to Make Settlement Payments and Continue to Litigate Tenaciously

40.     Defendants have now failed to make their May 2011 and June 2011 settlement payments, forcing Plaintiffs to invoke the Settlement Agreement's notice procedures and plan for collection efforts.  This may also require Plaintiffs to ask the Court to decide the summary judgment motion on Defendant John Catsimatidis' individual liability—which was briefed in 2009 and supplemented in March 2010 at the request of the Court—but has been held in abeyance until Defendants' default on the settlement payment.  (Settlement Agreement (Ex. 8).) Defendants, however, continue to force Plaintiffs to expend attorney time responding to requests to modify the payment schedule.

**ATTEMPTS AT SETTLEMENT**

41.    Plaintiffs suggested that the parties attempt to settle the case many times, both

orally and in writing.

42.    Defendants agreed to negotiate for the first time during post-summary judgment

discovery and trial preparation, after more than five years of fighting, despite more than ten

attempts by Plaintiffs to open such negotiations.

43.    I have contemporaneous notes of Defendant's counsel telling me in December of

2006 that he was not willing to talk about settlement because he wanted to see if I "can try a

case." (Ex. 22.)

44.    Among Plaintiffs' documented attempts at settlement are the following:

1.    E-mail from Adam Klein to Randy Mastro (Apr. 13, 2004, 17:43 EST):
"This document [attached complaint] is being provided to you as a draft
for the purpose of facilitating pre-filing settlement discussions and is
confidential.  I look forward to speaking with you again about this matter
once you have an opportunity to investigate the issue with your client.  We
agree to hold off on filing the Complaint until we speak again early next
week." (Ex. 16.)

*Plaintiffs' fees were $46,554.50 as of April 13, 2004.*

2.    E-mail from Adam Klein to Randy Mastro (Apr. 27, 2004, 19:53 EST):
"Please call me tomorrow to discuss this matter.  We are planning on
filing the Complaint by the end of this week if we cannot reach some
common understanding in terms of pre-filing negotiations." (Ex. 17.)

*Plaintiffs' fees were $49,152.00 as of April 27, 2004.*

3.    E-mail from Adam Klein to Randy Mastro (Nov. 5, 2004, 14:32 EST):
"This is our last attempt to reach out to your client to facilitate settlement."
(Ex. 63.)

*Plaintiffs' fees were $664,008.00 as of November 5, 2004.*

4.    Letter from Justin Swartz to Kevin Nash et al. (Oct. 3, 2006): "We suggest
that the parties discuss resolution to this matter before engaging in
expensive end-stage litigation . . . Plaintiffs are willing to consider a
modest discount to settle this matter without further contested litigation,

but the window for such is closing quickly." (Ex. 64.)

*Plaintiffs' fees were $2,290,167.50 as of October 3, 2006.*

5.     E-mail from Justin Swartz to Justin Swartz (Dec. 29, 2006, 12:24 EST): "On a telephone call today, I proposed that we talk about settling this case and Kevin Nash told me that he is 'not willing to talk about settlement.' He told me, 'I want to see if you can try a case.'" (Ex. 22.)

*Plaintiffs' fees were $2,543,688.50 as of December 29, 2006.*

6.     Letter from Linda Neilan to Kevin Nash, et al. (Sept. 2, 2008): "In light of the Court's August 28, 2008 Order and Opinion, please let us know if Defendants are interested in discussing a resolution in this matter before the parties begin to prepare for trial." (Ex. 65.)

*Plaintiffs' fees were $3,120,735.00 as of September 2, 2008.*

7.     E-mail from Justin Swartz to Kevin Nash, et al. (Dec. 2, 2008, 23:16 EST): "[W]e propose that the parties jointly request a settlement conference with Magistrate Judge Peck. As you know, given the Court's liability finding, Defendants are responsible for Plaintiffs' attorneys' fees, which are mounting quickly." (Ex. 66.)

*Plaintiffs' fees were $3,367,995.00 as of December 2, 2008.*

8.     E-mail from Justin Swartz to Arthur Aufses, et al. (Jan. 24, 2009, 8:09 EST): "As you know, because we have already prevailed on liability, your clients are jointly and severably liable for all of the fees and costs our clients incur in discovery, in trial preparation, and at trial. The depositions we have noticed for next month will be particularly costly so, even though the Court has not required us to be prepared to discuss settlement until the conference near the end of February, we suggest that you consider hiring a professional mediator and/or meeting with us this coming week to attempt to resolve the case promptly." (Ex. 67.)

*Plaintiffs' fees were $3,565,315.00 as of January 24, 2009.*

9.     E-mail from Justin Swartz to Christopher Parlo, et al. (Feb. 2, 2009, 21:12 EST): "We remain willing to discuss settlement sooner than February 23rd. Doing so could prevent plaintiffs from incurring significant fees and costs on trial experts, depositions, and other trial preparation during the next few weeks, all of which will be chargeable to defendants." (Ex. 68.)

*Plaintiffs' fees were $3,613,715.00 as of February 2, 2009.*

10.     E-mail from Justin Swartz to Christopher Parlo (Feb. 3, 2009, 0:03 EST): "To help get the process started, I propose that we meet at our office or yours sometime this week to start to attempt to create agreed formulas under which damages can be calculated and to review the form of the data together." (Ex. 69.)

*Plaintiffs' fees were $3,619,967.00 as of February 3, 2009.*

11.     E-mail from Justin Swartz to Christopher Parlo (May 27, 2009, 19:02 EST): "[I]t is in your clients' interest to get us their offer to settle the department managers sooner than later so we can start that negotiation process. Feel free to call anytime." (Ex. 70.)

*Plaintiffs' fees were $4,521,631.50 as of May 27, 2009.*

45.     On the eve of trial on or about June 5, 2009, the parties finally agreed on settlement in principle and the Court adjourned the trial date at the parties' request. However, another year and a half of negotiations ensued. The parties held many in-person and telephonic settlement meetings and attended several settlement conferences with the Court.

46.     In April 2010, the parties finally agreed on all of the settlement terms.

47.     Only one class member opted out of the final settlement and none objected.

**FEE REQUEST**

48.     After the final approval process, and after attempting to negotiate fees and costs informally, the parties sought court involvement in the award of attorneys' fees. On December 6, 2010, the Court ordered the parties to attend JAMS mediation, which they did under the supervision of Hon. John Lifland (ret.). The mediation failed after a couple of months. Although Plaintiffs have consistently attempted to engage Defendants in a negotiation to settle fees and costs, as recommended by the Court, Defendants have declined the invitation, requiring Plaintiffs to file this motion. (*See* E-mail from Justin Swartz to Christopher Parlo (June 29, 2011, 12:45:59 EST) (Ex. 71).)

49.     Plaintiffs' accrued fees as of June 26, 2011, in the amount of $5,293,853, was calculated by multiplying the number of hours that each attorney, paralegal, law clerk or file clerk recorded contemporaneously with performing the work by the actual current hourly rate that O&G charges paying clients for that individual's work.

50.     Plaintiffs made strategic choices to prosecute the case in a way that would minimize costs and fees, and attempted to save Defendants from expending more resources than necessary to defend the action.  Plaintiffs accomplished this by offering to avoid unnecessary motion practice whenever possible—for example, with the motion to dismiss, counterclaims, and motion for collective action notice, *see supra* ¶¶ 11-16, 30—and conducting informal investigations of potential witnesses with relevant knowledge instead of taking depositions.

51.     Plaintiffs further reduced costs by delegating tasks to the lowest-billing professional who could perform the task well whenever possible.  Partners, and at times, senior associates, handled strategy decisions, communications with opposing counsel, revisions of important documents, court conferences, major discovery disputes, major depositions, and communications with key witnesses.  Associates generally handled legal research, drafting correspondence, document review, communications with Defendants regarding document discovery disputes, deposition preparation, defending depositions, taking depositions of Defendants' witnesses where appropriate, drafting discovery requests and responses, and coordinating discovery responses.  Paralegals generally handled the most time-consuming projects, including handling routine Plaintiff inquiries, initial document review, identifying Defendants' production deficiencies, coordinating deposition schedules, drafting deposition notices, gathering content for declarations, reviewing, analyzing and tracking documents and gathering materials and documents for depositions.

52.     Several of the paralegals and lawyers who have been staffed on this matter are bilingual and capable of handling inquiries from clients who do not speak English.

53.     A core group of five attorneys—Adam Klein, myself, Linda Neilan, Douglas James, and Molly Brooks—worked on this case at any one point.   Of this group, only myself, Linda Neilan, and Molly Brooks performed significant work during any period.  I was a senior associate at the inception of the case.  Mr. Klein was initially the partner in charge of the case, and took a lesser role once I became the principal partner on the file.

54.     The time spent by the core group of five attorneys accounted for approximately 75% of the lawyer time billed in this case.  The remainder of attorneys' time was expended by other O&G lawyers as necessary when the litigation became particularly burdensome or to perform discrete tasks while the core team was otherwise engaged.   For example, during the three-months leading up to trial, 10 lawyers worked on the case, which is reasonable given that they were deployed strategically to perform discrete tasks for which little or no ramp-up time was necessary.

55.     Due to the large number of cases on my docket, as well as the firm's policy of staffing cases as efficiently as possible, I relied heavily on junior partners and associates in the firm to handle the day-to-day management of this and other complex litigation.  Ms. Neilan was an associate at the time of the filing of the case but became a partner during the course of litigation.  When Ms. Neilan left the firm, I delegated substantial work to Ms. Brooks, an associate.  Douglas James was an associate who worked on the matter during a time of heavy pre-class certification discovery.

56.     I instructed my staff to make substantial deductions from our actual lodestar amount.  These deductions amounted to a total voluntary cut of 12%.

57.     We made the following voluntary adjustments, in the order listed here, in the exercise of reasonableness and discretion:

1.    We do not seek recovery for time spent by attorneys who billed fewer than 30 hours on the case.

2.    We do not seek recovery for time spent on media or press related work.[2]

3.    We do not seek recovery for time spent by more than one attorney at depositions and court conferences.

4.    We discounted my own hourly rate by 11% from $675 to $600; we discounted Adam Klein's rate by 12% from to $740 to $650.

5.    I applied a 5% across-the-board reduction after all the above itemized voluntary reductions were made.

58.     Exhibit 1 is the detailed time records for this case and calculation of fees and costs that I instructed my staff to prepare.

1.    The "ALL TOTALS" page shows the total attorneys' fees and costs sought in this petition, as well as the total percentage voluntary reduction of 12%.

2.    The "TOTAL FEES" page shows a breakdown of the number of hours spent and the fees sought for each individual who billed on *Torres*, *Amaro*, and *Barreto*.  The page also includes an analysis of the hours expended by the core team of attorneys and the hours expended by attorneys and non-attorneys.

3.    The "TOTAL COSTS" page shows a breakdown by category of the costs and disbursements expended on *Torres*, *Amaro*, and *Barreto*.

---

[2]    "Town hall conferences" denote meetings with groups of clients, not media work.

4.    The "Torres-Time Records" page is the contemporaneous time records of all billers in *Torres* up to June 26, 2011, retrieved from O&G's accounting department, sorted chronologically.

5.    The "Torres-Cost Records" page is the list of costs incurred in *Torres* up to June 26, 2011, retrieved from O&G's accounting department.

6.    The "Amaro & Barreto – Time Records" page is the contemporaneous time records of all billers in *Amaro & Barreto* up to June 26, 2011, retrieved from O&G's accounting department, sorted chronologically.

7.    The "Amaro & Barreto – Cost Records" page is the list of costs incurred in *Amaro* and *Barreto* up to June 26, 2011, retrieved from O&G's accounting department.

8.    The "Total Time Record (chron)" page shows contemporaneous time records of all billers in *Torres*, *Amaro*, and *Barreto*, sorted chronologically.

9.    The "Total Time Record (by biller)" page shows contemporaneous time records of all billers in *Torres*, *Amaro*, and *Barreto*, sorted by name.

10.    The "Reduction 1 – Billers < 30hrs" page shows the effect of voluntarily reducing the fee request by not seeking reimbursement for attorneys who billed less than 30 hours.

11.    The "Reduction 2 – Media & Press" page shows the effect of voluntarily reducing the fee request by not seeking reimbursement for time spent on media and press work.

12.     The "Reduction 3 – Multiple Attorney" page shows the effect of
voluntarily reducing the fee request by not seeking reimbursement for time
spent by more than one attorney at court conferences or depositions.

13.     The "Reduction 4 – Hourly Rates" page shows the effect of voluntarily
reducing the fee request by discounting Mr. Klein's and my hourly rates.

14.     The "No. of Attys Per Period" page shows the number of hours each
attorney whose time we are seeking to be compensated for worked in each
two month period throughout the litigation.  It also shows the total number
of attorneys who were billing during each two month period and the total
number of attorneys who were billing during the three months leading up
to the trial.

15.     The "Hourly Rates" page is the current hourly rate schedule of each
individual who billed in this case, as obtained from O&G's accounting
department.  These are the rates that O&G regularly charges to their
clients and that clients regularly pay.

## OUTTEN & GOLDEN'S EXPERIENCE

59.     O&G has substantial experience and an excellent track record prosecuting large-
scale wage and hour class and collective actions like this one. *See, e.g., Hens v. Clientologic Op.
Corp.*, No. 05 Civ. 381S, 2010 WL 5490833 (W.D.N.Y. Dec. 21, 2010); *Willix v. Healthfirst,
Inc.*, No. 07 Civ. 1143, 2010 WL 5509089 (E.D.N.Y. Nov. 29, 2010); *Khait v. Whirlpool Corp.*,
No. 06 Civ. 6381, 2010 WL 2025106 (E.D.N.Y. Jan. 20, 2010); *Westerfield v. Washington
Mutual, Inc.*, No. 06 Civ. 2817, 2009 WL 5841129 (E.D.N.Y. Oct. 8, 2009); *Damassia v. Duane
Reade, Inc.*, Nos. 04 Civ. 8819, 06 Civ. 2295, 250 F.R.D. 152, 165 (S.D.N.Y. 2008); *Stefaniak v.*

*HSBC Bank USA, N.A.*, No. 1:05 Civ. 720S, 2008 WL 7630102 (W.D.N.Y. June 28, 2008); *Diaz*

*v. Scores Holding Co.*, No. 07 Civ. 8718, 2008 WL 7863502 (S.D.N.Y. May 9, 2008); *Gilliam v.*

*Addicts Rehab. Ctr. Fund*, No. 05 Civ. 3452, 2008 WL 782596 (S.D.N.Y. Mar. 24, 2008);

*Rosenburg v. IBM Corp.,* No. C06-0430, 2007 WL 128232 (N.D. Cal. Jan. 11, 2007); *Hens v.*

*ClientLogic Operating Corp.*, No. 05 Civ. 381S, 2006 WL 2795620 (W.D.N.Y. Sept. 26, 2006);

*Ansoumana v. Gristedes,* No. 00 Civ. 0253, 2004 WL 504319 (S.D.N.Y. Jan. 7, 2004).  This list

is not exhaustive.  O&G's lawyers, including those who worked on this case, almost exclusively

practice employment law and many focus their practices on class and collective wage and hour

litigation.

## RISK AND OPPORTUNITY COST

60.    This matter has required our firm to expend substantial time over a lengthy period

of time that could have been spent on other hourly fee-generating matters.  All of the attorneys at

O&G are qualified and capable of handling such matters.  The litigation consumed a high

percentage of my time, along with that of Ms. Neilan, Ms. Brooks, and our support staff.

61.    The firm expended this effort and advanced costs and expenses without any

guarantee of recovery, unlike in hourly cases where the firm is virtually guaranteed a recovery of

fees regardless of the outcome.

62.    The risk of little or no recovery is a real possibility in wage-and-hour cases.  *See,*

*e.g.*, *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2009) (affirming denial of class

certification because common questions did not predominate); *Zivali v. AT&T Mobility LLC*, No.

08 Civ. 10310, 2011 WL 1815391, at *1 (S.D.N.Y. May 12, 2011) (granting motion for

decertification on the ground that plaintiffs are not similarly situated); Judgment in a Civil Case,

*Henry v. Quicken Loans, Inc.*, No. 2:04-cv-40346 (E.D. Mich. Mar. 17, 2011) (jury verdict in favor of employer), ECF 707 (Ex. 71).

63.     Unfortunately, O&G has had its share of wage and hour cases in which we have recovered no fees or a very low percentage of our fees, including for reasons that are unforeseeable such as bankruptcy of the defendant. *See e.g. Aber-Shukofsky v. J.P. Morgan Chase & Co.*, 755 F. Supp. 2d 441, 445-52 (E.D.N.Y. 2010) (dismissing case on the basis of the Financial Institutions Reform, Recovery, and Enforcement Act after nearly a year of litigation); *Clarke v. J.P. Morgan Chase & Co.*, No. 08 Civ. 02400, 2010 WL 1379778, at *9-25 (S.D.N.Y. Mar. 26, 2010) (granting Defendants' summary judgment after nearly two years of litigation); *Alix v. Wal-Mart Stores Inc.*, 868 N.Y.S.2d 372, 373-76 (App. Div. 2008) (affirming denial of class certification after more than six years of litigation); *Lamarca v. Great Atl. & Pac. Tea Co., Inc.*, No. 601973/04 (Supreme Court, New York County) (defendant declared bankruptcy after more than three years of litigation); *Diaz v. Scores Holding Co., Inc.*, No. 07 Civ. 8718 (settling the case for sharply discounted lodestar where primary defendant is bankrupt after more than three years of litigation).

64.     O&G declines to represent dozens of potential clients, including potential class clients, each month due in part to the need to focus on prosecuting existing cases.

65.     We turned down numerous other class action cases during the pendency of this case. Many cases, for example, are referred to us each year through other firms that hope to co-counsel with us. Each year that we prosecuted this case, we had to turn away such potentially profitable cases because of the resources tied up by this case.

66.     For example, among many other cases, we have turned away potential class cases on behalf of restaurant workers, delivery drivers, appliance repair people, bank branch

employees, assistants, pharmaceutical reps, and stock brokers. Some of these cases were ultimately very profitable for other firms that took them.

67.     Many of the cases that we turned away would likely have been cases in which we recovered our full hourly rates for every hour we worked because we usually apply for, and receive, approximately one-third of the common fund. *See, e.g.*, *Willix v. Health First*, No. 07 Civ. 1143, 2011 WL 754862, at *6 (E.D.N.Y. Feb. 18, 2011) (awarding approximately $2.5 million in fees, which was approximately 1.85 times the lodestar). These awards on average compensate us for our full lodestar amount, calculated using our contemporaneously kept records and current hourly rates.

68.     It was clear from early on that this case would not result in a multiplier over lodestar, despite the significant risk. Despite the likelihood that Plaintiffs would recover less than their hourly rates and not be compensated for risk, Class Counsel continued to prosecute this case vigorously and spend the resources necessary to prevail.

## QUALIFICATIONS AND EXPERIENCE OF O&G ATTORNEYS[3]

### *Justin M. Swartz*

69.     I have served as lead counsel in many of the wage and hour cases brought by my firm. Currently, I represent workers in wage and hour lawsuits against Starbucks, JP Morgan Chase, CVS, Boston Market, KPMG, Tyson Foods, Bovis Lend Lease, and other major companies. I have also represented thousands of restaurant workers in overtime and tip theft cases against New York City restaurants and entertainers and servers who have worked at Scores and Penthouse nightclubs.

---

[3]     More details about the qualifications and experiences of O&G's attorneys can be found at the firm's website at http://www.outtengolden.com/firm/team/.

70.    Since I graduated with honors from law school in 1998, I have focused almost exclusively on employment law, representing employees.  Before joining O&G in 2003, I began my career representing workers as an associate at Goodman & Zuchlewski, LLP, in New York and Stowell & Friedman, Ltd., in Chicago.  At O&G, in addition to being a partner, I also co-chair its Class Action Practice Group (representing employees in class action wage/hour and discrimination cases), its Public Interest Committee, and its LGBT Employment Rights Practice Group.

71.    I am active in a number of bar associations and in writing and lecturing on various areas of employment law and class action issues.  I am a member of the Labor and Employment Section of the American Bar Association ("ABA") and serve as co-chair of its Annual CLE Conference Planning Committee.  I am also a member of the National Employment Lawyers Association ("NELA"), am co-chair of its Wage and Hour Committee, and serve on the Executive Board of its New York affiliate, NELA/NY.  I am a frequent lecturer on employment law topics including class and collective wage and hour litigation and ethics.

72.    I have been opposing counsel in a number of cases against Morgan Lewis, one of Defendants' law firms.  In particular, Samuel Shaulson, who bills at $713.31 per hour according to a recent court filing in *Banus v. Citigroup Global Mkts., Inc.*, No. 09 Civ. 7128 (Ex. 12), has been a frequent adversary.  The cases in which Mr. Shaulson served as opposing counsel include *Pickle v. J.P. Morgan Chase & Co.*, No. 10 Civ. 02791 (S.D.N.Y. May 19, 2010); *Clarke v. JP Morgan Chase Bank, N.A.*, No. 08 Civ. 2400 (S.D.N.Y. Mar. 26, 2010); and *Fouvolle v. J. P. Morgan Chase & Co.*, No. H-04-2219 (S.D. Tex. Jan.1, 2004).

***Adam T. Klein***

73.     Adam Klein is a partner at O&G and the co-chair of the firm's Class Action Practice Group.  He has prosecuted numerous wage and hour class/ collective actions, including those involving IBM, Whirlpool, JP Morgan Chase, and other Fortune 500 companies.

74.     Mr. Klein was selected by his peers in Best Lawyers in America and New York's Super Lawyers – Manhattan Edition 2007, 2008, 2009, 2010.  Mr. Klein is a member of NELA and of the Executive Committee of the Lawyers' Committee for Civil Rights Under Law.  He served on the Executive Board of NELA's New York Affiliate (NELA/NY) from 2000 to 2006, served on the Executive Board of the Employee Rights Section of the American Trial Lawyers Association, and is the former co-chair of the Class Action Committee of NELA.

75.     Mr. Klein has testified before Congress and the United States Equal Employment Opportunity Commission on employment-related issues and has been a guest lecturer at the United States Department of Labor and the Civil Rights Division of the United States Justice Department on the topic of enforcement of statutory civil rights.  Mr. Klein has also lectured and has participated in programs relating to employment law sponsored by NELA, the American Constitution Society, the Institute for Judicial Administration, the ABA, Cornell University, Georgetown University Law School, New York University Law School, the Law and Education Institute, the Practicing Law Institute, the Bar Association of the City of New York, the Impact Fund, the American Conference Institute, and Strafford Publications.

76.     Mr. Klein received his law degree from Hofstra University in 1990.

***Lewis M. Steel***

77.     Lewis Steel is of counsel to O&G.  Since joining O&G in 2004, Mr. Steel has worked almost exclusively on class wage and employment discrimination matters.  In 2006,

Judge Chin certified a class of black and Hispanic former and present Parks and Recreation employees represented by Mr. Steel and denied summary judgment to Defendants in substantial part. *See Wright v. Stern*, 450 F. Supp. 2d 335 (S.D.N.Y. 2006).  In a subsequent decision approving a settlement of the same matter, Judge Chin commented that Mr. Steel is a "highly respected and experienced member[] of the civil rights bar." *Wright v. Stern*, 553 F. Supp. 2d 337, 346 (S.D.N.Y. 2008).

78.     Mr. Steel received his L.L.B. degree from New York Law School in 1963, where he was editor-in-chief of the law review.  He was admitted to the New York bar in 1963.  He was awarded an honorary Doctor of Laws degree by New York Law School in 1997 for his contributions to civil rights law.

79.     He was assistant counsel and associate counsel of the National Association for the Advancement of Colored People from 1964-1968. In that capacity, he litigated discrimination cases in many different state and federal jurisdictions.

80.     Since 1964, Mr. Steel has practiced civil rights law in a number of firms, including Eisner Levy Steel and Bellman, P.C. and Steel Bellman Ritz & Clark, P.C.  While working with these firms he handled scores of employment discrimination matters, including complex class actions.  He has handled both criminal and civil cases, at all stages, has tried them to conclusion before both judges and juries and has successfully handled appeals at all stages through the Unites States Supreme Court.

81.     Mr. Steel is a former board member of the New York County Lawyers Association.

82.     He has lectured and written on employment discrimination and has been an adjunct professor of law at New York Law School. His articles have been published in law

reviews and the popular press.  He has been included in Best Lawyers in America for over twenty years.

***Linda A. Neilan***

83.     Linda Neilan received her J.D. degree with honors from Rutgers Law School in 2001.  As a law student she was awarded the Justice Henry E. Ackerson, Jr. Award for distinction in legal skills and the Kinoy-Stavis Fellowship in public interest law. Ms. Neilan clerked for the Honorable Ronald L. Ellis in the Southern District of New York from 2001 through 2002.  In October 2002, Ms. Neilan joined O&G as an associate. She became a partner in 2009 and left the firm that same year to work for the U.S. Department of State as a Foreign Service Officer.

84.     While practicing at O&G, Ms. Neilan belonged to NELA and NELA/NY; she also belonged to the Labor and Employment Law Committee of the New York City Bar Association. She was also a member of the ABA, where she belonged to the Labor and Employment Law Section's Federal Labor Standards Legislation Committee ("FLSL").  Ms. Neilan served as Co-Chair of the Family Medical Leave Act Subcommittee of the FLSL and was the Associate Editor of The Family and Medical Leave Act 2006 Supplement, which is published by BNA Books.

85.     Ms. Neilan was a frequent lecturer on employment issues, including at conferences sponsored by the ABA, the Labor & Employment Committee of the Association of the Bar of the City of New York, and NELA/NY.

86.     Ms. Neilan remains a Foreign Service Officer with the United States Department of State.

*Molly A. Brooks*

87.     Molly Brooks received her J.D. in 2004 from Northeastern University School of Law.

88.     Before joining O&G as an associate in 2008, Ms. Brooks litigated state and federal court actions on behalf of labor unions and union-affiliated health and retirement plans as an associate at Cohen, Weiss and Simon, LLP in New York.  Since joining O&G, Ms. Brooks has litigated numerous class wage and hour cases in this district and others.

89.     Ms. Brooks is a member of the Labor & Employment Committee of the Association of the Bar of the City of New York, NELA, NELA/NY, and the ABA.

## EXHIBITS

90.     Attached as exhibits to my declaration are the true and correct copies of the following:

1.     Plaintiffs' contemporaneous time records and calculations, up to June 26, 2011

2.     Court Conference Tr. 19:22- 20:7, Sept. 20, 2004

3.     Court Conference Tr. 2:1-3, 4:6-8, 13:5-6, Apr. 27, 2005

4.     Court Conference Tr. 22:5-23:3, May 26, 2005

5.     Letter from Justin Swartz to Kevin Nash (May 4, 2005)

6.     Letter from Linda Neilan to Kevin Nash (Nov. 21, 2006)

7.     E-mail from Linda Neilan to Kevin Nash (Oct. 2, 2008 14:55 EST)

8.     Settlement Agreement

9.     Letter from Justin Swartz to Kevin Nash, et al. (Oct. 3, 2006)

10.    E-mail from Justin Swartz to Kevin Nash, et al. (Dec. 2, 2008, 23:16 EST)

11.    Order, *Duran v. U.S. Bank Nat'l Ass'n*, No. 2001-035537 (Super. Ct. Cal. Dec. 16, 2010)

12.    Aff. of Samuel S. Shaulson in Support of Mot. for Attorneys' Fees and Costs, *Banus v. Citigroup Global Markets*, No. 09-07128 (S.D.N.Y. Jan. 10, 2011), ECF 50

13.    First Appl. of Morgan, Lewis & Bockius LLP For Interim Allowance of Compensation for Professional Services Rendered And for

Reimbursement of Actual and Necessary Expenses Incurred from Dec. 1, 2009 Through Feb. 28, 2010, *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. Apr. 14, 2010), ECF 2492

14.　Services Rendered By Morgan, Lewis & Bockius LLP Commencing December 1, 2009 Through February 28, 2010, *In re Chemtura Corp.*, No. 09-11233 (Bankr. S.D.N.Y. Apr. 14, 2010), ECF 2492, Ex. B

15.　Renee Flores Deposition 39:8-18, Apr. 15, 2009

16.　E-mail from Adam Klein to Randy Mastro (Apr. 13, 2004, 17:43 EST)

17.　E-mail from Adam Klein to Randy Mastro (Apr. 27, 2004, 19:53 EST)

18.　Letter from Justin Swartz to Judge Berman (Nov. 3, 2004)

19.　Letter from Justin Swartz to Randy Mastro (Nov. 19, 2004) (enclosure omitted)

20.　Letter from Adam Klein to Kevin Nash (Mar. 21, 2005)

21.　Letter from Adam Klein to Judge Berman (Mar. 14, 2005)

22.　E-mail from Justin Swartz to Justin Swartz (Dec. 29, 2006, 12:24 EST)

23.　Letter from Justin Swartz to Randy Mastro (June 30, 2004)

24.　Deborah Clusan Deposition 603:11-606:19, Apr. 25, 2005

25.　Letter from Justin Swartz to Randy Mastro (July 29, 2004)

26.　E-mail from Mark Bini to Adam Klein, et al. (June 24, 2004 14:56 EST)

27.　Letter from Justin Swartz to Judge Berman (Nov. 3, 2004)

28.　Letter from Justin Swartz to Judge Peck (May 25, 2005)

29.　Letter from Justin Swartz to Judge Peck (June 10, 2005)

30.　Letter from Justin Swartz to Judge Peck (June 21, 2005)

31.　Letter from Justin Swartz to Judge Crotty (Oct. 27, 2006)

32.　Letter from Molly Brooks to Judge Crotty (Jan. 27, 2009)

33.　Letter from Justin Swartz to Judge Crotty (Feb. 17, 2009)

34.　Letter from Justin Swartz to Judge Peck (Apr. 13, 2005)

35.　Letter from Justin Swartz to Judge Crotty (Jan. 6, 2009)

36.　Court Conference Tr. 11:3-22, Apr. 14, 2005

37.　Court Conference Tr. 11:8-18, May 26, 2005

38.　Court Conference Tr. 21:4-9, May 2, 2005

39.　John Catsimatidis Deposition 203:2-15, Aug. 5, 2005

40.　Jack Squicciarini Deposition 13:10-19, May 18, 2005

41.　Robert Pastorino Deposition 17:10-23:5, Aug. 6, 2005

42.　Stephen Alan Schneider Deposition 48:20-50:18, Oct. 6, 2005

43.　Deborah Clusan Deposition 602:10-20, Apr. 25, 2005

44.　Galo Balseca Deposition 183:12-24, Aug. 2, 2005

45.　Deborah Clusan Deposition 345:14-17, Apr. 18, 2005

46. Robert Montalvo Deposition 83:4-21, July 1, 2005

47. Deborah Clusan Deposition 6:5-12, Apr. 18, 2005

48. E-mail from Justin Swartz to Nick Katsoris, et al. (Jan. 30, 2009 14:03 EST)

49. E-mail from Justin Swartz to Arthur Aufses (July 5, 2005 10:30 EST)

50. E-mail from Adam Klein to Nick Katsoris, et al. (Oct. 24, 2006 10:27 EST)

51. Letter from Justin Swartz to Judge Crotty (Oct. 27, 2006)

52. Letter from Justin Swartz to Judge Crotty (Dec. 12, 2006)

53. Letter from Linda Neilan to Judge Crotty (June 19, 2007) (exhibits omitted)

54. E-mail from Justin Swartz to Kevin Nash (Dec. 29, 2006 10:54 EST)

55. E-mail from Justin Swartz to Kevin Nash (Jan. 11, 2007 17:07 EST)

56. E-mail from Justin Swartz to Kevin Nash (Jan. 17, 2007 9:23 EST)

57. Letter from Justin Swartz to Judge Crotty (Jan. 24, 2007)

58. E-mail from Linda Neilan to Kevin Nash, et al. (Sept. 16, 2008 14:29 EST)

59. E-mail from Linda Neilan to Arthur Aufses et al. (Nov. 6, 2008 15:55 EST)

60. Court Conference Tr. 21:25-24:5, Jan. 7, 2009

61. E-mail from Justin Swartz to Kevin Nash (May 21, 2009 23:29 EST)

62. Letter from Justin Swartz to Judge Crotty (June 2, 2009)

63. E-mail from Adam Klein to Randy Mastro (Nov. 5, 2004, 14:32 EST)

64. Letter from Justin Swartz to Kevin Nash, et al. (Oct. 3, 2006)

65. Letter from Linda Neilan to Kevin Nash, et al. (Sept. 2, 2008)

66. E-mail from Justin Swartz to Kevin Nash, et al. (Dec. 2, 2008, 23:16 EST)

67. E-mail from Justin Swartz to Arthur Aufses et al. (Jan. 24, 2009, 8:09 EST)

68. E-mail from Justin Swartz to Christopher Parlo, et al. (Feb. 2, 2009, 21:12 EST)

69. E-mail from Justin Swartz to Christopher Parlo (Feb. 3, 2009, 0:03 EST)

70. E-mail from Justin Swartz to Christopher Parlo (May 27, 2009, 19:02 EST)

71. E-mail from Justin Swartz to Christopher Parlo (June 29, 2011, 12:45:59 EST)

72. Judgment in a Civil Case, *Henry v. Quicken Loans, Inc.*, No. 2:04-cv-40346 (E.D. Mich. Mar. 17, 2011), ECF 707

I declare under penalty of perjury, under 28 U.S.C. § 1746, that the foregoing is true and

correct.

Executed this 1st day of July, 2011.
New York, New York

/s/  Justin M. Swartz
Justin M. Swartz

**Outten & Golden LLP**
3 Park Avenue, 29th Floor
New York, NY 10016
(212) 245-1000