UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------x
CARLOS TORRES, RUBEN MORA,
BOBBY IRIZARRY, LEWIS CHEWNING,          No. 04 CV 3316
GILBERTO SANTIAGO,
WILLIAM HELWIG, ROBERT MISURACA,
JOSEPH CREMA, MARIO DIPRETA,
VICTOR PHELPS, JOSELITO AROCHO,
ALFRED CROKER, DANIEL SALEGNA,
FRANK DELEON, and ROBERT PASTORINO,
on behalf of themselves and all other similarly situated,

                              Plaintiffs,

            -against-

GRISTEDE'S OPERATING CORP., NAMDOR, INC.,
GRISTEDE'S FOODS, INC., CITY PRODUCE
OPERATING CORP., GRISTEDE'S FOODS NY, INC.,
JOHN CATSIMATIDES, JAMES MONOS, and
GALO BALSECA,

                              Defendants.
--------------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE
AS TO WHY AN ORDER SHOULD NOT BE ISSUED ADJOURNING
DEFAULT DATE AND ENJOINING ENFORCEMENT OF THE ACCELERATION
PROVISION CONTAINED IN THE SETTLEMENT AGREEMENT PENDING A
HEARING OR DECISION ON DEFENDANTS' MOTION TO PERMIT NOTICE TO BE
SENT TO SETTLEMENT CLASS MEMBERS INFORMING THEM OF
GRISTEDE'S FINANCIAL DIFFICULTY AND REQUESTING THEIR
PERMISSION FOR MODIFICATIONS TO THE SETTLEMENT AGREEMENT**


                              Of Counsel:
                              Kevin J. Nash
                              Christopher A. Parlo
                              Amanda N. Slatin

## PRELIMINARY STATEMENT

The significant change of circumstances relating to the continued deterioration of Gristede's financial condition since the Settlement Agreement was executed and approved in this matter has created an urgency for certain modifications of the existing monetary terms of the Settlement Agreement. Although the parties have discussed these modifications in good faith, Plaintiffs' counsel appears unwilling to fully agree to Defendants' proposed, and badly needed, modifications to the Settlement Class Members. Accordingly, Defendants have no choice but to file with this Court today a Motion to permit notice to be sent to Settlement Class Members informing them of Gristede's financial difficulty and requesting their permission for modifications to the settlement agreement.

Because of Gristede's continued financial difficulty, it finds itself in arrears under the Settlement Agreement. As a consequence, Plaintiffs can proceed to enter a large judgment against Gristede's on Monday, July 25, 2011 for the balance of the Settlement amount in excess of $2.0 million. Invocation of the "acceleration" provision and entry of a multi-million dollar judgment will result in disastrous consequences to the company and prevent normal operations. Indeed, such action may leave Gristede's little option except to file for bankruptcy, jeopardizing the livelihood of its over 1,500 employees. Bringing the company to the precipice does no good to anyone. Settlement Class Members who are entitled to payments under the terms of the Agreement will be denied their settlement share -- money that Gristedes is more than willing to pay but will be unable to if the "acceleration" provision is triggered. Accordingly, Defendants respectfully submit this Memorandum of Law in support of their order to show cause directed to Plaintiffs as to why an order should not be issued: (1) extending the "acceleration date," which is currently set for Monday, July 25, 2011, contained in the Settlement Agreement; and (2)

DB1/ 67657602.2

enjoining Plaintiffs from seeking enforcement of the "acceleration" provision contained in the

Settlement Agreement at Paragraph VI.3.1(G), pending a hearing or decision on Defendants'

Motion to permit notice to be sent to settlement class members informing them of Gristede's

financial difficulty and requesting their permission for modifications to the settlement agreement.

## I.    PROCEDURAL AND FACTUAL HISTORY

### A.    The Relevant Elements of the Settlement Agreement

At its core, the Settlement established a Total Settlement Fund of $3,530,000, to fund two

separate pools of money, for Department Managers and Co-managers, itemized as follows:

      (a)    $2,235,000 Department Manager Settlement Fund

      (b)    $1,255,000 Co-Manager Settlement Fund[1]

See Settlement Agreement ("Stlmt Agmt") Sections 1.39, 1.15, 1.8, attached to the Affirmation

of Kevin J. Nash (the "Nash Aff.") as Exhibit ("Ex.") 1. Because it already was facing cash flow

issues, the parties agreed that Gristede's could fund the settlement payment on an installment

basis, with an initial lump sum deposit of $425,000 by May 31, 2010, and twenty-one monthly

payments of $115,000 thereafter. Stlmt Agmt §§ 3.1(B), (C).

An "acceleration" provision was also included in the Settlement Agreement in the event

Gristede's did not make two installment payments after a cure period. Under the terms of the

"acceleration" provision, upon certain conditions being met Gristede's would be required to pay

the full remaining amount of the Settlement Payment, all remaining interest accrued under the

terms of the Settlement Agreement, and any remaining attorneys' fees and costs awarded by the

Court or agreed to by the parties. Nash Aff., Ex. 1 at ¶ VI.3.19(G). On Monday, July 25, 2011,

all extensions will expire, leaving Gristede's absolutely vulnerable to a crushing judgment.

---

[1] Capitalized terms are intended to have the same meaning as in the Settlement Agreement.

**B.    The Decline in Gristede's Financial Condition**

In June 2009, Gristede's, in good faith, entered into the Settlement and has made

significant payments into the Settlement Fund. Indeed, the first scheduled distribution to

settlement class members (of over $1,000,000) has already been made. Nash Aff. ¶4. However,

in the time since the Settlement was reached, Gristede's financial circumstances (and that of the

New York supermarket industry in general) have changed significantly. The A&P bankruptcy

proceeding, filed in December 2010, is a vivid highlight of the problems facing the supermarket

industry in New York City. Moreover, that filing directly impacted Gristede's as it led to a

severe tightening of credit by suppliers.

In the seven (7) fiscal quarters since June 1, 2009, Gristede's has incurred net losses in

excess of $10 million, exclusive of charges related to the settlement of the class action lawsuit.

See Declaration of Mark Kassner (the "Kassner Declaration" or "Kassner Decl.") attached to the

Nash Aff. as Ex. 2, at ¶ 3. While Gristede's has taken steps to address its financial problems, a

weak economy and fierce competition has resulted in a significant decline in revenue. Kassner

Decl. ¶ 4. During the quarter ended May 31, 2011, total revenue was down 13% compared to the

same quarter in 2009. Kassner Decl. ¶ 4. At the same time, external factors, such as the

December 2010 bankruptcy of A & P have resulted in Gristede's lenders and suppliers being far

less flexible in extending traditional credit terms – further eroding Gristede's liquidity. Kassner

Decl. ¶ 5.

In addition, despite a roughly $4,200,000 net increase in its bank credit line in October

2010, availability under the company's $22,500,000 credit facility averaged less than $750,000

during the past three months, which availability is not sufficient to finance operations through

Gristede's typically slow summer season. Kassner Decl. ¶ 6. While Gristede's has asked its

bank for relief, that amount will be barely sufficient to fund the Company's operations through

4

the end of the year, let alone enable the Company to make payments under the Settlement as it is currently structured. Kassner Decl. ¶ 6. Indeed, Gristede's has already defaulted on several monthly settlement installments, and therefore already owes several hundred thousand dollars to the Settlement. Kassner Decl. ¶ 6. See default letters from Class Counsel attached to the Nash Aff. as Ex. 3.[2]

The question is not Gristede's willingness to pay its obligations to participating Settlement Class Members, but its actual ability to pay -- which will only decrease and become virtually non-existent should the "acceleration" provision come into play. Kassner Decl. ¶ 7. Indeed, acceleration of all settlement payments, along with interest and attorneys' fees, would likely render Gristede's insolvent and leave its employees in great peril.

## C. The Settlement Modifications That Are Needed

Based upon Gristede's difficult and worsening financial condition it has been forced to make and implement tough decisions, including the closing of stores and the laying off of employees. Nash Aff. ¶ 5. More difficult decisions and curative steps will be needed to see Gristede's through this situation. In that context, Gristede's has moved this Court to seek authorization to modify the existing Settlement Agreement as follows:

First, Gristede's simply cannot afford to make charitable contributions when it is behind on its existing monthly settlement payment installments and is facing the risk of bankruptcy. Accordingly, Gristede's would like to take the $200,000 from the Remainder Fund which is now slated to be paid to charity and use it to pay some of the settlement payments due to the Settlement Class Members. That would also reduce Gristede's obligations under the Settlement

---

[2]  Class Counsel have also refused to extend a date upon which the full balance of the settlement payments would become due because of the current defaults and Gristede's inability to cure them within the past two months beyond July 25, 2011. Stlmt Agmt § 3.1(G).

5

and leave the $200,000 available for payroll and other operating expenses. This would not result in any loss to any Settlement Class Member and would help save the remaining settlement payments and jobs of many of them.

Second, the Settlement Agreement currently calls for monthly settlement payments of $115,000. Stlmt Agmt §§ 3.1 (C). This is particularly burdensome during summer months when sales are down due to vacations and customers otherwise not being in New York City. Gristede's would like to reduce these monthly payments to $50,000 per month and be excused entirely from having to make payments in May, June, July and August. This accommodation would not reduce at all the $2,604,000 to be paid to the participating Settlement Class Members, but would simply extend the amount of time which Gristede's would have to pay that full amount. Gristede's would continue to be responsible to pay interest on the outstanding amount until the debt is fully paid. Again, this would not result in any loss to any Settlement Class Member.

Third, Gristede's would like to be excused from having to redistribute the settlement shares of the individuals who chose not to participate in the Settlement. Every putative settlement class member was given a detailed notice and opportunity to participate in the Settlement. 219 individuals chose not to do so. Under the terms of the Settlement, the amounts they rejected are to be redistributed among the individuals who chose to participate. Given its significant financial difficulties Gristede's would like that redistribution to be cancelled so financial resources can be devoted to those class members that actually filed claims. This would not diminish in any way the settlement share that Settlement Class Members were offered to participate in the Settlement and which would have been the maximum they could have received

DB1/ 67657602.2

if all individuals had chosen to participate in the settlement. Given the difficult financial

conditions, redistribution is a luxury which Gristede's cannot possibly afford.

In exchange for these modifications, Gristede's is willing to establish a letter of credit to

pay the participating Class Members the balance of their full settlement shares. If Gristede's

cannot make those payments or becomes insolvent, plaintiffs' only option is to reactivate highly

disputed claims against John Catsimatidis individually, and Defendants do not believe such an

effort would be successful.

Instead, as part of the modifications, Gristedes' proposes to have a direct collateral source

available to guaranty the payment of the remaining settlement payments as restructured, with

interest, until the debt is fully paid.[3]

### D.       Defendants' Efforts To Meet and Confer with Class Counsel

Defense Counsel Kevin Nash first wrote to Class Counsel about this issue on May 2,

2011. Mr. Nash received no written response. Defendants also asked for a conference with the

Court to discuss these issues, which plaintiffs opposed. On June 13, 2011, the Court Ordered

that, "[t]here is no need for a conference at this time. The absence of a conference is not

intended to prosecute any rights either party may have." Dkt. No. 371. Counsel for the parties

continued to discuss the possible modifications over the last several weeks and Gristede's made a

payment of $115,000 to reduce the arrears to two months. Additional counter proposals have

been forwarded by Gristede's, and are still under review by Class Counsel. However, Class

Counsel indicated late in the day on July 22, 2011 that it refuses to extend a critical deadline of

Monday July 25, upon which acceleration of the full remaining settlement amount would become

---

[3]  Gristede's has offered to provided Class Counsel with financial records of Gristede's and the Red
Apple Group to confirm Gristede's financial condition and the ability of Red Apple Group to serve as a
guarantor.

immediately due and payable, together with other onerous (and disastrous for Gristede's)

financial terms. Accordingly, the only option Defendants have is to file a motion for relief even

though we hope to continue with the discussions with Class Counsel following such filing. As

that motion is currently pending, Defendants have filed the instant Order to Show Cause seeking

to further extend the July 25, 2011 acceleration date and enjoin Plaintiffs from enforcing the

"acceleration" provision until Defendants' motion has been decided.

## II.   ARGUMENT

The resulting harm caused by (1) not adjourning the July 25, 2011 acceleration date, and

(2) permitting enforcement of the "acceleration" provision, will cause Gristede's irreparable

harm. Further, Plaintiffs will be harmed because they could lose the ability to receive the

balance of settlement payments which they are due if Gristede's fails -- payments that Gristede's

is willing and able to pay, with certain modifications to the payment terms. Accordingly,

Gristede's respectfully requests this Court to issue an order to show cause directed to Plaintiffs

as to why an order should not be issued: (1) extending the "acceleration date," which is currently

set for Monday, July 25, 2011, contained in the Settlement Agreement; and (2) enjoining

Plaintiffs from seeking enforcement of the "acceleration" provision contained in the Settlement

Agreement.

### A.   The Standard For Preliminary Injunctive Relief

To obtain preliminary injunctive relief in the Second Circuit, the moving party must

establish: "a showing of (a) irreparable harm and (b) either (1) likelihood of success on the

merits or (2) sufficiently serious questions going to the merits to make them a fair ground for

litigation and a balance of hardships tipping decidedly toward the party requesting the

preliminary relief." Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.

1979); cf. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, ——, 129 S.Ct. 365, 374 (2008)

8

("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.") (internal citations omitted); Oneida Nation of New York v. Cuomo, Nos 10-4265, 10-4272, 10-4598, 10-4758, 10-4477, 10-4976, 2011 WL 1745008, at *6 (2d Cir. May 9, 2011) (moving party must show that a preliminary injunction is in the public interest) (citing Winter., 555 U.S. 7, ——, 129 S.Ct. at 374)).

Even after the Supreme Court articulated in Winter its standard for obtaining a preliminary injunction, the Court of Appeals has continued to find that a district court may grant a preliminary injunction where, "instead of a likelihood of success on the merits, the plaintiff shows 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" See Habitat for Horses v. Salazar, 745 F. Supp. 2d 438, 447 (S.D.N.Y. 2010) (quoting Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund, 598 F.3d 30, 35, 38 (2d Cir. 2010); see also Oneida Nation of New York, 2011 WL 1745008, at *6 (recognizing "serious questions" standard as applicable Second Circuit law) (internal quotation marks and citation omitted); Metro. Taxicab Bd. of Trade v. City of New York, 615 F.3d 152, 156 (2d Cir. 2010) (same). cf. DAG Jewish Directories, Inc. v. Y & R Media LLC, No. 09 Civ. 7802, 2010 WL 46016, at *1(S.D.N.Y. Jan. 7, 2010) (recognizing possible conflict between Supreme Court's formulation of preliminary injunction test and the standards applied by the Second Circuit).

Recently, the Court of Appeals acknowledged the virtue of the "serious questions" standard, which has been in place in "[f]or the last five decades," by observing that such an inquiry "permits a district court to grant a preliminary injunction in situations where it cannot

determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." See Citigroup Global Mkts., Inc., 598 F.3d at 35. Here, the costs of enforcing the "acceleration" provision of the Settlement Agreement, which would likely result in Gristede's having to shutter its stores, causing more than a thousand local residents to lose their jobs, far exceeds whatever benefit Plaintiffs can hope to gain from their blinkered and unyielding stance.

Moreover, as demonstrated below, under both the test adopted in Winter and the preliminary injunction standards applied by the Second Circuit, Defendants have shown that Plaintiffs should be enjoined from enforcing the "acceleration" provision of the Settlement Agreement.

          1.     Gristede's Will Suffer Irreparable Harm If Plaintiffs Are Not Enjoined From Enforcing The Acceleration Provision of the Separation Agreement.

In determining whether the moving party has demonstrated irreparable harm, courts examine whether the alleged injury is "neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits . . . to resolve the harm." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007). A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." Id. (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1998). Moreover, irreparable harm exists where monetary damages would be an inadequate remedy the harm alleged. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 19-20 (1st Cir. 1996) (finding irreparable harm where party established that it "would lose incalculable revenues and sustain harm to its [corporate] goodwill" in the absence of injunctive relief).

Here, there can be no doubt that Defendants would be irreparably harmed by the

enforcement of the "acceleration" provision of the Separation Agreement. Simply put, exposing a company such as Gristede's with its already difficult financial situation to a multi-million dollar judgment, represents a quintessential example of irreparable harm, and that is exactly the outcome that will likely follow if Defendants' motion is not granted. See, e.g., John B. Hull, Inc. v. Waterbury Petroleum Prods., 588 F.2d 24, 28 (2d Cir. 1978) cert. denied, 440 U.S. 960, 99 (1979) (irreparable injury shown where loss of customers would likely force moving party out of business); United Farm Workers v. Chao, 593 F. Supp. 2d 166, 169 (D.D.C. 2009) ("In the business context . . . the well-established exception to the rule [regarding injunctive relief for monetary damages] is that if the potential harm could threaten the very existence of the business, a court may deem such harm irreparable."); Register.com, Inc. v. Verio, Inc, 126 F. Supp. 2d 238, 252 (S.D.N.Y. 2000) ("A showing that a [party] may suffer a substantial loss of business if relief is not granted meets the standards for interim relief.") (citing Doran v. Salem Inn, Inc., 422 U.S. 922 (1975)) ; Emons Indus., Inc v. Liberty Mut. Ins. Co., 749 F. Supp. 1289, 1294 (S.D.N.Y. 1990) ("It is firmly established that [a] threat to the continued existence of a business can constitute irreparable injury warranting the issuance of a preliminary injunction.") (internal quotations and citation omitted); USA Network v. Jones Intercable, Inc., 704 F. Supp. 488, 491 (S.D.N.Y.1989) (recognizing that "threaten[ed] [ ] destruction or catastrophic impairment of an ongoing business" represents irreparable harm) (internal citations omitted); Stanley–Fizer Assocs., Inc. v. Sport–Billy Prods. Rolf Deyhle, 608 F.Supp. 1033, 1035 (S.D.N.Y. 1985) ("A loss of business that is commercially life-threatening can constitute irreparable harm and can warrant a grant of a preliminary injunction.") (internal citations omitted).

Further, the Supreme Court has specifically observed that the prospect of bankruptcy caused by business losses is "certainly" a sufficient basis to establish the type of injury required

DB1/ 67657602.2

to grant a preliminary injunction. <u>See Doran.</u>, 422 U.S. at 932 (affirming district court's decision to grant injunctive relief where movants demonstrated that suffering a "substantial loss of business and even bankruptcy" constituted irreparable harm). Indeed, the Second Circuit has recognized that a potential bankruptcy is precisely the kind of damage where monetary compensation would be an inadequate remedy. <u>See</u> <u>Tucker Anthony v. Schlesinger</u>, 888 F.2d 969, 975 (2d Cir. 1989) (finding irreparable harm where, absent issuance of a preliminary injunction, moving party faced imminent bankruptcy); <u>cf.</u> <u>Guidance Endodontics. LLC v. Dentsply Int'l, Inc.</u>, 633 F. Supp. 2d 1257, 1278, 1289 (D.N.M. 2008) (granting injunctive relief to party that established irreparable harm by showing that it faced significant business losses and the "possibility of bankruptcy").

Here, Plaintiffs' insistence on enforcing the "acceleration" provision of the Settlement Agreement, threatens the company's very existence. Such developments would, in turn, have devastating consequences for the more one thousand Gristede's employees and their families who depend on the company for their financial well-being and security. By any measure, the harm Defendants' face qualifies as an irreparable injury.

           2.    <u>Gristede's Is Likely To Succeed On The Merits Of Its Claims</u>

Pursuant to Federal Rule 60(b)(5) or (6), a party may petition the court for relief from an order, judgment or proceeding if (1) enforcing the agreement is "no longer equitable" or (2) "any other reason . . . justifies relief." Fed. R. Civ. P. 60 (b) (5) and (6). If a party's circumstances change, such it is "no longer equitable that the judgment should have prospective application," a party may move for relief pursuant to Rule 60(b)(5). <u>Lee v. Marvel Enters., Inc.</u>, 765 F. Supp. 2d 440, 451 (S.D.N.Y. 2011). Moreover, because "discretionary relief sought under Rule 60(b)(5) is equitable in nature" courts should consider "whether the moving party has acted equitably or suffers from unclean hands." <u>Id.</u>

In <u>Rufo v. Inmates of the Suffolk County Jail</u>, 502 U.S. 367 (1992), the Supreme Court

clarified the standards for obtaining relief under Rule 60(b)(5) and (6).  There, the Court

overturned the narrow "grievous wrong" standard established in <u>U.S. v. Swift & Co.</u>, 286 U.S.

106 (1932), holding that Rule 60(b) mandated courts to adopt a more flexible approach to

dealing with the unforeseen circumstances that can affect parties subject to a court order,

judgment or proceeding.  The Court's reasoning in <u>Rufo</u>, is particularly instructive in this matter,

where a flexible approach is the appropriate response to addressing the changed circumstances

impacting the Settlement Agreement:

> Rule 60(b)(5) provides that a party may obtain relief from a court order when 'it
> is no longer equitable that the judgment should have prospective application,' not
> when it is no longer convenient to live with the terms of a consent decree.
> Accordingly, a party seeking modification of a consent decree bears the burden of
> establishing that a significant change in circumstances warrants revision of the
> decree. If the moving party meets this standard, the court should consider whether
> the proposed modification is suitably tailored to the changed circumstance.
>
>                        * * *
>
> A party seeking modification of a consent decree may meet its initial burden by
> showing a significant change either in factual conditions or in law.  Modification
> of a consent decree may be warranted when changed factual conditions make
> compliance with the decree substantially more onerous.

502 U.S. at 383-384.

Defendants' dire financial condition is clearly a significant change that warrants

modification of the Settlement Agreement.  Enforcing the "acceleration" provision would not

merely be onerous on Defendants -- it would be potentially ruinous for Gristede's and its more

than 1,500 employees.

3.   The Balance of Equities And The Public Interest Clearly Support Issuance
     Of An Order to Show Cause And a Preliminary Injunction.

To the extent the Court considers factors beyond (1) the irreparable harm that Gristede's

will suffer absent an order enjoining Plaintiffs from enforcing the "acceleration" provision of the

Settlement Agreement, and (2) the strong likelihood that Gristede's will succeed on the merits,

the balance of equities and the public interest also weigh heavily in favor of granting Gristede's

injunctive relief. In stark contrast to the financial ruin Gristede's faces, Plaintiffs will not be

harmed if injunctive relief is granted, and, in fact, stand to benefit from the relief sought by

Defendants. Indeed, it does not serve anyone's interest to pursue a course of action that could

result in the collapse of a local business that has served the community for decades. And

Gristede's employees and their families are not the only one who will bear the burden of the

consequences of enforcing the "acceleration" provision ; regrettably, the food and beverage

vendors that do business with Defendants will also be adversely and severely impacted by

interruption in normal operations.

## CONCLUSION

For all of the foregoing reasons, Gristede's respectfully requests that the Court issue an

order to show cause directed to Plaintiffs as to why an order should not be issued: (1) extending

the "acceleration default date," which is currently set for Monday, July 25, 2011, contained in

the Settlement Agreement; and (2) enjoining Plaintiffs from seeking enforcement of the

"acceleration" provision contained in the Settlement Agreement at Paragraph VI.3.1(G), pending

a hearing or decision on Defendants' Motion to permit notice to be sent to settlement class

members informing them of Gristede's financial difficulty and requesting their permission for

modifications to the settlement agreement.

14

DB1/ 67657602.2

Dated: July 22, 2011
       New York, New York

                    GOLDBERG WEPRIN
                    FINKEL GOLDSTEIN LLP
                    Attorneys for the Gristede's Corporate Defendants
                    1501 Broadway, 22nd Floor
                    New York, New York 10036
                    (212) 221-5700

                    By: _____
                              Kevin J. Nash
                           A Member of the Firm